# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CASE NO.: 8:23-cv-02996-VMC-AEP

JESSE LEE,

      Plaintiff,

vs.

CITY OF GULFPORT and
JAMES O'REILLY

      Defendants.

_____/

## DEFENDANT, JAMES O'REILLY'S
## MOTION FOR FINAL SUMMARY JUDGMENT

COMES NOW, Defendant, JAMES O'REILLY ("Mr. O'Reilly"), by and through the undersigned counsel, pursuant to Federal Rule of Civil Procedure 56, and hereby files his Motion for Final Summary Judgment, and states:

## INTRODUCTION

This is a case involving a city and its representatives engaging with an individual in an honest attempt to be helpful, only to be met with a multi-year campaign of vitriol, rage-filled and loud tirades, violence, threats of violence, and contempt when their answers and input did not fulfill Plaintiff's expectations. Plaintiff's Amended Complaint is devoid of any factual details of Plaintiff's own actions, which, when considered as the proper context for the City's actions in this case, fully explain the basis for its decisions and show that Plaintiff's constitutional rights were not violated.

## Statement of Material Facts

1.    Plaintiff's Amended Complaint centers around his putative inability initially to operate his ice-cream cart attached to a bicycle, or wheels, and sell frozen, prepackaged ice cream, as well as his subsequent and varied interactions with City representatives, both contemporaneously with his attempts to operate said cart and subsequently, and his resulting frustration and seemingly incorrigible misinterpretation or misunderstanding of the laws that regulate such vendors, particularly in Gulfport. [Doc. 28]

2.    Plaintiff, JESSE LEE ("LEE," or "Plaintiff"), moved to the City of Gulfport, Florida in October 2018. [*Id.* at ¶ 14]

3.    Shortly thereafter, sometime in December 2018 or January 2019, he decided that he wanted to open and run a mobile ice-cream vending business. [*Id.* at ¶ 15; Part One of Deposition of Jesse Lee, attached as Ex. "A," 26:10-20]

4.    In early 2019, LEE met with the City Manager for the City of Gulfport, Defendant James O'Reilly ("Mr. O'Reilly"), regarding his desire to start a mobile vending business. [Ex. A, 35:25–36:4] He alleges, but cannot prove, that he applied for a permit in January 2019 to operate it but was denied, and that he was told that mobile vending was not allowed. However, there is no evidence whatsoever, other than Plaintiff's self-serving statements, of his having ever applied for any sort of permit with either the City of Gulfport or the Gulfport Merchants Association, which handles special events in the City of Gulfport, nor any testimony suggesting this, in fact, occurred. [Plaintiff Jesse Lee's Responses to Defendant City of Gulfport's Third

Request to Produce to Plaintiff (Response to Request No. 2) and Defendant, City of Gulfport's Third Request to Produce to Plaintiff, attached collectively as Ex. "B"]

6.      Mobile vendors of all varieties have only ever been allowed on the City's public rights-of-way as part of special events, for which portions of the City code can be waived temporarily as to those events. [Doc. 66-1, 93:19–94:7; Ex. A to Affidavit of Justin Shea, attached as Ex. "C," ¶ 1a]

7.      LEE had two in-person discussions with Mr. O'Reilly in early 2019 regarding the mobile vending laws in the City of Gulfport. [Ex. A, 49:4–50:7, 50:20-22]

8.      At that time, Mr. O'Reilly informed Plaintiff of the City's then-policy, which was that mobile vending of any variety was not permitted. [*Id.*, 51:1-24] This is a longstanding policy within the City. [correspondence restating the policy repeatedly with other inquiring individuals over an extended period of time, attached as Ex. "D"]

10.     Beach Boulevard, where LEE always attempted to operate his ice cream cart, is a relatively narrow road, with small, brick-and-mortar businesses lining both sides, that leads down to the Gulfport Casino and Tampa Bay. [Affidavit of James O'Reilly, attached as Ex. "E," ¶ 17] The City has a policy of protecting its small, brick-and-mortar businesses against competition from food trucks and other mobile vendors which do not have the overhead or expenses they do, and who might attempt to show up on the right-of-way adjacent to their businesses and compete with them. [Deposition Transcript of Defendant, James O'Reilly, attached as Ex. "F," 16:6-11]

11.     Per the affidavit provided by Mr. O'Reilly's assistant, Lori Roach, which incorporates her previously recorded recollections from that time, Plaintiff spoke with Mr. O'Reilly on Tuesday, January 22, 2019, over the phone and in person on Tuesday, January 22, 2019, and on Monday, February 4, 2019 at City Hall. [Affidavit of Lori Roach, attached as Ex. "G", at ¶¶ 5-6; *see also* Ex. A, 50:20-21]

12.     At both of his in-person meetings with Mr. O'Reilly in early 2019, LEE became verbally abusive and profane with Mr. O'Reilly and was constantly interrupting and shouting over him. LEE became increasingly confrontational and profane as the meetings progressed. [Ex. G at ¶¶ 5-6] The first in-person meeting lasted for roughly 30 minutes, while the second one lasted approximately 45 minutes. *Id.*

12.     Plaintiff himself does not deny that the meetings he had with Mr. O'Reilly got heated and contentious, or that he repeatedly interrupted Mr. O'Reilly. [Ex. A at 59:20-24]

14.     Following the early 2019 meetings, after about a one-year hiatus from interacting with City officials, Plaintiff contacted the City again, around May 2020, and admits in deposition that he was verbally abusive and profane with Mr. O'Reilly's assistant, Ms. Lori Roach, over the phone. [Ex. A at 61:1-25] He had no opinion, however, on whether it was proper to speak to a public servant in such a manner. [*Id.* at 62:11-20]

15.     Asked about a separate phone call with Ms. Roach, on June 8, 2020, Plaintiff could not deny that he called her a "fucking lying bitch," or a "fucking liar"

at that time. [*Id.* at 64:11–65:6; 66:19–67:2] Instead, Ms. Roach's Affidavit confirms the fact that he called her those names. [Ex. G, ¶¶ 7-8]

30.     Around the same time as the above events, following a prior, mid-June of 2020 encounter between City officials and LEE at the City Hall which became disruptive,[1] in addition to several others, LEE returned to City Hall on September 4, 2020.   He had initially dealt with the Gulfport Building Department that day, in relation to a garage sale permit. The interaction there got heated, as LEE demanded in-person service and pushed a handicap access button multiple times to attempt to force the Building Department door to remain open, at a time when the building was not publicly accessible at the time due to the COVID-19 pandemic lockdown, and access was being restricted to all members of the general public. [Ex. A, 92:11–93:4; Deposition of former Police Chief Robert Vincent, attached as Ex. "H," 70:22–71:2] He got angry and walked over to City Hall, and in a call with a representative of City Hall, he professed a desire to file a complaint against the Building Department official with whom he had interacted. [Doc. 28, ¶¶ 63-64; Ex. A, 147:20–148:6]

31.     Mr. O'Reilly, having dealt with LEE numerous times previously in the prior disruptive, threatening, and profane encounters, directed police to issue a trespass warning to LEE, because of the COVID-19 lockdown, LEE's refusal to leave, O'Reilly's waning patience after several prior prolonged interruptions to business operations within City Hall, and Lee's aggressive behavior in repeatedly attempting to

---

1 *See* Ex. F, ¶¶ 7-8.

force open the Building Department door to gain access to a restricted area. [Ex. F, 71:9-15; Ex. E, ¶ 10-11]

32.     Plaintiff has instead claimed, in conclusory fashion, that his trespass was in retaliation for a putative discrimination "complaint" filed on September 1, 2020, which alleged disparate treatment of mobile food vendors based on race. [Doc. 28, ¶¶ 52, 76] In reality though, Plaintiff never "filed" any formal complaint, and the email which Plaintiff alleges was a complaint came across more as a rambling and non-specific rant with little to no mention of ice cream cart, but which specifically made it clear that Plaintiff did not regard any City channels for a discrimination complaint as worthwhile, or adequate. [Email Referencing Alleged Harassment, attached as Ex. I; *see also* Ex. B (Response to No. 3)]

33.     Then, on, July 22, 2021, as part of a vitriolic and loud disagreement at City Hall in the lobby area between Plaintiff and Commander Joshua Stone from the Gulfport Police Department, Plaintiff physically threw at and actually struck Commander Stone with a CD with which he had been provided in response to a public records request, by throwing it at and hitting his hamstring/rear knee area.[2] He was arrested for felony battery on a law enforcement officer and later pled guilty to the charge. [Ex. A, 131:2–133:16]

34.     As video of that interaction confirms, Plaintiff also repeatedly used a variety of abusive language in speaking with Commander Stone, a high-level Gulfport

---

2 *See* video to be filed separately upon leave of Court, identified as depicting said incident.

police officer, in addition to battering him. He was also yelling at him and into the lobby of City Hall in a loud voice, causing a disturbance in a nonpublic forum from which he had been trespassed already. Before Plaintiff struck Commander Stone with the disc, he also pettily dropped the disc right in front of him and made him pick it up – further evidence of his ongoing abuse of City officials.

35.    This interaction confirmed previous impressions Mr. O'Reilly had that LEE was a volatile individual who might attempt to harm or who would otherwise interact with City employees or others in an unpredictable, criminal, and abusive fashion. [Ex. E, ¶ 8]

36.    Despite his prior trespass, LEE returned to the Building Department on September 14, 2021, and demanded an explanation of why he was allegedly called that morning by someone at the Department. He informed those inside that he was doing a so-called "First Amendment audit," and that he was live on Facebook. LEE circled around the building, rambling out loud to his possible Facebook audience about prior disagreements with the City, and going up and knocking on windows and filming and yelling at those working inside for an answer, until he was eventually issued a trespass warning.[3]

37.    Beyond Mr. O'Reilly, Commander Stone, and Ms. Roach, a number of other City officials and non-City employees have attested to the fact that LEE has been verbally abusive and continually profane towards them on repeated occasions.

---

3 *See* video of incident (to be filed separately and identified as LEE's video of the incident).

[Affidavit of Shirley Dibucci, attached as Ex. "J," ¶¶ 4-6] (noting Plaintiff scared her, yelled at her, and would refer to her as "DiBitchy"—a fact proved by emails produced in discovery); Ex. C, ¶¶ 9-12; Ex. G, ¶¶ 3-12; Deposition of Barbara Banno, attached as Ex. "K," 58:2-18, 32:12-20, 26:15-22, 27:17–28:5 (noting, among other things, that LEE told her customers she discriminates against African Americans, and would call her a "dyke" and a "cunt" to her customers as well, as well as in other settings); Deposition of Suzanne King, attached as Ex. "L," 18:25–19:18 (referring to Plaintiff giving her scary looks that caused her to have to avoid him in public places, intimidating her, and calling her a "cunt"); Ex. H, 71:21–72:20.

Worse still, some individuals have received death threats in response to publicity effectuated by LEE by way of sending footage of incidents he has videotaped to so-called "First Amendment Auditors," whose specious analyses on social media afterwards often rile up and/or incite lay viewers, and generate income from YouTube or other social media via advertisements. [Ex. H, 71:8-13; Ex. K, 33:23–34:25] As to Ms. Banno's allegation that Plaintiff has called her a "cunt" multiple times, Plaintiff does not deny that. [Part Two of Deposition of Jesse Lee, attached as Ex. "M," 31:17–32:8] Nor does he dispute that he called Suzanne King a "cunt." [*Id.* at 32:9-12] Finally, Mr. O'Reilly and the City will jointly file, upon leave of Court, videos depicting an occasion when Plaintiff was removed from a City Council meeting on April 5, 2022 because he was yelling and cursing; an occasion on or about February 2022 when he was standing over former Chief Vincent in a restricted area; and, as part

of the July 22, 2021 assault on Commander Stone, video footage of Plaintiff verbally and then physically assaulting and harassing him.

38.     On April 27, 2023, a private volunteer appreciation luncheon event was being held at the Gulfport Casino. Gulfport Police received prior intelligence indicating that Plaintiff and another individual intended to show up and cause a disturbance. The then-Chief of Police, Robert Vincent, sent an email to Plaintiff the day beforehand informing him that it was a private event, that he was not welcome at the event, and that if he showed up and refused to leave, he would be arrested for trespassing. [Doc. 28-4; Ex. H, 33:6–34:21]

While his prior knowledge of the email is unclear, Plaintiff showed up at the private event. His cell-phone video recording demonstrates that he initially attempted to go into the Casino but was asked to leave. He refused to leave and stood just a few feet away from the handicap access ramp—clearly within the curtilage of the building and the front steps that enter into the building, while filming Gulfport Police Chief Vincent. Chief Vincent then made the decision to arrest Plaintiff for his continued refusals to leave, after being issued a verbal trespass warning. [Ex. A, 180:13–181:21]

39.     At a July 4th event in 2024, LEE approached Mr. O'Reilly and told him that he was going to hit him. [Ex. F, 20:11–21:7] Plaintiff has also physically threatened members of the Gulfport City Council. [*Id.* at 29:15–31:20]

## MEMORANDUM OF LAW

### I.     Summary Judgment Standard

Pursuant to F.R.C.P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.     Qualified Immunity Standard

Qualified immunity shields government officials performing discretionary functions from § 1983 suits unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).

The Eleventh Circuit has established a two-part analysis for qualified immunity cases. First, the defendant government official must "prove that he[she] was acting with the scope of his discretionary authority when the allegedly wrongful acts occurred[.]" *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004) (internal citation and quotation omitted). Second, once the defendant establishes that he[she] was acting within the scope of the discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Vinyard v. Wilson*, 311

F.3d 1340, 1346 (11th Cir. 2002) (internal citation and quotation omitted). In conducting this second part of the analysis, a court must determine whether a plaintiff alleged the deprivation of an actual constitutional right and, if so, then determine whether the alleged right was clearly established at the time of the alleged violation. *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Vinyard*, 311 F.3d at 1346. To show that the law was clearly established, a plaintiff may cite decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the highest court of the pertinent state—in this case, the Supreme Court of Florida, that provide clear notice of the violation. *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

The threshold determination in the qualified immunity analysis is thus whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [individual's] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

After a defendant invokes qualified immunity, the plaintiff must then prove (1) that the officer violated a constitutional right and (2) that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009). If the plaintiff fails to prove either prong, the officer is entitled to qualified immunity as a matter of law. *Id.* at 1327.

While it is certainly the contention of Mr. O'Reilly that no constitutional right was violated, it is noteworthy that because qualified immunity is the "usual rule" for government actors sued in their individual capacities, it will shield them unless case law establishes a bright line in "a concrete and factually defined context" that makes a violation of federal law obvious. *Lassiter v. Alabama A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994). Simply stated, it cannot be said under the factual circumstances that Mr. O'Reilly violated "clearly established law" by having LEE, who had been and was continuing to be abusive and disruptive, trespassed from two nonpublic fora (City Hall and the adjacent Building Department) pursuant to Florida's trespass statute.

**III. Summary Judgment Should Be Granted As To Counts Three and Four Because There Was No Substantive Due Process Violation.**

Counts Three and Four of Plaintiff's Amended Complaint alleges that the City's trespass policy, both on its face and as applied to LEE, violates his substantive due process rights, as Plaintiff alleges that he possesses a "fundamental liberty interest, protected by the Due Process clause in entering and remaining in public places like City Hall." [Doc. 28 at ¶¶ 122-27] However, there is no authority that establishes that Plaintiff has such a fundamental right. The Substantive Due Process Clause only "protects those rights that are 'fundamental,' that is, rights that are <u>implicit in the concept of ordered liberty</u>." *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) (quotation and citation omitted) (emphasis added). It is well-settled law, however, that the government need not permit all forms of speech on property that it owns and controls. *Postal Serv. v. Council of Greenburgh Civic Ass'ns,* 453 U.S. 114, 129 (1981); *Greer v. Spock,* 424 U.S. 828 (1976). "The [government] workplace, like any place of employment, exists to accomplish the business of the employer. It follows that the Government has the right to exercise control over **access** to the [governmental] workplace in order to avoid **interruptions** to the performance of the duties of its employees." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (emphasis added).

It is also well established that there is no right of unfettered access to public buildings "simply because [they] are owned or controlled by the government." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Courts have

consistently held that the interior of government buildings—like the one in this case—are nonpublic fora. *See, e.g.*, *Watkins v. U.S. Postal Employee*, 611 F. App'x 549, 552 (11 Cir. 2015) (U.S. Post Office lobby was a nonpublic forum and postal employee could lawfully remove plaintiff from singing in the lobby); *Gay Guardian Newspaper v. Ohoopee Reg'l Libr. Sys.,* 235 F. Supp. 2d 1362, 1369 (S.D. Ga. 2002), *aff'd*, 90 F. App'x 386 (11th Cir. 2003) (a public building's front lobby is typically considered a nonpublic forum); *Freedom Found v. Wash. Dep't of Ecology*, 426 F.Supp.3d 793, 799-803 (W.D. Wash. 2019), *aff'd*, 840 F. App'x 903 (9th Cir. 2020) (lobby of Washington Department of Ecology was a nonpublic forum and noting that the Eight, Second, and Eleventh Circuits have held that a government agency lobby is a nonpublic forum); *Lavite v. Dunstan*, 932 F.3d 1020, 1029 (7th Cir. 2019) (county administration building that housed over 20 county departments deemed a nonpublic forum).

The case of *Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011), relied upon by Plaintiff in responding to Mr. O'Reilly's Motion to Dismiss, is clearly inapposite to the factual circumstances present here. First of all, *Catron* involved a public park, which is a quintessential traditional public forum[4]—not at all comparable to a City Hall lobby, or Building Department entrance or lobby, both of which are nonpublic fora. The plaintiffs there were homeless individuals who alleged they were illegally trespassed from a public park. *Id.* Here, in a nonpublic forum, it is a "long-settled principle" that governmental actions are subject to a lower level of First

---

4 *Id.* at 1264.

Amendment scrutiny when "the governmental function is . . . as [a] proprietor, to manage its internal operations." *U.S. v. Kokinda*, 497 U.S. 720, 725 (1990). "Regulation of speech activity where the government has not dedicated its property to First Amendment activity is examined only for reasonableness." *Id.* at 727.

While a right to intrastate travel was argued in *Catron*, the U.S. Supreme Court has never recognized a right to intrastate travel, and even the federal courts of appeal are divided on the issue. *Tinius v. Choi*, 77 F.4th 691, 707 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 815 (2024). Regardless, courts have expressed skepticism that the right of intrastate travel, *if* it exists, extends beyond the right to travel on roadways to a right to access certain public administrative buildings. *See, e.g.*, *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746 (7th Cir. 2012) ("The right to intrastate travel protects the right to move from place to place, not the right to access certain public places.").[5] LEE certainly has no unrestricted right to access any public space or building he desires to enter at any given time.

Even assuming, arguendo, there were an arguable constitutional liberty interest at stake, the Eleventh Circuit has nevertheless still clarified that a substantive due process claim under § 1983 requires a plaintiff to show: "(1) a deprivation of a constitutionally protected interest, and (2) that the deprivation was the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a

---

5 *See also* Potter v. City of Lacey, 46 F.4th 787, 796 n.5 (9th Cir. 2022), *certified question answered*, 550 P.3d 1037 (Wash. 2024) (noting a lack of authority recognizing a broader conception of the alleged right to intrastate travel).

constitutional violation." *Hoefling v. City of Miami*, 811 F.3d 1271, 1282 (11th Cir. 2016). Yet such "conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience-shocking in a constitutional sense." *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003) (citing *Collins v. City of Harker Heights, Tex.*, 112 S. Ct. 1061, 1070 (1992)). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Waddell*, 329 F.3d at 1305 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).

Simply put, not only is there no authority establishing a fundamental right to enter or remain in a nonpublic forum building like Gulfport's City Hall, or the adjacent Building Department, but there is no authority suggesting that issuing a trespass warning to someone who violates a law, by way of attempting to enter a restricted area, or is disruptive of official public business, is either unreasonable or "egregious" conduct, or conscience-shocking. Any restrictions the City placed on LEE were viewpoint neutral and reasonable, as they were based on his disruptions and abusive conduct in speaking to City officials and others, not on his viewpoints. Importantly, the Eleventh Circuit has only found "conscience-shocking" behavior in two cases. *See 625 Fusion, LLC v City of Fort Lauderdale*, 526 F.Supp.3d 1253, 1271-72 (S.D. Fla. 2021) (noting this, and the fact that a state-employed professor's violent and intentional battery against a student and a firefighter's sexual assault of an apprentice did not meet the standard); *see also Nix v. Franklin Cnty. Sch. Dist.*, 311 F.3d 1373 (11th Cir. 2002) (finding that a science teacher's conduct in bringing in a live wire to a physics class

which ended up killing a student did not shock the conscience, as allegations of mere deliberate indifference were insufficient).

There is no plausible way that issuing a Fla. Stat. § 810.08 trespass warning to someone who was disturbing a nonpublic forum and attempting to enter a restricted area, as LEE was in this case, would be either unreasonable, or rise to the level of shocking the conscience. Additionally, although LEE's trespass warnings did not have an explicit appellate remedy written on them, his testimony suggests that he was nevertheless aware of the police-department policy, entitled "Written Directive 406," which was adopted shortly after his second trespass. [Doc 1-4; Ex. A, 163:21–166:18] The police department policy provided an appeal to the City Manager, but LEE deliberately disregarded the option and made a conscious decision not to appeal his trespass warnings. [*Id.*; Doc. 1-4] Even if LEE did not forfeit any limited liberty interest he may have had, which Mr. O'Reilly asserts that he did, such that he was not entitled to any procedural due process, "a procedural due process violation is not complete 'unless and until the State fails to provide due process.'" *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). The City did, in this case; it was just not pursued by Plaintiff.

Finally, Mr. O'Reilly would note that there is a line of case law supporting the usage of the State of Florida's trespass statutes to trespass people from public property. *See, e.g.*, *Adderley v. Florida*, 385 U.S. 39 (1966) (holding that the arrest and convictions for trespass after warnings of students who entered jail grounds to trespass prior arrests and segregation policies, and who blocked vehicular traffic, did not deprive them of

them of their constitutional rights)[6]; *Downer v. State*, 375 So. 2d 840 (Fla. 1979) (The fact that one is exercising First Amendment rights while violating otherwise proper restrictions upon their entry to a public facility does not insulate them from prosecution for trespass.").

Counts Three and Four against Mr. O'Reilly therefore must be dismissed as a matter of law, as there is no genuine issue of material fact that a reasonable person would not have known that his actions were unreasonable, or conscience-shocking, or that they would be in violation of clearly established law—they simply were not.

**V.     Summary Judgment Should Be Granted on Count Five Because Probable Cause Existed for Plaintiff's Arrest.**

Defendant Mr. O'Reilly refers to and incorporates by reference the arguments made, and the case law cited, in his Motion to Dismiss filed in this case [Doc. 47 ¶¶ 17-22] While the Court did not address the arguments at the motion-to-dismiss stage, Mr. O'Reilly would refer to the applicable case law on probable cause and relevant facts argued therein, as well as ¶ 37, *supra*.

As an additional point, Mr. O'Reilly again brings this Court's attention to the case law supporting the usage of the State of Florida's trespass statute on public property. *See supra*, p.17 (citing *Adderley* and *Downer*—one a United States Supreme Court case, and the other a Florida Supreme Court case). As pointed out in Doc. 47,

---

6 The Court stated: "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 47. "The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose." *Id.*

section III, unless Plaintiff can present objective evidence that he was arrested when *otherwise similarly situated individuals* not engaged in the same sort of protected speech had not been likewise arrested, of which there is no evidence, it is his burden to prove an absence of probable cause as to the alleged retaliatory arrest.

Here, LEE fails to state a viable cause of action in Count V because he was violating proper restrictions on his access to what was, at most, a nonpublic form, which was at the time hosting a private-party, invitation-only event, by refusing to leave the Casino curtilage on April 27, 2023. There should have been no doubt that he was on the Casino's property, as he was literally standing on the curtilage of that building directly adjacent to a sign which says "GULFPORT CASINO." *See Keister v. Bell*, 879 F.3d 1282 (11th Cir. 2018). The decorative landing pad in front of the Gulfport Casino is consistent with a demarcation of it being a part of the curtilage of the Casino, not a public sidewalk, beside the Casino sign which was adjacent to the area in which Plaintiff was standing, right next to a bench and handicap access ramp that was part of the entrance to the Casino building. Finally, as the Supreme Court held in *Greer v. Spock*, 424 U.S. 818 (1976), the government permitting its citizenry to access its land via sidewalks and streets does not automatically convert a nonpublic forum to a public one. *See also Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011).

There is no genuine issue of material fact that there was no clearly established right for Plaintiff to access, or be at, a private, invitation-only event on April 27, 2023, or that the City had probable cause to arrest him once he refused a law enforcement

officer's verbal request for him to leave. Summary judgment should be granted on Count Five.

## VI. Summary Judgment Should be Granted on Counts Six and Seven Because Plaintiff Forfeited Any Limited Liberty Interest He May Have Had.

Counts Six and Seven of Plaintiff's Amended Complaint allege that Plaintiff's procedural due process rights under the Fourteenth Amendment were violated by the City's trespass policy, both on its face and as applied to LEE. [Doc. 28 at ¶¶ 155-163] To sustain a § 1983 procedural due process claim, a plaintiff must allege: "(1) a deprivation of a constitutionally protected liberty or property interest; (2) state action; and (3) constitutionally inadequate due process." *Arrington v. Helms*, 438 F.3d 1336, 1347–48 (11th Cir. 2006). Plaintiff LEE cannot establish a genuine issue of material fact as to elements (1) and (3). As to element (1), the First Amendment "does not guarantee" unfettered right of access to public buildings "simply because [they] are owned or controlled by the government." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

As pointed out in section III, *supra*, courts have consistently held that the interior of government buildings are nonpublic forums. As for the restrictions that may be imposed in nonpublic fora, they need only be viewpoint neutral and "reasonable in light of the purpose served by the forum." *McDonough*, 116 F.4th at 1328 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 819 (1995)). The government may "legally preserve [a nonpublic forum] under its control for the use to which it is dedicated." *Perry*, 460 U.S. at 46. "Nothing in the Constitution requires the

Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Watkins*, 611 F. App'x at 552 (quoting *Cornelius*, 473 U.S. at 799-800).

Given that a limited public forum is created "for certain groups or for the discussion of certain topics," *Rosenberger*, 515 U.S. at 829, it is clear that City Hall and the Building Department are both nonpublic forums during business hours, as it is generally merely "managing its internal operations" during regular daytime operations. *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 216 (2015). Particularly on the dates Plaintiff was trespassed, Gulfport's City Hall and Building Department were taking lockdown and other precautions for COVID-19, and the interior of the Building Department and City Hall were not opened up for unrestricted public access on September 4, 2020. [Ex. E, ¶ 10] Even outside of a pandemic, Gulfport's City Hall is a small building with multiple departments working in close spatial proximity—not a large, multi-story city hall as is often seen in a bigger city.[7] These features greatly militate in favor of its lobby being a nonpublic forum.[8] *See Claudio v. U.S.*, 836 F. Supp. 1219 (E.D.N.C. 1993) (noting that the lobby of the Raleigh Federal Building was small and ill-equipped to handle noise, a crowd, or any sort of disruptive behavior, and finding it to be a nonpublic forum); *see also Cornelius*, 473 U.S. at 803 ("where the principal function of the property would be disrupted by

_____

7 Ex. E, ¶ 3.
8 Gulfport's current policies are consistent with this. *See* Ord. No. 2024-02, Gulfport Code.

expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum.").

Additionally, on the first element of a procedural due process claim, the law is clear that a plaintiff must show "not only a constitutionally protected [liberty] interest, but also a governmental deprivation of that constitutionally protected [liberty] interest." *Arrington v. Helms*, 438 F.3d 1336, 1348 (11th Cir. 2006). However, if a person forfeits the liberty interest, then there is no deprivation. See *Occupy Fort Myers v. City of Fort Myers*, 882 F.Supp.2d 1320, 1338-39 (M.D. Fla. 2011) (holding plaintiffs failed to establish likelihood of success on the merits of count alleging a violation of Fourteenth Amendment liberty interests because there was no liberty interest in plaintiffs' use of the park); *see also Sheets*, 415 F.Supp.3d at 1128 (citing cases and holding that plaintiff failed to establish entitlement to due process because he forfeited his liberty interest by recording without consent, and thus was not using City Hall under ordinary conditions or for its intended purpose); *Woodbury v. City of Tampa Police Dep't*, No. 8:10-CV-0772-T-30AEP, 2010 WL 2557677, at *1-2 (M.D. Fla. June 8, 2010) (holding a parent did not have a liberty interest to visit their child's school and school district could indefinitely bar parent's access to school "to maintain order and prevent disruptions"), *report and recommendation adopted* 2010 WL 2557534 (June 23, 2010); *Catron*, 658 F.3d at 1266 (noting that a person may forfeit a liberty right by trespass or other violation of law) (citing *Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994)).

In this case, the City had an "unofficial" trespass policy which was based on Florida law,[9] which Plaintiff violated by behaving in the manner in which he did on September 4, 2020 and then again on September 14, 2021. [Doc. 1-1] It was not a written policy at that time, or ever an ordinance, but an informal and unwritten policy based entirely on Florida statutory law, whose verbiage regarding when trespass warnings may be issued on both private <u>and</u> public property within the guidance in Fla. Stat. § 810.08(3). LEE's abusive and disruptive actions on both of the dates he was trespassed were inconsistent with the purposes of the nonpublic forum from which he was twice trespassed. *See supra*, ¶¶ 30, 36. On both occasions, he forfeited any limited, at best, liberty interest he may have had by violating Florida law and causing disturbances. On a procedural due process claim, then, Plaintiff does not even get past the first element, all of which is based on clearly established law at the time of LEE's trespasses, including *Catron*, *Church v. City of Huntsville*, and *Occupy Fort Myers*. Moreover, he also cannot meet the third element, since he never availed himself of the appellate remedies afforded to him by the Gulfport Police Department for appealing trespasses, of which he admitted to being aware of in the aftermath.

Finally, Mr. O'Reilly would note that the verbiage Plaintiff uses suggesting that he was "permanently banned" from City Hall is inconsistent with the facts. [Ex. E, ¶¶ 13-14]. Reasonable restrictions on his access were imposed in light of his demonstrated

---

9 *See* Fla. Stat. § 810.08(3) ("to communicate an order to depart the property in the case of a threat to public safety or welfare"); [Doc. 1-1] ("empowered to issue trespass warnings whenever they have reason to believe an individual has caused or is likely to cause a disruption of services or put the safety of staff or the public at risk.") [Ex. H, 8:1– 9:11]

tendency to be disruptive and abusive towards City officials — nothing more. Summary judgment should therefore be granted as to Counts Six and Seven as a matter of law.

Dated May 29, 2025.

Respectfully submitted,

*/s/ Donovan A. Roper*
DONOVAN A. ROPER, ESQUIRE
Florida Bar No.: 0858544

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of May, 2025, I electronically submitted the foregoing with the Clerk of Court using the CM/ECF system, who will send electronic notice to all parties and pro se litigants.

DAR/IPD/RDR:lb

*/s/ Donovan Roper*
DONOVAN A. ROPER, ESQUIRE
Florida Bar No.: 0858544
IAN DEPAGNIER, ESQUIRE
Florida Bar No.: 116385
R. DUSTYN RING, ESQUIRE
Florida Bar No.: 1049924
**ROPER & ROPER, P.A.**
116 North Park Avenue
Apopka, FL 32703
  TEL: (407) 884-9944
FAX: (407) 884-4343
email@roperandroper.com
idepagnier@roperandroper.com
dring@roperandroper.com
kroper@roperandroper.com
