UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:23-CV-02996-VMC AEP

JESSE LEE,
Plaintiff

vs.

CITY OF GULFPORT,
Defendant

DEPONENT:  JAMES O'REILLY
DATE:      JANUARY 21, 2025
TIME:      10:03 AM - 12:30 PM
LOCATION:  LAWYERS' REPORTING
           8950 DRIVE M.L.K. JR. STREET NORTH, SUITE 160
           SAINT PETERSBURG, FLORIDA 33702

LAWYERS' REPORTING, INC.
1655 PALM BEACH LAKES BOULEVARD, SUITE 450
WEST PALM BEACH, FL 33401
(561) 242-0023 SERVICE@LAWYERSREPORTING.COM
REPORTER:  LILIANNA CAVANAUGH

1                      APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, JESSE LEE:

4    Marcy I. LaHart, Esquire

5    Marcy I. LaHart P.A.

6    249 Southeast Tuscawilla Road

7    Micanopy, Florida 32667

8    Telephone No.: (352) 545-7001

9    E-mail: Marcy@floridaanimallawyer.com

10

11   ON BEHALF OF THE DEFENDANT, CITY OF GULFPORT:

12   Donovan A. Roper, Esquire

13   Dustyn Ring, Esquire

14   Roper & Roper P.A.

15   116 North Park Avenue

16   Apopka, Florida 32703

17   Telephone No.: (407) 884-9944

18   E-mail: e-mail@roperandroper.com

19   donroper@roperandroper.com

20   dring@roperandroper.com

21

22   Also Present: Jesse Lee, Plaintiff

23

24

25

1                           INDEX

2                                                  Page

3    PROCEEDINGS                                    5

4    DIRECT EXAMINATION BY MS. LAHART               5

5    CROSS-EXAMINATION BY MR. ROPER                 75

6    REDIRECT EXAMINATION BY MS. LAHART             84

7

8                          EXHIBITS

9    Exhibit                                        Page

10   PLAINTIFF

11   1 - July 12, 2019, E-mail from Thomas Woodman    56

12   2 - July 11, 2019, E-mail between Robert Vincent

13       and Joshua Stone                             59

14   3 - July 26, 2022, E-mail James O'Reilly to

15       Andrew Salzman                               61

16   4 - March 2, 2020, E-mail from Samantha Ring to

17       Michael Fridovich, James O'Reilly, and Sam

18       Henderson                                    64

19   5 - March 17, 2021, E-mail with Service of Court

20       Document from Andrew Salzman                 65

21   6 - Gulfport Police Department Report Page 2 of 6  67

22

23   DEFENDANT

24   1 - E-mail from Jesse Lee                         82

25

1                          STIPULATION

2

3    The deposition of JAMES O'REILLY was taken at LAWYERS'

4    REPORTING, 8950 DRIVE M.L.K. JR. STREET NORTH, #160,

5    SAINT PETERSBURG, FLORIDA 33702, on TUESDAY the 21st day

6    of JANUARY 2025 at 10:03 a.m. (ET); said deposition was

7    taken pursuant to the Fed. R. Civ. P. Rule 30 of Civil

8    Procedure.

9

10   It is agreed that LILIANNA CAVANAUGH, being a Notary

11   Public and Court Reporter for the State of FLORIDA, may

12   swear the witness and that the reading and signing of

13   the completed transcript by the witness is not waived.

14

15

16

17

18

19

20

21

22

23

24

25

1                    PROCEEDINGS

2              THE REPORTER:  We are now on the record.  And,

3         Mr. O'Reilly, will you please state your full name

4         for the record?

5              THE WITNESS:  James E. O'Reilly.

6              THE REPORTER:  And will you please raise your

7         right hand?  Do you solemnly swear or affirm that

8         the testimony you're about to give will be the

9         truth, the whole truth, and nothing but the truth?

10             THE WITNESS:  Yes, I do.

11             THE REPORTER:  You may proceed.

12             THE WITNESS:  Thank You.

13                  DIRECT EXAMINATION

14              BY MS. LAHART:

15        Q.   Good morning, Mr. O'Reilly.

16        A.   Good morning.

17        Q.   What's the E for?

18        A.   Edward?

19        Q.   Mr. O'Reilly, I assume you have given

20   depositions in your past, but if I am incorrect, please

21   straighten me out.

22        A.   No.

23        Q.   You've never given a deposition before?

24        A.   I'm sorry.  I'm not correcting you.

25        Q.   Oh, okay.

1          Let's start with your background.  Where did

2     you grow up?

3          A.   Gulfport, Florida.

4          Q.   High school in Gulfport?

5          A.   Yes.  Boca Ciega High School.

6          Q.   A lifer.  College?

7          A.   Saint Leo University, Saint Leo College when I

8     went.

9          Q.   And where was that located?

10         A.   San Antonio, or Davis City, whichever is --

11    it's actually the City of Saint Leo, but yes.

12         Q.   What did you study at Saint Leo?

13         A.   Public Administration.

14         Q.   You have a bachelor's?

15         A.   Yes.

16         Q.   When did you get that?

17         A.   1995, '96.

18         Q.   Any postgraduate education?

19         A.   No.

20         Q.   Was -- what was your first job out of college.

21         A.   I worked at the city -- real job first, I was

22    the recreation supervisor at the City of St. Pete Beach.

23    I was working at the City of St. Pete Beach for clarity

24    purposes when I obtained my education.

25         Q.   Okay.  When did you go to work for Gulfport?

1     A.   Two -- January 2004.

2     Q.   And were you hired as a city manager then, or

3   did you have another role?

4     A.   I was hired as a leisure service director.

5     Q.   January 2004.  How long were you the leisure

6   services director?

7     A.   Four years.  Because, at times, I was acting

8   city manager.

9     Q.   Okay.  And when did you become the official

10   city manager?

11     A.   Okay.  I was appointed interim September 2008.

12   We reached contract agreement the following year.

13     Q.   So January 2009?

14     A.   December 2009.

15     Q.   Oh.  So you were the interim for a long time?

16     A.   Because I told them to go look.

17     Q.   Why was that?  Did you not want the job?

18     A.   I was a leisure service director.

19     Q.   You were --

20     A.   A leisure services director.

21     Q.   What did you do as the leisure services

22   director?

23     A.   I was -- I was responsible for the marina,

24   library, senior center, recreation center, casino,

25   Catherine Hickman Theater.

1    Q.    All right.  Marina, library, senior center.

2    A.    Marina.

3    Q.    Got that.  Casino.  And what was the last one?

4    A.    Catherine Hickman Theater --

5    Q.    Theater.

6    A.    -- and the recreation center.

7    Q.    Did you have any particular training in

8    leisure services?  Or was that something you just kind

9    of evolved into?

10    A.    I was hired at the City of St. Pete Beach in

11    the entry level position.  I've worked part-time in the

12    field.

13    Q.    So were you reluctant to accept the position

14    as city manager?

15    A.    No.

16    Q.    So you've been the city manager since --

17    acting since September of 2008?

18    A.    That's correct.

19    Q.    And you signed a contract in December of 2009?

20    A.    Yes -- something around those lines.

21    Q.    What are your responsibilities as a city

22    manager?

23    A.    I'm the chief operating officer of -- for the

24    City.  Manage daily -- daily -- daily -- day-to-day

25    operations.

1      Q.   Can you give me some examples of those daily

2  day-to-day operations?

3      A.   Supervising the directors that implement the

4  city budget, manage all departments, under -- with

5  directors under my purview.

6      Q.   Does that include the police department?

7      A.   Yes, it does.

8      Q.   How many employees are under you?

9      A.   About -- any -- at any given time, 166.

10     Q.   What's the population of Gulfport?  And I

11 don't need an exact number but --

12     A.   12,222.

13          MR. ROPER:  Easy number to remember, for right

14    now.

15          THE WITNESS:  For now.  That -- that was last

16    time.

17          BY MS. LAHART:

18     Q.   Can you tell me what you did to prepare for

19 your deposition today?  Did you review any documents?

20     A.   No.  Other than what -- what you sent me.

21     Q.   Okay.  Have you ever read the -- either the

22 complaint or the amended complaint in this action?

23     A.   I approached it, briefly.

24     Q.   There was a motion to dismiss filed on your

25 behalf?

1  A. Yes.

2  Q. Did you read that, either before or after it

3 was filed?

4  A. I believe I -- it was sent to me.  I briefly

5 read it.

6  Q. Did you play any role in selecting the

7 documents that would be provided in response to the

8 request for production I provided -- or I served on

9 behalf of Mr. Lee?

10  A. No.

11  Q. Do you know who did?

12  A. I believe my HR director and the city clerk.

13  Q. What's the -- what are their names?

14  A. The city clerk is Theresa Carrico, and the

15 human -- HR -- human resources risk manager supervisor

16 -- director is Shannon Farrell.

17  Q. F-A-R-R-E-L-L?

18  A. I believe so.

19  Q. What is Mary Farrand's role in the City?

20  A. She's a police commander.

21  Q. Are you also the human rights officer for

22 Gulfport?

23  A. I will serve in that capacity, according to

24 the City's ordinance.

25  Q. So that's a yes?

1      A.    Yes.  Well, I -- I -- yes.

2      Q.    What have you done as the human rights officer

3    for Gulfport?

4      A.    I've been laid out as the respondent.  There's

5    a process laid out in the ordinance.  I haven't done

6    anything beyond that.

7      Q.    Okay.  In the process laid out in the

8    ordinance.

9      A.    Yes.

10      Q.    Have you ever reviewed a discrimination

11    complaint?

12      A.    A formal complaint.  We received one complaint

13    -- formal complaint.

14      Q.    Who filed that?

15      A.    I believe it was a resident of Seaside Villas,

16    at the time -- or whatever it was named at that time.

17      Q.    What was the basis of the complaint?

18      A.    The allegation was that it was discrimination

19    based on a rental situation of tenant.  It was a tenant-

20    landlord dispute.

21      Q.    And was it based on a familial status or --

22      A.    It was -- I believe it was -- this is quite a

23    while back.  It was discrimination based on lifestyle, I

24    guess -- I -- I mean, or sexuality.  I mean, it was --

25    the allegations --

1    Q.   That the claimant was gay?

2    A.   Yes.  That they -- the allegation was that's

3  why they were being evicted.

4    Q.   And what was the result of that complaint?

5    A.   It was unfounded.  It was basically a -- it

6  was a tenant-landlord dispute.

7    Q.   So there -- you found that there was a

8  legitimate reason for this person to be evicted?

9    A.   Right.

10         And -- and if I may correct, there was an -- a

11  situation that arose involving Boy Scouts.  They were

12  utilizing the City facility, prior to us making any

13  determination that Boy Scouts ceased operating in the

14  City -- in the City facility.

15   Q.   Okay.  I had asked you earlier about the

16  motion to dismiss that was filed on your behalf.  Did

17  you review it before it was filed?

18   A.   I don't think so.

19   Q.   Did you read it after it was filed?

20   A.   I may have perused it, briefly.

21   Q.   You realize that it was filed on your behalf?

22   A.   Yes, I do.

23   Q.   There's some allegations made in this motion,

24  essentially saying that Jesse Lee's ice cream cart is

25  really a food truck.  Is that your understanding?

1      A.    Excuse me?

2      Q.    Do you think that Jesse Lee's ice cream cart

3   is a food truck?

4      A.    No.

5      Q.    It's alleged here that Jesse observed people

6   operating food trucks in 2019, and those people were

7   right -- white -- not right, white -- without

8   considering other meaningful, factual distinctions or

9   differences, that they already had food truck permits

10   from DBPR.  Do you know anybody who checked to see if

11   food truck still were operating in the City of Gulfport

12   had permits from the DBPR?

13      A.    No.

14      Q.    Do you remember the operation of a food truck

15   called -- it's escaping me.

16          MR. ROPER:  Pick and Pull (phonetic).

17          MS. LAHART:  Pick and Pull, yes.

18          BY MS. LAHART:

19      Q.    Do you remember anything about that?

20      A.    Not that I -- other than there was a

21   complaint, we went looking for it.  But other than that,

22   they didn't have any permission.

23      Q.    They didn't have any permission.  So were

24   they --

25      A.    Unless they were part of a special event,

1   which I don't believe they were.

2        Q.   So did they receive a citation, like Mr. Lee

3   did?

4        A.   I would have to check the record type.  I

5   don't know.

6        Q.   Do you recall what the zoning district they

7   were operating in was?

8        A.   I believe they were in the Waterfront

9   Redevelopment District.

10       Q.   It would be the WRD?

11       A.   Correct.

12       Q.   Can you explain to me how this operating as

13  part of a special event, if you're a mobile food vendor,

14  would look?

15       A.   Excuse me.  How would it -- as part of a

16  special event?

17       Q.   Yeah.  Suppose that I am a mobile food vendor.

18  I see online on Facebook, there's a post that there's a

19  special event coming up, and I want to sell tofu dogs.

20  How does that happen?

21            MR. ROPER:  Object to the form of the question.

22       Compound.  Assumes facts not in evidence.  Improper

23       hypothetical.  You can answer.

24            THE WITNESS:  Okay.  What you would do is

25       contact the sponsor of the event who has received

1        permission for the outside sales of food and -- and

2        drink, et cetera, whichever.  And you would register

3        through the special event sponsor.

4             BY MS. LAHART:

5        Q.   So it would be up to the sponsor of the event,

6   whether or not I could sell my tofu weenies?

7        A.   Yes.  During the special event.

8        Q.   And what if I wanted to sell my tofu weenies

9   in the water -- we just -- the WRD, but there was no

10  special event going on, I would not be allowed to do

11  that?

12       A.   You would not be allowed to sell your food,

13  unless you were in accordance with our ordinance, which

14  you would have to have your food truck, or food vendor,

15  would have to be on private property.  It's not allowed

16  on the public right of way.

17       Q.   Okay.  So if I am able to convince the sponsor

18  of a event to allow me to sell something, does the City

19  play any role in making that decision?

20            MR. ROPER:  Objection to the form of the

21       question.  Compound.  Vague.  Ambiguous.  You can

22       answer, if you understand.

23            THE WITNESS:  We have some minimum standards

24       that it requires it not to be adult-oriented, things

25       to that effect.  But they make the determination,

1    the type, and vendors they have.

2         BY MS. LAHART:

3    Q.   Does the sponsor of the event have to inform

4    you of who the vendors will be?

5    A.   No.

6    Q.   Why is it that mobile food vendors are not

7    allowed to sell food on -- using the city right of way,

8    outside of special events?

9    A.   In the fact that the City has made a

10   determination, out of respect for the bricks and mortar

11   buildings -- businesses.

12   Q.   So it's so that they won't compute with the

13   bricks and mortars buildings?

14        Let's go back to September of 2004, when Mr.

15   Lee was first issued a trespass from City Hall.  Tell me

16   how that came to be?

17        MR. ROPER:  Objection.  Calls for speculation.

18   Do you know what -- if you understand the question,

19   you can answer.

20        THE WITNESS:  I was not aware that he received

21   a trespass in 2004.

22        BY MS. LAHART:

23   Q.   Oh, I -- I'm wrong.  It was 2020.  September

24   4, 2020.  My bad.

25        What was your role in deciding to issue that

1    trespass?

2            MR. ROPER:  Objection to the form of the

3        question.  Assumes facts not in evidence.  You can

4        answer the question, if you understand.

5            BY MS. LAHART:

6        Q.   Did you have any role in deciding to issue

7    that?

8        A.   Yes, I signed it.

9        Q.   You signed it.  What did -- what,

10   specifically, did you sign?

11       A.   The trespass complaint.

12       Q.   Who wrote the trespass complaint?

13       A.   A police officer.

14       Q.   When you say, "the trespass complaint," are

15   you talking about the piece of paper that Mr. Lee was

16   given by a police officer?

17       A.   I was -- I was asked to -- I was asked to -- I

18   -- I'm -- I'm not sure if you're talking about the

19   ticket, or the citation, or some type of -- I guess I

20   signed a citation, or the officer did.

21       Q.   So you don't know if you signed it or not?

22       A.   I don't.  If you show it to me, I'll be happy

23   to look at it.

24       Q.   Okay.  Who initiated the trespass?

25       A.   I couldn't give you the details on that date.

1    I'd have to look at the records.

2         Q.   What records would you look at?

3         A.   What the call was.  That was four years ago.

4         Q.   So he was trespassed from City Hall based on

5    somebody having made a call?

6         A.   I'm sorry?

7         Q.   Was he trespassed from City Hall based on

8    somebody having made a call?

9         A.   Some- -- someone made a complaint, yes.

10        Q.   Who?

11        A.   I couldn't tell you that.

12        Q.   Okay.  What would you have to do to tell me?

13        A.   I -- I -- let me look at the ticket.  I don't

14   know the specifics of September 2024 --

15        Q.   Okay.

16        A.   -- or '20.  I don't.  I'll be honest with you.

17        Q.   Okay.

18        A.   That far back.

19        Q.   So you know he was trespassed from City Hall,

20   but you don't know why, and you don't know --

21        A.   I believe -- okay.

22        Q.   Tell me what you do remember.

23        A.   Okay.  What I remember is his behavior had

24   escalated to the point, I believe, with the building

25   department.  Is that the building department

1   interaction?

2       Q.   So he was trespassed from City Hall based on

3   behavior with the building department?

4       A.   I believe so.  I believe that he was pulling

5   on the door or something.  I -- if that's that specific

6   case.

7       Q.   Is Mr. Lee still trespassed from City Hall?

8       A.   At this time, yes.

9       Q.   Okay.  What warnings were he given before he

10  was trespassed?

11          MR. ROPER:  Objection.  Calls for speculation.

12      You can answer, if you know.

13          BY MS. LAHART:

14      Q.   Do you understand the question?

15      A.   I understand the question.  I am not going to

16  speculate.

17      Q.   You don't know?

18      A.   How many times he was warned?  No, I don't

19  know.

20      Q.   Do you know if he was warned at all?

21      A.   I believe so.

22      Q.   By whom?

23      A.   The police department.

24      Q.   You believe he was warned by the police

25  department.  Do you know who in the police department?

1      A.    No.

2      Q.    Do you know what the warning was?

3      A.    I believe to his behavior.

4      Q.    What, specifically, about his behavior?

5      A.    He was hostile towards the building

6   department.

7      Q.    He was hostile.  What do you mean by that?

8      A.    He was asked to just drop off a permit or

9   something to that effect.  He was pulling on the door.

10  He was asked to not enter, something to that effect.

11     Q.    So he has now been trespassed for more than

12  four years.  Does that trespass ever end?

13     A.    If he's -- if he request to end it.

14     Q.    Who would he request to update it?

15     A.    He would request it to me.

16     Q.    He would request it to you.  And how would you

17  decide whether or not you were going to terminate the

18  trespass?

19     A.    If the behavior had changed, his -- towards my

20  city staff.

21     Q.    So has his behavior changed?

22     A.    Reserve that determination.

23     Q.    Reserve that determination on -- for what?

24  What would you want to know, or see, or be told?

25     A.    I'd want him to stop bullying, badgering, and

1    bullying my city police.  And threatening.

2         Q.   Badgering, bullying --

3         A.   Threatening.

4         Q.   Threatening.  What threats has he made?

5         A.   He told me he was going to strike me.

6         Q.   He told you he was going to hit you?

7         A.   Yes.

8         Q.   Well, if he threatened you, do you think

9    you're really the most objective person to determine

10   whether or not his trespass should be ended?

11        A.   I -- that's a -- that's a process.

12        Q.   Okay.  Did you file a police report when he

13   threatened you?

14        A.   No.

15        Q.   Was there any witness to this?

16        A.   Numerous.

17        Q.   When did it happen?

18        A.   I believe it was the 4th of July of this year

19   or past year.

20        Q.   Did you -- were you afraid?

21        A.   No.

22        Q.   So you said that the trespass is still in

23   effect, and if Jesse wanted to be able to go to City

24   Hall, and/or the building department, just like any

25   other citizen, he would have to ask you to terminate the

1    trespass; is that correct?

2        A.   (No verbal response.)

3        Q.   Okay.  How would he go about doing that?

4        A.   I would meet with him and then have a

5    conversation -- discussion with them.  I'd inquire of

6    the police department if there was any additional

7    complaints filed on Mr. Lee or other city staff.

8        Q.   And how long would there have to be without

9    any complaints before the trespass would be terminated?

10           MR. ROPER:  Objection.  Calls for speculation.

11       If you understand the question, you can answer.

12           THE WITNESS:  This is an ongoing issue with

13       him, so it's -- it's timing uncertain.

14           BY MS. LAHART:

15       Q.   What if he was unhappy with your decision?

16    Would he be able to appeal that?

17       A.   Sure.

18       Q.   To whom?

19       A.   He could stand -- he could make his case to

20    city council.  He's -- he's allowed to attend city

21    council meetings.  We never stopped his ability to speak

22    at city council meetings.

23       Q.   So the city council can override your --

24       A.   Of course.

25       Q.   -- let me finish my question.  City council

1    can override your decision to not end somebody's

2    trespassing?

3         A.    That's a negative.  They can override my

4    decision not to overturn it, correct.

5         Q.    Okay.  Does it say that in your ordinance?

6         A.    No.  Counsel can make a determination and

7    direct me.  They set policy.

8         Q.    Okay.  What are the specific criteria that you

9    would apply, in deciding whether or not to end a

10   trespass warning?

11        A.    If we're not continuing sustaining the

12   behaviors that have created it.

13        Q.    Have you ever terminated a trespass?

14        A.    No.

15        Q.    Has anybody ever asked you to do so?

16        A.    No.

17        Q.    The decision would be based on your

18   conversation with the person who had been trespassed?

19        A.    That.  Additionally, if there's any other

20   complaints.

21        Q.    Okay.  But you can't tell me the time frame?

22        A.    No.

23        Q.    If somebody was asking that their trespass be

24   ended, could they bring an attorney to that meeting with

25   them?

1     A.   If they choose to.

2     Q.   Is there anything in writing that provides

3   them that right?

4     A.   They can bring in anyone they want.

5     Q.   Okay.  Is there anything in writing that says

6   -- either in an ordinance, a written policy, an e-mail

7   to somebody, that says you can appeal to Mr. O'Reilly,

8   and you have the right to be represented by counsel?

9     A.   I'm not aware of that.

10         MR. ROPER:  Objection to form.  Compound.

11         BY MS. LAHART:

12     Q.   All right.  Let's talk about the arrest at the

13   Gulfport Casino.  According to the motion that was filed

14   on your behalf, Plaintiff was warned, due to information

15   provided to the Chief of Police, suggesting that

16   Plaintiff intended to show up at a private volunteer

17   event at the Gulf court -- Gulfport Casino, not to show

18   up at said event, and that if he did, he would be

19   arrested for trespassing.

20         Do you know who provided information to the

21   Chief of Police?

22     A.   I have no idea.

23     Q.   Did you have a conversation with Chief Vincent

24   about this?

25     A.   After the fact?

1    Q.   Ever.

2    A.   Yes.

3    Q.   Tell me about that.  When did you talk, what

4    did you talk about?

5    A.   So --

6         MR. ROPER:  Mr. O'Reilly, as long as that

7         conversation did not involve your legal counsel,

8         whether it was Mr. Salzman or our office, you can go

9         ahead and answer that question --

10        THE WITNESS:  Okay.

11        MR. ROPER:  -- to the extent it does not

12        involve legal counsel.

13        THE WITNESS:  I received a call from the Chief

14        of Police that the incident had taken place.  He

15        advised me that Mr. Lee had been taken into custody.

16        BY MS. LAHART:

17   Q.   Okay.  Did you have any conversations with the

18   Chief of Police before the event?

19   A.   No.

20   Q.   Did you exchange any e-mails with him?

21   A.   No.  If you -- if we have, then you have them.

22        THE WITNESS:  (Phone rings) -- I thought I had

23        turned it off.

24        MS. LAHART:  It's okay, Mr. O'Reilly, I can't

25        even find mine.

1       MR. ROPER:  You lost them?

2       MS. LAHART:  I think it's probably in my car.

3       MR. ROPER:  Oh.  It's never a good feeling.

4       MS. LAHART:  That's all right.

5       BY MS. LAHART:

6       Q.   While the timeline of when the e-mail was read

7   by Plaintiff is disputed, he showed up anyway.  Do you

8   know what e-mail that is being referred to here?

9       A.   No.

10      Q.   Did you attend the volunteer luncheon?

11      A.   Yes.

12      Q.   Did you observe Mr. Lee there?

13      A.   No.

14      Q.   Can you tell me specifically what he was doing

15  that he was arrested for?

16      A.   I believe he -- what I was under -- advised by

17  the Chief of Police, that he was advised not to enter,

18  as it was a private party.  He still attempted to enter.

19  Subsequently, he had been trespassed also from the

20  Gulfport Casino.

21      Q.   He had been trespassed from the Gulfport

22  Casino?

23      A.   Yes, ma'am.

24      Q.   When was that?

25      A.   I couldn't tell you.  I was advised of that by

1  my staff.

2      Q.   Okay.  Who trespassed him and why?

3      A.   Why?  Who's the --

4      Q.   What -- when and why?

5      A.   That -- I couldn't tell you when, but I know

6  it involved a state representative and also all my staff

7  and his attitude towards my staff -- his behavior

8  towards my staff.  I shouldn't say attitude.  I'm not

9  trying to -- it's just a figure of speech.  But his

10 behavior towards my city staff.

11     Q.   Which state representative?

12     A.   Jennifer Webb.

13     Q.   And what happened with Jennifer Webb?

14     A.   Your client became aggressive, according to my

15 staff, and my staff had to step between them.

16     Q.   When did that happen?

17     A.   I -- I couldn't give any times for it.

18     Q.   Did Representative Webb file any complaints

19 against Mr. Lee?

20     A.   No.  My -- my staff intervened.  You should

21 say former state representative.

22     Q.   Okay.  What were they discussing; do you know?

23     A.   She met with him as a constituent.

24     Q.   Uh-huh.

25     A.   And asked for a public area.  Subsequently,

1  then, I was told by my staff that it deteriorated.

2  Q. Do you know where that meeting took place?

3  A. In Gulfport Casino.

4  Q. Okay. According to this motion filed on your

5  behalf, it says that Mr. Lee was told not to show up at

6  the volunteer luncheon. What if he had been a guest of

7  one of the volunteers that was being celebrated? Would

8  he have been allowed to attend?

9  MR. ROPER: Objection. Calls for facts which

10  are not in evidence. And assumes facts which are

11  not in evidence. Calls for speculation. You can

12  answer.

13  THE WITNESS: If he was a guest, we would

14  invite him in.

15  BY MS. LAHART:

16  Q. Okay.

17  A. If he was a guest of someone that was invited.

18  Q. Okay. Do you know if any other people were

19  warned not to show up to the casino that day?

20  A. I'm trying to think. There was an issue with

21  another gentleman, I believe, but I'm not definite.

22  Q. Another gentleman, Ray Rodriguez?

23  A. (No verbal response.)

24  Q. What was it feared that either Mr. Lee or Mr.

25  Rodriguez would do if they showed up at the casino?

1    A.    They have directed threatening -- behaved in a

2    threatening manner to both employees and members of the

3    public and elected officials.

4    Q.    What has Mr. Lee threatened to do to the

5    public?

6    A.    He has screamed at them repeatedly, made

7    members -- I -- I -- that -- what I'm differentiating as

8    members of the business community or such -- he has

9    verbally attacked them.

10    Q.    What did he say to them?

11    A.    I am -- I couldn't quote him.

12    Q.    Okay.  Did -- has he ever threatened any

13    member of the business community with bodily harm?

14    A.    I -- you would have to ask them.

15    Q.    So as we sit here today, you don't know of him

16    ever having threatened any member of the Gulfport

17    business community with physical harm?

18    A.    That, I couldn't tell you.

19    Q.    Okay.  What about your staff?

20    A.    Yes.

21    Q.    Has he threatened to beat them up?  Okay.

22    A.    And city council.

23    Q.    Who did he threaten?

24    A.    Councilmember Brown, the mayor, Councilmember

25    Thanos, Councilmember Ray.

1    Q.    What did he threaten to do to them?

2    A.    To strike -- he -- he made vile threats

3    towards a Councilmember, an older lady.

4    Q.    "Vile threats," what do you mean by that?

5    A.    You know what the word vile means.  Counsel,

6    I'm not -- I mean, I'm not trying to be harsh or -- it

7    was just some very disgusting things directed towards an

8    elderly Councilwoman.

9    Q.    Okay.  He used profanity?

10   A.    Yes.

11   Q.    Did he threaten harm?

12   A.    I believe so.

13   Q.    You believe so, or you know so?

14   A.    Well, I had to step between them.  I had to

15   enter -- put my body between him as he approached the

16   Councilmember.

17   Q.    When did that happen?

18   A.    It was the dedication of the -- a city statute

19   in, I want to say, maybe September a couple of years

20   ago.

21   Q.    Okay.  And where did that occur?

22   A.    At the casino.  At the pad adjacent to the

23   Gulfport Casino.

24   Q.    Pad adjacent to the golf course -- the

25   Gulfport Casino?

1      A.    The casino, yes.

2      Q.    And is that pad part of the casino?

3      A.    We believe so.

4      Q.    Why do you believe that?

5      A.    Because it's on -- it's all decorative, and

6  it's all part of one complex.  It's used to stage

7  equipment for the casino.

8      Q.    Okay.  So he used profanity with a

9  Councilmember.  And a couple of years ago, you had to

10  step between him and an elderly Councilmember.  What

11  other conduct by Mr. Lee resulted him being told he

12  couldn't come to the Gulfport Casino for the volunteer

13  lunch?

14      A.    He was threatening towards staff members at

15  the casino.

16      Q.    When was that?

17      A.    I couldn't tell you.  I was advised by the

18  staff.  They could tell you.

19      Q.    Okay.  When you say "staff," who do you mean?

20      A.    Justin Shea.

21      Q.    Justin Shea.  If Mr. Lee had not actually been

22  trespassed from the casino in the past, should he have

23  been arrested on the 23rd -- 27th?

24      A.    I don't make that --

25           MR. ROPER:  Objection.  Let me object to the

1          fact that that assumes facts which are not in

2          evidence. Improper hypothetical.  Calls for a legal

3          conclusion. If you understand the question, sir,

4          I'll allow you to answer.

5               THE WITNESS:  I don't make that determination.

6          The police make that determination.

7               BY MS. LAHART:

8          Q.   Okay.  So did you have anything to do with the

9     decision to either tell Mr. Lee he could not come to the

10    casino on April 27th or to arrest him on April 27th?

11         A.   No.

12         Q.   So would you say that, that was all Chief

13    Vincent?

14         A.   It was the police department.

15         Q.   It says, "Motion alleges that Mr. Lee has a

16    demonstrated tendency of disrupting"  -- well, I'll read

17    it to you -- "yet Plaintiff claims that he had no idea

18    the private event was taking place and had no intention

19    of causing problems at the event or disrupting it in any

20    way, despite a demonstrated tendency to do so at events

21    and locations not open to the public for comments or

22    inquiries."

23              Can you explain to me what events Mr. Lee has

24    disrupted prior to the volunteer luncheon?  And these

25    are events not open to the public.

1       A.   I'm sorry?

2       Q.   Well, it says here that, "he has a tendency to

3   do so at events and locations not open to the public for

4   comments or inquiries."

5            So I'm just asking you if you can list any

6   events that he has disrupted that were not open to the

7   public for comments or inquiries?

8       A.   He is -- there -- there are events that

9   possibly -- where he's disrupted public events, such

10  as --

11      Q.   What public events?

12      A.   -- the Tuesday market or the events related to

13  -- he has come to -- his behavior has been exemplified

14  at both the casino and also at the City Hall and

15  obviously the building department.

16      Q.   So what happened at Tuesday market?

17      A.   He obviously had an interaction with the

18  sponsors and was -- and also my staff.

19      Q.   And what about those interactions was

20  disruptive?

21      A.   He was asked -- he -- he was advised that he

22  needed to -- and he chose to block the sidewalk and

23  such.

24      Q.   He blocked the sidewalk?

25      A.   He was asked to move -- to remove his --

1   whatever that is.

2       Q.   Ice cream cart?

3       A.   That's what you call it.

4       Q.   Okay.  Well, I just want to make sure that I

5   understand.

6       A.   No, that's what -- no.  I understand.  I'm not

7   going to -- I don't know what it is.  It's a --

8       Q.   You don't know what it is?

9       A.   I know it's a cooler strapped to a bicycle.

10      Q.   Okay.  A cooler strapped to a bicycle is not a

11  food truck.  Would you agree with me on that?

12      A.   Yes.

13      Q.   Okay.  So he showed up at Tuesday market, and

14  he wanted to sell his ice cream, but he didn't leave

15  when he was told?

16      A.   Correct.

17      Q.   Okay.  And that was when?

18      A.   I'd have to go back and look at the timeline

19  for that.

20      Q.   Okay.  Now, is it your position that he

21  disrupted the Tuesday market?

22      A.   Yes.

23      Q.   Was anybody not (audio cuts out) -- sell their

24  goods?

25      A.   I -- I was -- I'm just talking specifically

1    with his interaction with my -- with city staff that was

2    asked to intervene.

3         Q.   Well, what happened with the city staff?

4         A.   He disagreed with Mr. Shea, who runs the

5    events on behalf of the -- or coordinates with the event

6    sponsors.

7         Q.   He disagreed with Mr. Shea?

8         A.   Yes.

9         Q.   And that is one of the reasons that he was

10   told not to come to the city casino?

11        A.   That's two different events.

12        Q.   So as we sit here today, do you know why he

13   was told not to come to the city casino?

14        A.   It was a private party.

15        Q.   Do you agree with me that the Tuesday market

16   is not private?

17        A.   The operation is private.

18        Q.   What do you mean, "the operation is private"?

19        A.   They -- they receive a sponsorship that is --

20   the organization that sponsors it controls that area of

21   the city right-of-way and the roadway during the event.

22   Made an agreement that -- to agreement with the City.

23        Q.   Okay.  And who is it that controls the right-

24   of-way during the Tuesday market?

25        A.   I believe it's the Gulfport Merchants in

1    Chamber, or whatever their iteration is today.

2        Q.   And is that still the case?

3        A.   Yes.

4        Q.   Can you think of -- well, can you tell me what

5    specifically Mr. Lee has done at the casino that shows

6    that he has a demonstrated tendency to disrupt events?

7        A.   I would have to confer with my staff, but my

8    staff has shared with me his behaviors.

9        Q.   And what were those?

10       A.   That he was threatening and intervened in

11   their business operations.

12       Q.   How did he intervene in their business

13   operations?

14       A.   While they were trying to conduct business, he

15   would interject himself into you and I having a

16   conversation.

17       Q.   He would inject himself into conversations?

18       A.   Into business that was being completed at the

19   desk.

20       Q.   What kind of business?

21       A.   Rentals, things to that effect.

22       Q.   How did he interject himself?

23       A.   Screaming and yelling.

24       Q.   What was he screaming and yelling about?

25       A.   I was advised by -- by my staff -- I have --

1   you had asked me what they've shared with me.  That's --

2   so --

3       Q.   Okay.

4       A.   Yes.

5       Q.   All right.  How about City Hall?  Can you tell

6   me what conduct at City Hall has been disruptive to non-

7   public events?

8       A.   To non-public events?

9       Q.   Uh-huh.

10      A.   Yes.  His coming into the lobby and wanting to

11  speak to the police department repeatedly, attempting to

12  harass, to call repeatedly, and also his behavior

13  towards my front counter people.

14      Q.   What behavior towards the front counter

15  people?

16      A.   Yelling at them and clearly calling them names

17  and such, accusing them of things.

18      Q.   What has he accused them of?

19      A.   Of not being responsive to him.

20      Q.   Have any of them filed police reports?

21      A.   My assistant filed a report with the human

22  resources officer.

23      Q.   Who's your assistant?

24      A.   Lori Roach.

25      Q.   R-O-A-C?

1       A.    R-O-A-C-H.

2       Q.    And what came of that?

3       A.    It was put in the file.  It was just

4   documented that -- his behavior towards her.

5       Q.    And you've talked about all of this -- these

6   bad acts by Mr. Lee.  Was he ever cited for violating a

7   city ordinance, other than the heinous act of selling

8   ice cream?

9           MR. ROPER:  Objection to the form of the

10          question.  Argumentative.

11          THE WITNESS:  I believe that's been

12          adjudicated.

13            BY MS. LAHART:

14      Q.    I'm asking: Was he ever given any other

15  citations, other than the ones for --

16      A.    I would have to check.  I'm not aware of

17  any --

18      Q.    You don't know?

19      A.    -- other than the trespass.

20      Q.    Okay.  So you mentioned that he came to City

21  Hall and wanted to talk to police officers.  What --

22  what's wrong with that?

23      A.    His repeated accusations towards -- he -- he

24  repeatedly makes accusations about corruption and such

25  towards the police department.

1      Q.   Has he ever made accusations of

2   discrimination?

3      A.   Not that I'm aware of.

4      Q.   It also alleged in the Motion to Dismiss that,

5   "Mr. O'Reilly never directed him," being Mr. Lee, "to be

6   permanently banned from City Hall or the building

7   department.  The decision to issue a trespass warning

8   was instead put in the hands of the police."

9           So the police decide whether or not to issue

10  trespass warnings?

11     A.   They decide.  I can ask.

12     Q.   You ask?

13     A.   I can ask for it.

14     Q.   But they decide whether or not to do it?

15     A.   If it meets the grounds, yes.

16     Q.   Nothing in the City's policy signifies or

17  reflects that city employees control the duration of a

18  trespass warning.  So if it's not controlled by city

19  employees, who does control it?

20     A.   I would.

21     Q.   You do?

22     A.   Well, I -- the duration.

23     Q.   Okay.

24     A.   Because you obviously asked me that earlier

25  today.

1      Q.   So if you control the duration of a trespass,

2   have you ever directed that a trespass be issued for a

3   shorter time than permanent or indefinite?

4      A.   No.

5      Q.   Why not?

6      A.   I've never had it brought to my attention

7   until the police.  The police have.  They'd appeal to me

8   to tender a ticket, per their policies.  I can't issue

9   it the way the police department can issue it.

10     Q.   Uh-huh.  And you don't tell the police

11   department how long it should be issued for?

12     A.   No.

13     Q.   Okay.  So then it's up to the police whether

14   it's going to be for a year, or five years, or forever?

15     A.   There's never been a determination on that.

16     Q.   There's never been a determination on what?

17     A.   On length.

18     Q.   On?

19     A.   Length of time.

20     Q.   Length of time.  So every trespass that has

21   ever been issued in the City of Gulfport has been either

22   permanent or indefinite.  Is that a true statement?

23         MR. ROPER:  Objection to the form of the

24      question.

25         THE WITNESS:  I couldn't tell you.

1          BY MS. LAHART:

2      Q.   Are you aware of any trespass warning that has

3  ever been issued that was not either permanent or

4  indefinite in duration?

5          MR. ROPER:  Same objection.  Calls for

6      speculation, also.  You can answer.

7          BY MS. LAHART:

8      Q.   No?  So would it be accurate to say that the

9  City has a policy that the trespass warnings that are

10 issued are either permanent or indefinite?

11         MR. ROPER:  Calls for a legal conclusion.

12     Objection.  You can answer.

13         THE WITNESS:  They're indefinite.

14         BY MS. LAHART:

15     Q.   The City itself, through Mr. O'Reilly, never

16 permanently barred Plaintiff from City Hall or the

17 building department; is that correct?

18     A.   He could have requested to appeal it.

19     Q.   Okay.  Do you know if he was ever in --

20 advised in writing that he had the ability to appeal?

21     A.   I'm not aware.

22     Q.   So he was just supposed to know that?

23     A.   (No verbal response.)

24     Q.   And how would you know that he had the right

25 to appeal?

1        A.    (No verbal response.)

2        Q.    Is there anybody that was prevented from

3    attending the volunteer luncheon by Mr. Lee?

4             MR. ROPER:  Objection.  Asked and answered. You

5        can answer again.

6             THE WITNESS:  I'm unaware of that.

7             BY MS. LAHART:

8        Q.    Do you know if anybody left because Mr. Lee

9    was there filming Mr. Vincent?

10       A.    I'm not aware of that.

11       Q.    And he never actually went into the building,

12   did he?

13       A.    I'm not aware of that.

14       Q.    Mr. O'Reilly, it's my understanding that the

15   City of Gulfport has recently adopted an ordinance

16   regarding trespass warnings; is that accurate?

17       A.    I don't believe so.  We have adopted an

18   ordinance regarding filming in public areas.

19       Q.    Okay.  So is there still not a trespass

20   ordinance?

21       A.    That's correct.

22       Q.    And what was the impetus to adopt an ordinance

23   regarding filming?

24       A.    Individuals attempting to enter certain

25   restricted areas.

1     Q.   If they were restricted areas, why would you

2     need an ordinance?

3     A.   To codify their -- the precluding of it.  And

4     then attempting to enter restricted areas.

5     Q.   Okay.

6     A.   It was not codified.  It was not handled --

7     codified.

8     Q.   And which individuals are we referring to?

9     A.   Individuals that -- we'll call them First

10    Amendment auditors.

11    Q.   Okay.  Can you give me the names of First

12    Amendment auditors?

13    A.   I've got 25,000 clicks on one of them, Liberty

14    Troll.

15    Q.   Liberty Troll?  So were these residents that

16    were --

17    A.   No.

18    Q.   They were outside --

19    A.   Outside individuals.

20    Q.   Outsiders, not even residents of Gulfport,

21    coming in, trying --

22    A.   I'm not going to -- I'm not -- no, I'm not

23    going to do that.  Now, you and I know you're partisan

24    (audio cuts out) -- that.  So let's just say these are

25    individuals who came to City Hall attempting to --

1      Q.    Film?

2      A.    Film.

3      Q.    Film what?

4      A.    To -- to -- individuals in City Hall.

5      Q.    Individuals in City Hall doing what?

6      A.    Members of the public and such.  Paying their

7   water bill.  They're private citizens.

8      Q.    Yeah.  Yeah.  Private citizens in a --

9      A.    I understand that.

10      Q.    -- public building, right?

11      A.    Okay.  That's your -- that's -- we can

12   legislate that all day.

13      Q.    All right.  So now, pursuant to your new

14   ordinance, there are restrictions regarding where people

15   can film -- is it inside City buildings?

16      A.    Yeah.

17      Q.    So they can film anywhere outside of City

18   buildings; is that accurate?

19          MR. ROPER:  Objection to the form.

20      Mischaracterization as prior deposition testimony.

21      You can answer.

22          BY MS. LAHART:

23      Q.    I -- I'm just trying to understand.

24      A.    Okay.  I mean, whatever the state statute

25   provides.

1      Q.    Whatever the state statute provides?

2      A.    Uh-huh.

3      Q.    Which state statute?

4      A.    You'll have to confirm with my city attorney

5   on that.

6      Q.    I understand he'll be here this afternoon.

7      A.    Good.  Then I can go.

8      Q.    One of the attachments to the complaint is a

9   letter dated July 12, 2019, and it is directed to Mr.

10  Raymond Rodriguez.  And although it's not signed, at the

11  end of it, it says, "Robert Vincent, Chief of Police."

12     A.    Okay.

13     Q.    It says in here, "The City maintains a policy

14  whereby supervisors of individual city facilities are

15  empowered to issue trespass warnings whenever they have

16  reason to believe an individual has caused or is likely

17  to cause a disruption of services or put the safety of

18  staff or the public at risk."

19     A.    Uh-huh.

20     Q.    Is that still the City's policy?

21     A.    Yes.

22     Q.    Okay.  Does the supervisor have to have

23  actually seen the conduct that is the basis for the

24  trespass warning?

25     A.    We'd like them to.  But if not, they have to

1    base their decision on their staff's input.

2       Q.   Okay.  So they could, based on what somebody

3    told them happened --

4       A.   Sure.

5       Q.   -- to issue a trespass?

6       A.   Sure.

7       Q.   Was this the policy that resulted in Mr. Lee's

8    arrest from the city casino?

9            MR. ROPER:  Objection to form of the question.

10       Assumes facts not in evidence.  Calls for a legal

11       conclusion.  If you understand the question, you can

12       answer, sir.

13           THE WITNESS:  No.  I don't know that.

14            BY MS. LAHART:

15       Q.   Okay.  What -- can you give me an example of

16    what a reason to believe an individual is likely to

17    cause disruption of services?  What -- what does that

18    mean?

19           MR. ROPER:  Objection.  Calls for a legal

20       conclusion.  You can answer.

21           THE WITNESS:  The big -- well, one of my

22       employee -- an employee -- a City staff member is

23       trying to do business -- commercial business with an

24       individual.  And someone then sticks a camera in

25       their face, to the resident or the client, and then

1       starts berating them or accusing the staff member of

2       whichever activities.

3               BY MS. LAHART:

4       Q.   Okay.  Well, I would say that, that is

5  actually causing a disruptor of services, right?

6       A.   I'm sorry?

7       Q.   That's causing a disruption of services,

8  correct?

9       A.   The individual's behavior?

10      Q.   Yes.

11      A.   Yes.

12      Q.   Okay.  What I want to know is how you would

13  determine that there is a reason to believe an

14  individual will cause disruption of services, if they

15  haven't actually done so?

16      A.   They've done it in the past.

17      Q.   So it was based on past behavior?

18      A.   (No verbal response.)

19      Q.   You are responsible for implementing this

20  policy; is that correct?

21      A.   Yes.

22              MR. ROPER:  Don't do that.

23              BY MS. LAHART:

24      Q.   And is there any requirement that somebody be

25  given a verbal or written warning before they are

1    trespassed from a city facility?

2        A.    There's no requirement.

3        Q.    It says here at the bottom of this letter, "If

4    you wish to appeal Mr. Frain's decision," he is

5    referring to Mr. Frain's decision to trespass Mr.

6    Rodriguez from the municipal marina.

7        A.    From the marina.

8        Q.    "You wish to appeal Mr. Frain's decision, you

9    may appeal to the city manager" --

10       A.    Right.

11       Q.    -- "James O'Reilly.  He can be reached at

12   (727) 893-1009."  Do you know if Mr. Lee was ever given

13   anything in writing that says you may appeal to the city

14   manager?

15       A.    I can't answer that.

16       Q.    And as we sit here today, there are no written

17   criteria or written procedural rules that apply to such

18   an appeal; is that correct?

19            MR. ROPER:  I'm just going to object to the

20       form.

21            MS. LAHART:  We've been going for a while, can

22       we take like a ten-minute break?

23            MR. ROPER:  Sure.

24            MS. LAHART:  Five-minute break?

25            MR. ROPER:  Absolutely.

1          (OFF THE RECORD)

2          BY MS. LAHART:

3      Q.   Do you complain about being discriminated

4  against the basis of having -- of being a Latino male or

5  a gay male?

6      A.   Possibly, he was -- said it.  I'll say it

7  politely.

8      Q.   Well, I'm sorry.

9      A.   Okay.

10     Q.   So I just asked you if you ever heard --

11     A.   Yes.  Yes.

12     Q.   -- Jesse Lee complain of --

13     A.   Yes.

14     Q.   You need to let me finish my question.

15     A.   Okay.  Okay.  Well, you've asked me twice.

16          MR. ROPER:  Yeah, let's --

17          THE WITNESS:  Okay.  Go ahead.  I'm sorry.

18          BY MS. LAHART:

19     Q.   Okay.  I would like it to be on the record,

20  Mr. O'Reilly.

21     A.   Okay.  Okay.  That's fine.

22     Q.   So I'm going to ask again: Have you ever heard

23  Mr. Lee complain of being discriminated against?

24     A.   Yes.

25     Q.   Have you ever heard him give public comment at

1    your city council meeting regarding discrimination in

2    the City of Gulfport?

3        A.    Yes.

4        Q.    Coming back to the Motion to Dismiss, it says

5    in a footnote, Note 6, "Mr. O'Reilly would also note

6    that Plaintiff filed a racial discrimination complaint

7    with the City.  There is no evidence that he pursued an

8    appeal of the decision on that complaint through the

9    state courts of Florida.  Ultimately much, if not all of

10   Plaintiff's complaint centered around the notion that he

11   is being discriminated against and that is" -- "and that

12   that is responsible for all events complained of in the

13   amended complaint.  His failure to pursue those

14   procedures is also relevant to the procedural due

15   process issue.  Procedural due process analysis here."

16   It says that, "There is no evidence or allegation that

17   he pursued an appeal of the decision on the complaint."

18   Was there ever a decision made on his complaint?

19       A.    I'm not aware of.

20       Q.    And if a decision had been made on his

21   complaint, you would be the person who made the

22   decision, correct?

23       A.    That's correct.

24       Q.    And why is it that you didn't investigate his

25   complaint?

1      A.    I had never received a formal complaint.

2      Q.    You never received a formal complaint?

3      A.    That's correct.

4      Q.    Did you receive anything from him?

5      A.    There was one e-mail recently.  I -- I don't

6  know the date on it.  That was more of a diatribe than

7  it was a complaint.

8      Q.    Well, what was the diatribe about?

9      A.    Why he couldn't sell ice cream?

10      Q.    Why he couldn't sell ice cream.  And did he

11  claim that the reason he couldn't sell ice cream had

12  something to do with his race?

13      A.    I'd have to look at it again.

14      Q.    Well, did he complain of discrimination in

15  that diatribe?

16      A.    Possibly.

17      Q.    Okay.  If you needed more specific information

18  to investigate a complaint, would you not have asked for

19  it?

20          MR. ROPER:  Object to the form.  Calls for

21      speculation.  You can answer.

22          BY MS. LAHART:

23      Q.    Mr. Lee has asserted in his complaint that he

24  filed in his -- by his complaint, I mean the lawsuit --

25  that he filed a complaint of discrimination around the

1   first part of September 2020.  Do you dispute that?

2       A.   I have no record of that.

3       Q.   What, if anything, did you do in response to

4   the e-mail he sent that you referred to as a diatribe?

5       A.   Nothing.

6       Q.   Nothing?

7       A.   No.

8       Q.   You didn't reply?

9       A.   No.

10      Q.   What are your obligations as the human rights

11  officer, if somebody does file a complaint?

12      A.   Take statements from all parties and such.

13  It's laid out in the ordinance.  It's a -- a formal

14  process.  It's then referred to -- you know, to have

15  mediation and such.  It's -- the details are laid out in

16  the ordinance.

17      Q.   Okay.  And is there a specific form that

18  somebody has to fill out?

19      A.   No.

20      Q.   So could somebody e-mail you a complaint of

21  discrimination?

22      A.   Sure.  And then we would ask them to put a

23  formal document together.

24      Q.   What would a formal document be?

25      A.   It's outlined in the ordinance.  I can't quote

1    it off the top of my head.

2         Q.    So is it something that has to be signed?

3         A.    I'd have -- I'd have to check the ordinance,

4    exactly.

5         Q.    Okay.  So if somebody sent you an e-mail

6    complaining of discrimination, you would ask them to

7    submit a formal complaint?

8         A.    That's correct.

9         Q.    But you didn't ask Mr. Lee to submit a formal

10   complaint, correct?

11        A.    I don't believe so.

12        Q.    Why not?

13        A.    Because I believe when he sent that he had

14   representation by attorneys and I had representation.  I

15   explained to Mr. Lee in the past, as long as he had

16   retained you and to -- to communicate through our

17   attorneys.

18        Q.    Do you know when Mr. Lee retained me?

19        A.    I only know when this -- when you've seen me.

20        Q.    So how do you know that Mr. Lee had

21   representation when he sent you that e-mail that you

22   referred to as a diatribe?

23        A.    I don't.

24        Q.    Okay.  And if he did have representation, did

25   the city attorney reach out to his counsel and ask them

1    -- ask that a more formal discrimination complaint be

2    submitted?

3        A.   You'll have to speak with city attorney on

4    that.

5        Q.   As we sit here today, do you have any reason

6    to think that that happened?

7        A.   Refer to the city attorney.

8        Q.   Did you ask the city attorney to reach a --

9        A.   No, I did not.

10       Q.   Remember, you have to let me ask my question.

11       A.   Okay.  Okay.  Well, we're having a nice little

12   banter, come on.

13       Q.   You know, I understand that that's the way an

14   ordinary conversation works, but --

15       A.   Okay.  That's fine.

16       Q.   -- Lily can't write down what both of us are

17   saying at one time.

18       A.   Okay.

19       Q.   I don't know how they managed to write down

20   what one person is saying.  So back to my question: Did

21   you direct the city attorney to respond to the complaint

22   that Mr. Lee had filed?

23       A.   No.

24       Q.   Did -- were there other people that had

25   complained of discrimination in the City of Gulfport?

1          MR. ROPER:  Object to the form.

2          BY MS. LAHART:

3     Q.   Did Mr. Rodriguez ever complain of being

4     discriminated against?

5     A.   I don't believe he -- he -- he had complained

6     about being discriminated against.

7     Q.   Okay.  What about Ms. Ring?  Did she complain

8     of being discriminated against?

9     A.   She complained against Boca Ciega Yacht Club.

10    Q.   Okay.  Did she complain to you about being

11    discriminated against by the Boca --

12    A.   And we -- and we referred it, and we took

13    action against the Boca Ciega Yacht Club.  We had

14    reached a point where -- till you-all had reached

15    settlement.

16    Q.   What action did you take against them?

17    A.   Council -- council was considering not

18    renewing their lease.  It was sent -- it was held in

19    suspense till you finish your litigation.

20    Q.   But ultimately the lease was renewed, correct?

21    A.   And I believe you settled.

22    Q.   How much are they paying for your --

23    A.   They pay $2,000 a month now for just the

24    building --

25          MS. LAHART:  Mr. Donovan, I apologize.  I only

1          bought two copies of the -- these documents.

2                MR. ROPER:  That's alright.

3                MS. LAHART:  You might want to come sit next to

4          Mr. O'Reilly, because I'm going to --

5                THE WITNESS:  You can sit here --

6                 BY MS. LAHART:

7           Q.   You need to be able to look at --

8                MR. ROPER:  Yeah.  Let me just take a glance.

9          I've probably seen it before.

10                BY MS. LAHART:

11          Q.   I have handed you an e-mail from Thomas

12     Woodman to Mary Farrand, dated Friday, July 12, 2019.

13     There were apparently a couple attachments to it.

14                We'll go ahead and mark this as Plaintiff's

15     Exhibit 1.

16                There was something I wanted to ask you about

17     this, and it will come to me if you just give me a

18     second.  On the one, two, three, fourth page, there is

19     an e-mail from Jason Motte.

20          (PLAINTIFF'S EXHIBIT 1 MARKED FOR IDENTIFICATION)

21          A.   Okay.

22                BY MS. LAHART:

23          Q.   M-O-T-T-E --

24          A.   Right.

25          Q.   -- to Mr. Woodman.

1      A.    Officer Motte, Sergeant Woodman, yes.

2      Q.    Officer Motte was a police officer with the

3  City of Gulfport at the time; is that correct?

4      A.    He -- he still is.  Yes.

5      Q.    Still is.  And who was Mr. Woodman?

6      A.    He's the sergeant.

7      Q.    And is Mr. Woodman still employed there?

8      A.    Yes.

9      Q.    And this e-mail states, "I had a question

10  posed to be today, so I was doing a little research."  I

11  think he meant posed to me.  "After my research, I've

12  concluded the police department trespassing an

13  individual from a public park or public grounds open to

14  the general public, such as parks, is unconstitutional

15  violating Florida's constitutional" -- "Florida

16  Constitution rights extended to an individual's civil

17  liberties for free movement.  I've attached the Florida

18  Appellate ruling, which is still enforced that I'm

19  representing" -- "that I'm referencing.  The ruling is

20  close to home too, pertaining the City of St.

21  Petersburg.  This case law is specific to people being

22  trespassed from public parks.  In this case, homeless

23  people were being trespassed from public parks.  The

24  courts rule that no one can be trespassed from public

25  property that is open to the general public, including

1  parks.  A park is no different than a sidewalk outlined

2  in the ruling.  It appears in the ruling a person can

3  only be trespassed from public property, if it isn't

4  open to the general public.  The reason I'm asking your

5  thoughts on this matter is a person asked me about Max

6  being trespassed from the beachfront and park.  They

7  asked how the City could do this, since the property is

8  open to everyone.  What are your thoughts on this matter

9  after reviewing the most current case I could find on

10  this matter?"

11          Did you ever see this e-mail?

12      A.    No, but this is what happens when police

13  officers try to practice law.

14      Q.    Okay.  Well, a police officer apparently had a

15  concern about the constitutionality of trespassing

16  citizens from public property.  Were those concerns ever

17  brought to your attention?

18      A.    I believe so.  And we asked for clarification.

19  I'll defer to the city attorney.

20      Q.    You asked for clarification?

21      A.    And the city attorney said we could go ahead

22  and do that because the case law related to St.

23  Petersburg was not applicable in our situations to where

24  we were trespassing individuals.

25      Q.    Why was it not applicable?

1      A.   You'd have to ask the city attorney.

2      Q.   Okay.  It's another e-mail.  It's only one-

3  pager.

4           Mr. Donovan, you want to take a look at it?

5           And I am going to put this sticker on it that

6  says, "Exhibit 2."

7           Okay.  This is dated July 11, 2019, and it is

8  an e-mail from Robert Vincent to Andrew Salzman.  You

9  were copied on that e-mail, correct?

10  (PLAINTIFF'S EXHIBIT 2 MARKED FOR IDENTIFICATION)

11     A.   Yes.

12          BY MS. LAHART:

13     Q.   Okay.  And it's, I think, forwarding an e-mail

14  from Josh Stone saying, "I think I found case law that

15  would make the issuance of trespass warnings on our

16  city-owned property without due process to challenge the

17  warning unconstitutional."

18          You have reached out to Mr. Salzman for

19  counsel on this.

20     A.   Uh-huh.

21     Q.   What format was the response for Mr. Salzman?

22     A.   I -- you'd have to ask him.  I don't -- if it

23  wasn't in the request for documentation.

24     Q.   So you -- as we sit here today, you don't

25  remember if he sent you an e-mail, drafted a memo?

1      A.    If he said -- if he would've sent an e-mail,

2    it would be in there.

3      Q.    Okay.  But at least as of July 12, 2019, you

4    were on notice that there were possible constitutional

5    problems with the City's trespass --

6          MR. ROPER:  Objection to the form of the

7      question.

8          BY MS. LAHART:

9      Q.    -- correct?

10          MR. ROPER:  Assumes facts not in evidence,

11      mischaracterization of prior deposition exhibit

12      content. If you understand the question, you can

13      answer, sir.

14          THE WITNESS:  I deferred to the city attorney.

15          BY MS. LAHART:

16      Q.    Okay.  Do you understand the question that I

17    asked?

18      A.    No.

19      Q.    Okay.  My question is, whether -- well, first

20    of all, it -- this shows that you were copied on it. Did

21    you actually receive this?

22      A.    If I'm copied on it, yes, I did.

23      Q.    Okay.  And it is an e-mail -- Mr. Vincent is

24    forwarding an e-mail that says, "I think I found case

25    law that would make the issuance of trespass warnings on

1   our city-owned property without due process to challenge

2   the warning unconstitutional."

3          Did you understand what Mr. Stone meant when

4   he said that?

5    A.   I understand.  That's why it was deferred to

6   the city -- referred to the city attorney.

7          MS. LAHART:  Okay.  Another e-mail I'll mark as

8          Exhibit 3.  And this is an e-mail from you to Mr.

9          Salzman.

10  (PLAINTIFF'S EXHIBIT 3 MARKED FOR IDENTIFICATION)

11          THE WITNESS:  Uh-huh.

12          MS. LAHART:  Looked like you blind copied

13          yourself.

14          THE WITNESS:  Uh-huh.

15          BY MS. LAHART:

16   Q.   And it's subject is: Jesse Lee trespassed at

17  City Hall complex.  There's a T on the end.  The e-mail

18  that you're forwarding is from the police chief to all

19  police department employees copied to you, "I have

20  communicated to Mr. Lee clarification that the trespass

21  warning issued to him for City Hall/Community

22  Development office, applies to the entire property, not

23  just the inside of the buildings.  If you see him on any

24  part of the City Hall campus, you may tell him to leave.

25  If he refuses to comply, he may be arrested for

1  trespassing.  Please note that this does not apply if he

2  is attending a public meeting."

3      A.   Okay.

4      Q.   Why was that clarification issued?

5      A.   Because it was specific to Community

6  Development.  We looked at the whole campus of City

7  Hall.

8      Q.   Okay.  Why in July 26, 2022 or on July 26,

9  2022, which was a couple years after the first trespass

10  and almost a year after the second one, was it necessary

11  to clarify that Mr. Lee was not allowed any place on the

12  campus?

13      A.   I don't recall.

14      Q.   If Mr. Lee had wanted to go to City Hall and

15  carry a protest sign on the front steps, would he be

16  allowed to do that?

17          MR. ROPER:  Objection to the form.  Assumes

18      facts not in evidence or an issue.  It calls for a

19      legal conclusion.  Calls for speculation.  You can

20      answer, if you understand the question.

21          THE WITNESS:  I'll defer to the legal counsel.

22           BY MS. LAHART:

23      Q.   Okay.  Mr. O'Reilly, you did tell me earlier

24  that you are responsible for implementing the City's

25  trespass policy, right?

1       A.    Uh-huh.  Yes, I am.

2       Q.    But you can't tell me whether the trespass

3   would have prevented him from protesting outside City

4   Hall?

5       A.    I believe he has protested at City Hall

6   without being arrested.

7       Q.    So in other words, there -- there's an

8   exception to this statement that was sent by Mr.

9   Vincent?

10          MR. ROPER:  Objection.  Assumes facts not in

11       evidence.  Mischaracterization of his prior

12       testimony.

13          BY MS. LAHART:

14      Q.    Mr. O'Reilly, I want you to know that I would

15   never intentionally mischaracterize your testimony.

16          MR. ROPER:  Is there a question there?

17          BY MS. LAHART:

18      Q.    You state that Mr. Lee has trust or protested

19   outside of City Hall and not been arrested.  What did he

20   protest?

21      A.    I couldn't tell you.

22      Q.    What do you mean by, "outside of City Hall"?

23      A.    The sidewalk.

24      Q.    The sidewalk?  So what if he wanted to protest

25   on the steps of City Hall?  Would that be allowable, or

1  would he be violating his trespass?

2      A.   He'd be violating his trespass.

3      Q.   Would Mr. Lee be able to go to the fire

4  department, if he wanted to?

5      A.   He has.

6      Q.   Do you know if he's ever gone into the

7  building that houses the fire department?

8      A.   I'm not aware of.

9      Q.   All right.  I've handed you an e-mail from --

10     A.   Samantha Ring.

11     Q.   -- Samantha Ring sent to you and some other

12  folks.

13          It's dated March 2, 2020.  States, "I would

14  like to know the procedure for removing Ray Rodriguez's

15  trespass.  I, along with others, feel it's unfair that

16  the marina allows some people, like Richard Walter, to

17  be on camera.  I have video calling a resident in marina

18  patron" --

19     (PLAINTIFF'S EXHIBIT 4 MARKED FOR IDENTIFICATION)

20     A.   Okay.  You don't have to say it.

21          BY MS. LAHART:

22     Q.   -- "pathetic over and over and harassing me

23  while I am in my car in a public parking lot and nothing

24  is done, and yet Ray Rodriguez has what appears to be a

25  lifetime ban.  There is a procedure to remove his ban.

1    There has to be, legally.  Please tell me what it is so

2    we can get this taken care of."

3                Did you respond to Ms. Ring?

4         A.    Not to Ms. Ring, I don't believe, but I will

5    tell you, I did meet with Mr. Rodriguez.

6         Q.    Why didn't you respond to Ms. Ring?

7         A.    I didn't believe she was party to Mr.

8    Rodriguez's issue.

9         Q.    She is a resident of Gulfport.  Was she not

10   allowed to know what the procedure is to have a trespass

11   removed?

12        A.    I made a mistake.

13        Q.    I have an extra copy of this one.  All right.

14   I'm going to hand you a document that I am going to

15   label the Plaintiff's Exhibit 5.

16                This is an e-mail between -- well, it contains

17   an e-mail between yourself and Mr. Salzman, which he has

18   apparently forwarded you a motion filed by Mr. Lee's

19   attorney, and the police chief has written, "Should we

20   consider amending the charge to the more recent

21   ordinance regarding mobile food vendors?"

22                Do you know what ordinance he's referring to?

23        (PLAINTIFF'S EXHIBIT 5 MARKED FOR IDENTIFICATION)

24                MR. ROPER:  Objection.  Calls for speculation.

25        You can answer, if you understand or --

1          THE WITNESS:  The City had based on state

2      statute changing the state law of the City had

3      revised its local vending ordinance.

4          BY MS. LAHART:

5      Q.   How was it revised?

6      A.   Setting the standards and it had to be on

7  private property.

8      Q.   Okay.

9      A.   Which is in conjunction with the state law.

10     Q.   Okay.

11     A.   Provided for within state law.

12     Q.   Okay.  So as of March 17, 2021, you -- or

13  apparently Chief Vincent thought that the mobile food

14  vendor ordinance would apply to Mr. Lee, correct?

15         MR. ROPER:  Objection.  The -- direct

16     contradiction from what the exhibit itself states.

17         MS. LAHART:  You're right.  I did not --

18         MR. ROPER:  Object to the form.

19         MS. LAHART:  I will withdraw the question.  I

20     did not ask that properly.

21          BY MS. LAHART:

22     Q.   In March of 2021, the City of Gulfport

23  considered Mr. Lee's contraption to be a mobile food

24  vending vehicle, correct?

25         MR. ROPER:  Objection to the form.  Asked and

1     answered.

2         THE WITNESS:  I believe that case has been

3     adjudicated.

4         BY MS. LAHART:

5     Q.   Could you answer my question?

6     A.   It did.  It's the courts -- the courts have

7   made a determination on that.

8     Q.   Okay.  Did the City of Gulfport consider Mr.

9   Lee's vehicle, ice cream cart, whatever you want to call

10  it, a mobile food dispensing vehicle?

11   A.   No.

12     MR. ROPER:  Again, objection.  Asked and

13    answered.

14     MS. LAHART:  All right.  This is Plaintiff's

15    Exhibit 6.  Let me -- this is a police report dated

16    April 27, 2023, and you are listed as a witness.

17   (PLAINTIFF'S EXHIBIT 6 MARKED FOR IDENTIFICATION)

18      THE WITNESS:  Okay.

19      BY MS. LAHART:

20   Q.   You are Witness number 2, James Edward

21  O'Reilly?

22   A.   Yep.  Okay.

23   Q.   And it says, "Witness of committed misdemeanor

24  trespass after warning."

25      What did you actually witness?

1      A.    This is Page 2 of 6.  If you could give me

2  Pages 1 through 6, I could tell you.  Obviously, it

3  involves someone's behavior towards one of my council

4  members.

5      Q.    Okay.  Well, it's dated the 27th of April

6  2023, which is the day that Mr. Lee was arrested at the

7  casino.

8      A.    Okay.

9      Q.    I'm asking what you witnessed that day.

10         MR. ROPER:  Well, I'm going to object, since

11      you've only given him one page out of what appears

12      to be a six-page report.  And so I'm going to object

13      on the grounds that it's incomplete exhibit and also

14      that he -- the -- he's being asked to call for

15      speculation.

16         BY MS. LAHART:

17      Q.    Okay.  He's made his objection for the record.

18  What did you observe on April 27, 2023, regarding Mr.

19  Lee?

20         MR. ROPER:  Same objection.  You can answer.

21         THE WITNESS:  I didn't.

22          BY MS. LAHART:

23      Q.    Did you see him?

24      A.    Did I see him?

25      Q.    At the city casino?

1       A.   No.

2            MS. LAHART:  I think you'll be happy to hear

3       this: I'm pretty close to wrapping up, if you could

4       give me a few minutes to look through my notes?

5            MR. ROPER:  Sure.  Why don't we go off the

6       record, and we'll give you guys the room?

7            MS. LAHART:  Thank you very much.

8            (OFF THE RECORD)

9            THE REPORTER:  The time is 12:02 p.m. Eastern

10      Time, and we are back on the record.

11           BY MS. LAHART:

12      Q.   Mr. O'Reilly, I'm going back to the Motion to

13 Dismiss that was filed on your behalf.  And in this

14 motion, it is asserted that the -- well, it says,

15 "Gulfport's challenged trespass policy has been

16 replaced, and therefore the declaratory relief action is

17 moot."  And it says, "Plaintiff claims that Gulfport's

18 trespass policy, which has since been replaced by an

19 ordinance, is void for vagueness in violation of the

20 procedural due process clause of the 14th Amendment."

21           Has the trespass policy been replaced by an

22 ordinance?

23      A.   I think there's a miscommunication in regards

24 to the actual video, and ordinance was perceived as

25 being a trespass ordinance.

1    Q.    But it's not?

2    A.    No.  It -- well, you'll have to get the city

3    attorney to differentiate than I can.  I look at it as a

4    video, but he may -- he may have --

5    Q.    Okay.

6    A.    -- interpret it different.

7    Q.    Do you recall receiving interrogatories,

8    written questions?

9    A.    Yes.

10   Q.    And did you review the answers to those

11   questions?

12   A.    Yes.

13   Q.    Okay.  Question 6 asks about the racial

14   discrimination complaint filed with the City.  "In the

15   allegation that" -- "made by your counsel, there is no

16   evidence or allegation that he pursued an appeal of the

17   decision on that complaint through the State of Florida.

18   Was a decision ever made by Gulfport or James O'Reilly

19   regarding Jesse Lee's discrimination complaint that is

20   referenced in Footnote 6 of James O'Reilly's Motion to

21   Dismiss?"

22        And the response is, "At this time, Defendant

23   would object to this interrogatory as phrased, as

24   Plaintiff never properly filed a discrimination petition

25   in the manner provided for by the City in its

1  ordinances, and instead filed a rambling set of

2  grievances against the City without any specific

3  discrimination claim and indicated that he considered

4  the process provided for absurd.  Therefore no decision

5  could be made by the City on Plaintiff's filing."

6       Did you ever ask Mr. Lee to provide additional

7  information regarding his complaints against the City?

8       A.   No.

9       Q.   Can you explain to me why Mr. Lee was

10  trespassed from City Hall, if his offensive conduct had

11  to do with the building department?

12       A.   (Coughs) -- I'm sorry.  Okay.  We -- very

13  simply, it was an expansion of his behaviors in City

14  Hall and also at the building department.  We were under

15  COVID lockdown, and he did not want to leave.

16       Q.   Okay.  We've talked at length about the policy

17  that was -- that's been referenced in various

18  communications, none of which I can put my fingers on at

19  the moment.

20       September 27, 2021, Chief Vincent sent Mr. Lee

21  a message via Facebook that said, "I would like to

22  clarify for you again that neither of the trespass

23  warnings you received for the city building were issued

24  by police officers.  They were issued by administration

25  and merely delivered to you by police officers.  You're

1    correct that police officers may not issue trespass

2    warnings, absent a threat to public safety, but such a

3    restriction does not apply to the owner or manager of a

4    property."

5            How do you -- is that consistent with your

6    testimony, then?

7        A.   Sure.  Sure.

8        Q.   Okay.

9        A.   The police officer will not issue if it's not

10   -- there's not legal standing.  The determination my

11   staff -- city attorneys provided this guidance that,

12   yes, my staff or I can request it.  I'm not -- if the

13   officer chooses not to deliver it because it's still a

14   citation, we don't have the authority to issue a

15   citation.  Only the officer does.

16       Q.   Okay.  Are you telling me that as city

17   manager, you could ask that a trespass be issued to a

18   citizen, and the police department can tell you, no,

19   we're not going to do that?

20       A.   Yes.

21       Q.   Has that ever happened?

22       A.   Possibly.  Not seriously.  They told me it

23   doesn't meet the criteria.

24       Q.   Can you give me a specific example?

25       A.   No, I can't.

1      Q.   All right.  Going back to this policy,

2   "Supervisors of individual city facilities are empowered

3   to issue trespass warnings whenever they have reason to

4   believe an individual has caused or is likely to cause a

5   disruption of services or put the safety of staff or the

6   public at risk."

7           Is it required that the individual have

8   violated an ordinance or statute before they are

9   trespassed?

10      A.   No.

11      Q.   Do you know the origin of this trespass

12   policy, who wrote it?

13      A.   I inherited it.

14      Q.   You inherited it.  Do you know who you

15   inherited it from?

16      A.   Previous city managers.

17      Q.   Previous city managers.  Mr. Vincent made a

18   statement -- written statement to Mr. Lee that, "The

19   city manager can trespass anyone for any reason or no

20   reason at all."

21           Would you agree with that?

22           MR. ROPER:  Objection.  Form.  Calls for

23      speculation.

24           THE WITNESS:  I never acted upon it in that

25      manner.

1    BY MS. LAHART:

2    Q.   Do you think that you can trespass somebody

3    for no reason at all?

4    A.   I've never acted on it in that manner.

5    Q.   That wasn't the question I asked you.

6    A.   Have I -- do I believe that?

7    Q.   Yes.

8    A.   No.

9    MS. LAHART:  I have nothing more --

10   THE WITNESS:  Okay.

11   MS. LAHART:  -- to ask of you at the moment.

12   Unfortunately, I am going to have to continue

13   this deposition, because a couple of the responses

14   to the request for production are in a format that I

15   cannot access.  And hopefully that will be a moot

16   point --

17   THE WITNESS:  Okay.

18   MS. LAHART:  -- but I just need to make that

19   statement for the record.

20   Do you have questions for the witness?

21   MR. ROPER:  I was thinking if you can tell us

22   what portions you can't access, we can maybe try to

23   see if our office can print them out, mail them over

24   here.

25   MS. LAHART:  One of them is more than 5,000

1     pages, so --

2          MR. ROPER:  So --

3          MS. LAHART:  -- I don't think that's going to

4     happen.  It's not something that we can deal with

5     right now.  I'm sorry.

6          MR. ROPER:  Okay.

7               CROSS-EXAMINATION

8          BY MR. ROPER:

9     Q.    I just have a couple of clarification

10    questions, Mr. O'Reilly.  You stated earlier that the

11    Gulfport Merchants Association runs certain special

12    events with the City of Gulfport.  Can you explain to

13    us, the Court, and/or the jury that'll hear the

14    testimony?

15              How long has the Gulfport Merchants

16    Association been around, and what is the purpose of it?

17    A.    Well, they're basically a chamber of commerce

18    type organization.  There were two organizations prior.

19    When I came to the City in 2004, I believe there was a

20    Gulfport Beach Merchants Association and a chamber of

21    commerce.  Subsequently, they merged in 2007.  They --

22    we drafted one document that allowed us to sponsor

23    activities with them, but they -- they pre-existed. That

24    goes back to the Waterfront Redevelopment District was

25    created in 1993.

1     Q.   Okay.  And what is the function of the purpose

2   of the Gulfport Merchants Association, currently?

3     A.   To promote businesses in the Waterfront

4   Redevelopment District.

5     Q.   Okay.

6     A.   And businesses outside the district.  It

7   subsequently expanded itself.

8     Q.   Okay.  How does one obtain a mobile food

9   dispensing vehicle permit, if one has one of those

10   pieces of equipment, to try and sell food from a food

11   truck at a Gulfport event?

12     A.   They would contact the event sponsor, who

13   would then make the determination.  And the example we

14   always use is you're not going to bring in a somebody

15   and have three people selling the same product.  They

16   kind of use that as a -- and that's just from my

17   experience with them.

18     Q.   Okay.  And how long has that procedure been in

19   place?

20     A.   At minimum, from 2004, in my -- best of my

21   knowledge.

22     Q.   Okay.  So if a vendor wants to sell widgets

23   or, in this case, a food from a food truck, one was --

24   that vendor has to contact the event sponsor themselves?

25     A.   That's correct.

1    Q.    Okay.  And then the event sponsor does what?

2    A.    Determines -- charges registration fee.  Make

3    sure that they give us -- we do an inspection during the

4    event to food vendors and things like that, to make sure

5    they have proper safety issues addressed, but all of it

6    is addressed through the Merchants Association.

7    Q.    Okay.  Do you have any kind of memory or

8    recollection of ever explaining the process that you've

9    just told us to Mr. Lee in the past?

10    A.    Yes, I have.

11    Q.    And can you give us a little bit of background

12    on that?

13    A.    Approximately six years ago, Mr. Lee came to

14    the City and inquired about doing some type of mobile

15    vending and wanted to sell food stuffs and such.  And --

16    and we explained that the events are covered through the

17    merchants and other sponsors.

18    Q.    Okay.  And did you inform him how to go

19    about --

20    A.    Yes.

21    Q.    -- filing an application?

22    A.    Yes.  And he -- and he has spoke to the

23    merchants.

24    Q.    Okay.  Do you know if he's ever filed an

25    application with them?

1    A.    I couldn't tell you that.

2    Q.    Okay.  Do you know if any of his applications

3    have ever been denied to the Gulfport Merchants

4    Association --

5    A.    I --

6    Q.    -- by that association?

7    A.    I couldn't speak to that.

8    Q.    Okay.  Now, different line of questioning, but

9    you mentioned earlier that at the time of the building

10   department trespass of Mr. Lee in 2020, that there was a

11   COVID lockdown in effect?

12   A.    Yes, sir.

13   Q.    Okay.  So at the time Mr. Lee was trying to

14   gain entrance into the building department after being

15   warned of his unacceptable behavior, was that bill --

16   was that COVID lockdown in effect at that point in time?

17   A.    Yes, sir.

18   Q.    In a different line of questioning, you were

19   asked whether or not you had spoken to either city

20   staff, elected council members, and/or police department

21   officials, officers, and other officials with regards to

22   Mr. Lee's behavior, at any given point in time in the

23   City of Gulfport, with regards to city officials, staff,

24   or police officers?

25   A.    Yes, I have.

1          Q.    Do you recall that?

2          A.    Yes.

3          Q.    Okay.  Have you also watched video footage of

4     those interactions?

5          A.    Yes.

6          Q.    Have you watched police body camera --

7          A.    Yes.

8          Q.    -- video footage of those interactions --

9          A.    Yes.

10         Q.    -- as well?

11         A.    I don't believe we've ever interacted, Mr. Lee

12    and I, where he has not videotaped it.

13         Q.    Okay.  In a different line of questioning, you

14    were asked by Opposing counsel about trespass warnings;

15    you recall that?

16         A.    Yes.

17         Q.    Okay.  Would you agree or disagree with the

18    following question: Does each trespass warning entail

19    different facts and circumstances in each situation,

20    whereby each case has to be addressed only on their

21    unique facts on a case-by-case basis?

22         A.    I agree.

23         Q.    Okay.  And in the case of Mr. Jesse Lee and

24    his interactions with the City of Gulfport staff,

25    elected officials, and also police officials, have you

1    exercised that tenant?

2         A.   Yes.

3         Q.   The September one -- now, I don't have a paper

4    copy of this handy.  I think it's in my car, but I know

5    we've sent this to you before.  So I'm going to --

6              MR. RING:  She sent it to us so --

7              MR. ROPER:  Okay.  You sent it to us.  Right.

8              So this is the -- this is number 1.  I'm just

9         going to show it to him.

10             MR. RING:  It goes onto the second page, too.

11             MR. ROPER:  Yeah.  Let me scroll this over. How

12        do you get to the next page?  I have an iPad, so I

13        don't use one of these.

14             MS. LAHART:  Yeah, this is old-school.

15             MR. RING:  Yeah.  What -- okay.  Here's the

16        second page.  I think the first page repeated

17        itself.

18             MR. ROPER:  Okay.

19             MS. LAHART:  Okay?

20             MR. ROPER:  All right.  Go back.  Go back to

21        the first page.

22             Mr. O'Reilly, I'm going to have you look at a

23        copy of what I will label as Exhibit 1 for the City.

24        What we will do after we go off the record is we

25        will make a paper copy, give it to the court

1          reporter, and we'll attach it as Exhibit 1.  Please

2          take your time and read that, and then I'll ask you

3          some questions.

4          (DEFENDANT'S EXHIBIT 1 MARKED FOR IDENTIFICATION)

5                 THE WITNESS:  Okay.

6                 MR. RING:  We got to save that.

7                 THE WITNESS:  It's fine.  Okay.

8                  BY MR. ROPER:

9          Q.   Okay.  Now, we've -- we're -- we'll attach

10    that as Exhibit 1 for the City, but do you recall seeing

11    that exhibit before?

12         A.   No.  I didn't.

13         Q.   Okay.  Now, it's titled -- okay.  So there's

14    actually two titles.  The first title on the first page

15    is Bullying and Discrimination Allowed by City

16    Questions, and then on the second page, it's titled

17    Bias, Discrimination, and Bullying.

18              My question to you after you've had a chance

19    to read that e-mail just now, but did you perceive or

20    take that e-mail as a discrimination complaint?

21         A.   No.  I took it as a list of complaints.

22         Q.   Okay.  Did you perceive that though as a

23    formal claim of discrimination that Mr. Lee was making

24    towards the --

25         A.   No.

1    Q.    -- City of Gulfport?

2    A.    No.

3    Q.    Okay.  What did you perceive it as?

4    A.    As a list of complaints that he had about the

5    City in general and the Merchants Association in

6    general.

7    Q.    Okay.  And Page 2.  On Page 2 of that

8    September 1, 2020 e-mail, right at the top, it states,

9    "Update and corrections to initial e-mail sent!  Also

10   wanted to make note that I repeated reported to you

11   about the bullying, discrimination, and bias treatment

12   placed on me by the City of Gulfport, its Counsel," S-E-

13   L, "major and city manager, intentional bullying and

14   discrimination, not limited to allowing the GMAC to do

15   the same with the assistance of the town and with no

16   interference!  You have done nothing but promote this

17   behavior intentionally and only valuing certain

18   businesses' needs, which, in fact, leaves them, yet

19   again, allowed to bully us further and discriminate

20   against us further on race, gender, sexual orientation,

21   and bias discrimination, with no protections in place

22   due to your lack of help!"

23          Again, did you perceive any type of

24   specific --

25   A.    No.

1   Q.   -- claim of discrimination out of that?

2   A.   No, sir.

3   Q.   Okay.  And then Mr. Lee goes on to state in

4   that e-mail, "Yet you are telling me I must be judged by

5   the very people being abusive, bias, discriminatory, and

6   bullying!"

7        Mr. Lee went on to ask that -- well, let's

8   follow up with, "I'm requesting an outside source to

9   proceed forward, so the same one violating my rights

10  aren't the ones passing what they deem fair as usual,

11  including their clear bias and conflict of interest in

12  every step forward.  This is a direct violation of my

13  rights to a fair and unbiased trial, to have you or

14  anyone associated with the City to oversee its

15  deliberations!  I'll wait for proper channels to be

16  offered!"

17       My question to you is: Do you know what he

18  meant when Mr. Lee was asking for an, "outside source to

19  proceed forward," meant?

20  A.   No.

21  Q.   Or means?

22  A.   No, sir.

23       MR. ROPER:  I don't have anything further.

24       THE WITNESS:  Okay.

25       MS. LAHART:  Just a few follow-up questions.

1          THE WITNESS:  Okay.

2                 REDIRECT EXAMINATION

3          BY MS. LAHART:

4     Q.   Mr. Roper asked you about the Gulfport

5  Merchants Association?

6     A.   Yes.

7     Q.   And they've been around a long time?

8     A.   Well, they were Chamber -- it was the Gulfport

9  Chamber of Commerce and the Gulfport Beach Merchants,

10  and subsequently they merged.

11     Q.   Okay.  And as the event sponsor, they're the

12  ones that control what happens on property that is owned

13  by the City of Gulfport, correct?

14     A.   Yeah.

15     Q.   Are there any written criteria that apply when

16  somebody wants to have a mobile food dispensing vehicle

17  at a special event?

18     A.   You would've to ask them that.  We have a

19  special event application that we give to the sponsor

20  who has to outline that.  I believe you've been provided

21  that.

22     Q.   So there is nothing in writing that says that

23  the Gulfport Merchants Association cannot discriminate

24  against someone?

25     A.   Yes, there is.

1     Q.   What is that?

2     A.   It's in -- in the agreement.  They agreed to

3  adhering to Chapter 25.

4     Q.   What agreement is that?

5     A.   So the -- it's about the agreement

6  application, special event application.

7     Q.   Okay.

8     A.   They have to agree to follow, adhere to -- I

9  believe it's Chapter 25.

10    Q.   Suppose there's a member of the Gainesville

11  [sic] Merchant Association who owns a pizza restaurant,

12  and I have a mobile food vending vehicle that I want to

13  sell pizza from.

14     Could the Gainesville -- Gulfport --

15    A.   I was ready to --

16    UNIDENTIFIED SPEAKER:  You mean Gulfport?

17    BY MS. LAHART:

18    Q.   -- Gulfport Merchants Association say, we're

19  not going to let you sell pizza because it would be in

20  competition with this --

21    A.   Yes.

22    MR. ROPER:  Objection.  Form.

23    BY MS. LAHART:

24    Q.   Okay.  Okay.  Mr. Roper asked you some follow-

25  up questions about the trespass from the building

1    department.  And I can't remember if he said or you said

2    that Mr. Lee was warned of unacceptable behavior.

3            Who gave him that warning?

4    A.    The building official.

5    Q.    And what did he say?

6    A.    He told him to stop pulling on the door.

7    Q.    Doesn't the door open inward?

8    A.    No.

9    Q.    Were you present?

10   A.    No.

11   Q.    Did you ever tell Mr. Lee that he might be

12   happier in a more ethnically diverse community, like

13   Tampa?

14   A.    No.  Not at all.

15   Q.    In response to the e-mail that is now

16   Defendant's Exhibit 1 -- it was the September 1st e-mail

17   from Mr. Lee -- what, if anything, did you do in

18   response to that e-mail?

19   A.    Kept it in file.

20   Q.    Okay.  And he was specifically requesting that

21   his concerns be considered by an outside source,

22   correct?

23   A.    Okay.

24   Q.    Well, Mr. Roper read you the last part?

25   A.    Yeah.  No.  I know.  I agree with you.

1      Q.   Okay.

2      A.   I agree with you.  It says he wanted it to be

3  a -- okay.

4      Q.   Okay.  Did you forward it to the Pinellas

5  County Office of Human Rights?

6      A.   No, I did not.

7      Q.   Florida Commission on Human Relations?

8      A.   No.  I did not.

9      Q.   Department of Justice?

10     A.   No.  I did not.

11     Q.   Did you respond to Mr. Lee that he could apply

12  to any of them?

13     A.   No.  I did not.

14     Q.   Send his complaint to any of those

15  organizations?

16     A.   No.

17          MS. LAHART:  We're done.

18          THE WITNESS:  We're done.  Back to Gainesville.

19          MR. ROPER:  We'll read.

20          THE REPORTER:  Read?

21          THE WITNESS:  Back to Gainesville.

22          MS. LAHART:  They're going to read.

23          THE REPORTER:  And then, Ms. LaHart, did you

24      want to order the transcript?

25          MS. LAHART:  Yes.

1        THE REPORTER:  Electronic, regular turnaround?

2        MS. LAHART:  Electronic, regular turnaround.

3        THE REPORTER:  All righty.  Mr. Roper, copy?

4        MR. ROPER:  Yeah.

5         (DEPOSITION CONCLUDED AT 12:30 P.M. ET)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OATH

 2

 3  STATE OF FLORIDA

 4  COUNTY OF ORANGE

 5

 6      I, the undersigned, certify that the witness in the

 7  foregoing transcript personally appeared before me and

 8  was duly sworn.

 9

10  Identification:  Produced Identification

11

12

13

14

15  _____

16          Lilianna Cavanaugh

17          Court Reporter, Notary Public

18          State of Florida

19          Commission Expires: 08/16/2027

20          Commission Number:  HH 434226

21

22

23

24

25
```

1                C E R T I F I C A T E

2

3  STATE OF FLORIDA)

4  COUNTY OF ORANGE)

5

6      I, Lilianna Cavanaugh, Court Reporter and Notary

7  Public for the State of Florida at Large, do hereby

8  certify that I was authorized to and did report the

9  foregoing proceeding, and that said transcript is a true

10  record of the said proceeding.

11

12      I FURTHER CERTIFY that I am not of counsel for,

13  related to, or employed by any of the parties or

14  attorneys involved herein, nor am I financially

15  interested in said action.

16

17  Submitted on: January 31, 2025.

18

19

20

21

22      _____

23          Lilianna Cavanaugh

24          Court Reporter, Notary Public

25

1                              ERRATA

2

3    PAGE      LINE                    CHANGE      REASON

4

5

6

7

8

9

10

11

12

13

14

15

16    I have read the entire transcript of my deposition taken

17    in the captioned matter or the same has been read to

18    me.I request that the following changes be entered upon

19    the record for the reasons indicated. I have signed my

20    name to the Errata Sheet and authorize you to attach the

21    changes to the original transcript.

22

23

24    _____     _____

25    Date                        NAME

1     LAWYERS' REPORTING, INC.
    1655 Palm Beach Lakes Boulevard, Suite 405
2     West Palm Beach, Florida 33401
      (561) 242-0023
3

4 February 3, 2025

5

6 James O'Reilly
  C/O: Donovan A. Roper, Esquire
7 Roper & Roper P.A.
  116 North Park Avenue
8 Apopka, Florida 32703

9

10

11 RE: Jesse Lee vs. City of Gulfport

12

13

14 Dear Mr. O'Reilly,

15

16 This is a courtesy letter to inform you that the
  deposition given by you via Zoom on January 21, 2025, has
17 been transcribed and is ready for your reading and
  signing.
18

19 If you will call my office any day Monday through
  Friday, between the hours of 9:00 a.m. to 4:00 p.m., the
20 transcript will be made available for you to read and
  sign.
21

22 Sincerely,

23

24 Lilianna Cavanaugh
  Court Reporter
25

## A

**a.m (2)** 4:6 92:19
**ability (2)** 22:21 41:20
**able (5)** 15:17 21:23 22:16 56:7 64:3
**absent (1)** 72:2
**Absolutely (1)** 48:25
**absurd (1)** 71:4
**abusive (1)** 83:5
**accept (1)** 8:13
**access (2)** 74:15,22
**accurate (3)** 41:8 42:16 44:18
**accusations (3)** 38:23 38:24 39:1
**accused (1)** 37:18
**accusing (2)** 37:17 47:1
**act (1)** 38:7
**acted (2)** 73:24 74:4
**acting (2)** 7:7 8:17
**action (5)** 9:22 55:13 55:16 69:16 90:15
**activities (2)** 47:2 75:23
**acts (1)** 38:6
**actual (1)** 69:24
**additional (2)** 22:6 71:6
**Additionally (1)** 23:19
**addressed (3)** 77:5,6 79:20
**adhere (1)** 85:8
**adhering (1)** 85:3
**adjacent (2)** 30:22,24
**adjudicated (2)** 38:12 67:3
**administration (2)** 6:13 71:24
**adopt (1)** 42:22
**adopted (2)** 42:15,17
**adult-oriented (1)** 15:24
**advised (8)** 25:15 26:16,17,25 31:17 33:21 36:25 41:20
**AEP (1)** 1:2
**affirm (1)** 5:7

**afraid (1)** 21:20
**afternoon (1)** 45:6
**aggressive (1)** 27:14
**ago (4)** 18:3 30:20 31:9 77:13
**agree (8)** 34:11 35:15 73:21 79:17,22 85:8 86:25 87:2
**agreed (2)** 4:10 85:2
**agreement (6)** 7:12 35:22,22 85:2,4,5
**ahead (4)** 25:9 49:17 56:14 58:21
**allegation (5)** 11:18 12:2 50:16 70:15 70:16
**allegations (2)** 11:25 12:23
**alleged (2)** 13:5 39:4
**alleges (1)** 32:15
**allow (2)** 15:18 32:4
**allowable (1)** 63:25
**allowed (12)** 15:10 15:12,15 16:7 22:20 28:8 62:11 62:16 65:10 75:22 81:15 82:19
**allowing (1)** 82:14
**allows (1)** 64:16
**alright (1)** 56:2
**Ambiguous (1)** 15:21
**amended (2)** 9:22 50:13
**amending (1)** 65:20
**Amendment (3)** 43:10,12 69:20
**analysis (1)** 50:15
**and/or (3)** 21:24 75:13 78:20
**Andrew (3)** 3:15,20 59:8
**answer (22)** 14:23 15:22 16:19 17:4 19:12 22:11 25:9 28:12 32:4 41:6,12 42:5 44:21 46:12 46:20 48:15 51:21 60:13 62:20 65:25 67:5 68:20
**answered (3)** 42:4

67:1,13
**answers (1)** 70:10
**Antonio (1)** 6:10
**anybody (5)** 13:10 23:15 34:23 42:2,8
**anyway (1)** 26:7
**apologize (1)** 55:25
**Apopka (2)** 2:16 92:8
**apparently (4)** 56:13 58:14 65:18 66:13
**appeal (14)** 22:16 24:7 40:7 41:18,20 41:25 48:4,8,9,13 48:18 50:8,17 70:16
**APPEARANCES (...** 2:1
**appeared (1)** 89:7
**appears (3)** 58:2 64:24 68:11
**Appellate (1)** 57:18
**applicable (2)** 58:23 58:25
**application (5)** 77:21 77:25 84:19 85:6,6
**applications (1)** 78:2
**applies (1)** 61:22
**apply (7)** 23:9 48:17 62:1 66:14 72:3 84:15 87:11
**appointed (1)** 7:11
**approached (2)** 9:23 30:15
**Approximately (1)** 77:13
**April (5)** 32:10,10 67:16 68:5,18
**area (2)** 27:25 35:20
**areas (4)** 42:18,25 43:1,4
**Argumentative (1)** 38:10
**arose (1)** 12:11
**arrest (3)** 24:12 32:10 46:8
**arrested (7)** 24:19 26:15 31:23 61:25 63:6,19 68:6
**asked (29)** 12:15 17:17,17 20:8,10

23:15 27:25 33:21 33:25 35:2 37:1 39:24 42:4 49:10 49:15 51:18 58:5,7 58:18,20 60:17 66:25 67:12 68:14 74:5 78:19 79:14 84:4 85:24
**asking (6)** 23:23 33:5 38:14 58:4 68:9 83:18
**asks (1)** 70:13
**asserted (2)** 51:23 69:14
**assistance (1)** 82:15
**assistant (2)** 37:21,23
**associated (1)** 83:14
**association (12)** 75:11,16,20 76:2 77:6 78:4,6 82:5 84:5,23 85:11,18
**assume (1)** 5:19
**assumes (8)** 14:22 17:3 28:10 32:1 46:10 60:10 62:17 63:10
**attach (3)** 81:1,9 91:20
**attached (1)** 57:17
**attachments (2)** 45:8 56:13
**attacked (1)** 29:9
**attempted (1)** 26:18
**attempting (4)** 37:11 42:24 43:4,25
**attend (3)** 22:20 26:10 28:8
**attending (2)** 42:3 62:2
**attention (2)** 40:6 58:17
**attitude (2)** 27:7,8
**attorney (14)** 23:24 45:4 53:25 54:3,7,8 54:21 58:19,21 59:1 60:14 61:6 65:19 70:3
**attorneys (4)** 53:14 53:17 72:11 90:14
**audio (2)** 34:23 43:24

**auditors (2)** 43:10,12
**authority (1)** 72:14
**authorize (1)** 91:20
**authorized (1)** 90:8
**available (1)** 92:20
**Avenue (2)** 2:15 92:7
**aware (10)** 16:20
  24:9 38:16 39:3
  41:2,21 42:10,13
  50:19 64:8

**B**
**bachelor's (1)** 6:14
**back (14)** 11:23
  16:14 18:18 34:18
  50:4 54:20 69:10
  69:12 73:1 75:24
  80:20,20 87:18,21
**background (2)** 6:1
  77:11
**bad (2)** 16:24 38:6
**badgering (2)** 20:25
  21:2
**ban (2)** 64:25,25
**banned (1)** 39:6
**banter (1)** 54:12
**barred (1)** 41:16
**base (1)** 46:1
**based (10)** 11:19,21
  11:23 18:4,7 19:2
  23:17 46:2 47:17
  66:1
**basically (2)** 12:5
  75:17
**basis (4)** 11:17 45:23
  49:4 79:21
**Beach (9)** 1:22,23
  6:22,23 8:10 75:20
  84:9 92:1,2
**beachfront (1)** 58:6
**beat (1)** 29:21
**behalf (10)** 2:3,11
  9:25 10:9 12:16,21
  24:14 28:5 35:5
  69:13
**behaved (1)** 29:1
**behavior (19)** 18:23
  19:3 20:3,4,19,21
  27:7,10 33:13
  37:12,14 38:4 47:9

47:17 68:3 78:15
  78:22 82:17 86:2
**behaviors (3)** 23:12
  36:8 71:13
**believe (42)** 10:4,12
  10:18 11:15,22
  14:1,8 18:21,24
  19:4,4,21,24 20:3
  21:18 26:16 28:21
  30:12,13 31:3,4
  35:25 38:11 42:17
  45:16 46:16 47:13
  53:11,13 55:5,21
  58:18 63:5 65:4,7
  67:2 73:4 74:6
  75:19 79:11 84:20
  85:9
**berating (1)** 47:1
**best (1)** 76:20
**beyond (1)** 11:6
**bias (5)** 81:17 82:11
  82:21 83:5,11
**bicycle (2)** 34:9,10
**big (1)** 46:21
**bill (2)** 44:7 78:15
**bit (1)** 77:11
**blind (1)** 61:12
**block (1)** 33:22
**blocked (1)** 33:24
**Boca (4)** 6:5 55:9,11
  55:13
**bodily (1)** 29:13
**body (2)** 30:15 79:6
**bottom (1)** 48:3
**bought (1)** 56:1
**Boulevard (2)** 1:22
  92:1
**Boy (2)** 12:11,13
**break (2)** 48:22,24
**bricks (2)** 16:10,13
**briefly (3)** 9:23 10:4
  12:20
**bring (3)** 23:24 24:4
  76:14
**brought (2)** 40:6
  58:17
**Brown (1)** 29:24
**budget (1)** 9:4
**building (19)** 18:24
  18:25 19:3 20:5

21:24 33:15 39:6
  41:17 42:11 44:10
  55:24 64:7 71:11
  71:14,23 78:9,14
  85:25 86:4
**buildings (5)** 16:11
  16:13 44:15,18
  61:23
**bully (1)** 82:19
**bullying (8)** 20:25
  21:1,2 81:15,17
  82:11,13 83:6
**business (10)** 29:8,13
  29:17 36:11,12,14
  36:18,20 46:23,23
**businesses (3)** 16:11
  76:3,6
**businesses' (1)** 82:18

**C**
**C (2)** 90:1,1
**C/O (1)** 92:6
**call (10)** 18:3,5,8
  25:13 34:3 37:12
  43:9 67:9 68:14
  92:19
**called (1)** 13:15
**calling (2)** 37:16
  64:17
**calls (15)** 16:17 19:11
  22:10 28:9,11 32:2
  41:5,11 46:10,19
  51:20 62:18,19
  65:24 73:22
**camera (3)** 46:24
  64:17 79:6
**campus (3)** 61:24
  62:6,12
**capacity (1)** 10:23
**captioned (1)** 91:17
**car (3)** 26:2 64:23
  80:4
**care (1)** 65:2
**Carrico (1)** 10:14
**carry (1)** 62:15
**cart (4)** 12:24 13:2
  34:2 67:9
**case (14)** 1:2 19:6
  22:19 36:2 57:21
  57:22 58:9,22

59:14 60:24 67:2
  76:23 79:20,23
**case-by-case (1)**
  79:21
**casino (26)** 7:24 8:3
  24:13,17 26:20,22
  28:3,19,25 30:22,23
  30:25 31:1,2,7,12
  31:15,22 32:10
  33:14 35:10,13
  36:5 46:8 68:7,25
**Catherine (2)** 7:25
  8:4
**cause (4)** 45:17 46:17
  47:14 73:4
**caused (2)** 45:16 73:4
**causing (3)** 32:19
  47:5,7
**Cavanaugh (6)** 1:24
  4:10 89:16 90:6,23
  92:24
**ceased (1)** 12:13
**celebrated (1)** 28:7
**center (4)** 7:24,24 8:1
  8:6
**centered (1)** 50:10
**certain (3)** 42:24
  75:11 82:17
**CERTIFICATE (1)**
  89:1
**certify (3)** 89:6 90:8
  90:12
**cetera (1)** 15:2
**challenge (2)** 59:16
  61:1
**challenged (1)** 69:15
**chamber (5)** 36:1
  75:17,20 84:8,9
**chance (1)** 81:18
**CHANGE (1)** 91:3
**changed (2)** 20:19,21
**changes (2)** 91:18,21
**changing (1)** 66:2
**channels (1)** 83:15
**Chapter (2)** 85:3,9
**charge (1)** 65:20
**charges (1)** 77:2
**check (3)** 14:4 38:16
  53:3
**checked (1)** 13:10

**chief (13)** 8:23 24:15
24:21,23 25:13,18
26:17 32:12 45:11
61:18 65:19 66:13
71:20
**choose (1)** 24:1
**chooses (1)** 72:13
**chose (1)** 33:22
**Ciega (3)** 6:5 55:9,13
**circumstances (1)**
79:19
**citation (5)** 14:2
17:19,20 72:14,15
**citations (1)** 38:15
**cited (1)** 38:6
**citizen (2)** 21:25
72:18
**citizens (3)** 44:7,8
58:16
**city (141)** 1:10 2:11
6:10,11,21,22,23
7:2,8,10 8:10,14,16
8:21,24 9:4 10:12
10:14,19 12:12,14
12:14 13:11 15:18
16:7,9,15 18:4,7,19
19:2,7 20:20 21:1
21:23 22:7,20,20,22
22:23,25 27:10
29:22 30:18 33:14
35:1,3,10,13,21,22
37:5,6 38:7,20 39:6
39:17,18 40:21
41:9,15,16 42:15
43:25 44:4,5,15,17
45:4,13,14 46:8,22
48:1,9,13 50:1,2,7
53:25 54:3,7,8,21
54:25 57:3,20 58:7
58:19,21 59:1
60:14 61:6,6,17,21
61:24 62:6,14 63:3
63:5,19,22,25 66:1
66:2,22 67:8 68:25
70:2,14,25 71:2,5,7
71:10,13,23 72:11
72:16 73:2,16,17,19
75:12,19 77:14
78:19,23,23 79:24
80:23 81:10,15

82:1,5,12,13 83:14
84:13 92:11
**City's (5)** 10:24
39:16 45:20 60:5
62:24
**city-owned (2)** 59:16
61:1
**Civ (1)** 4:7
**civil (2)** 4:7 57:16
**claim (4)** 51:11 71:3
81:23 83:1
**claimant (1)** 12:1
**claims (2)** 32:17
69:17
**clarification (5)**
58:18,20 61:20
62:4 75:9
**clarify (2)** 62:11
71:22
**clarity (1)** 6:23
**clause (1)** 69:20
**clear (1)** 83:11
**clearly (1)** 37:16
**clerk (2)** 10:12,14
**clicks (1)** 43:13
**client (2)** 27:14 46:25
**close (2)** 57:20 69:3
**Club (2)** 55:9,13
**codified (2)** 43:6,7
**codify (1)** 43:3
**college (3)** 6:6,7,20
**come (8)** 31:12 32:9
33:13 35:10,13
54:12 56:3,17
**coming (4)** 14:19
37:10 43:21 50:4
**commander (1)**
10:20
**comment (1)** 49:25
**comments (3)** 32:21
33:4,7
**commerce (3)** 75:17
75:21 84:9
**commercial (1)**
46:23
**Commission (3)** 87:7
89:19,20
**committed (1)** 67:23
**communicate (1)**
53:16

**communicated (1)**
61:20
**communications (1)**
71:18
**community (5)** 29:8
29:13,17 62:5
86:12
**competition (1)**
85:20
**complain (7)** 49:3,12
49:23 51:14 55:3,7
55:10
**complained (4)** 50:12
54:25 55:5,9
**complaining (1)** 53:6
**complaint (40)** 9:22
9:22 11:11,12,12,13
11:17 12:4 13:21
17:11,12,14 18:9
45:8 50:6,8,10,13
50:17,18,21,25 51:1
51:2,7,18,23,24,25
52:11,20 53:7,10
54:1,21 70:14,17,19
81:20 87:14
**complaints (7)** 22:7,9
23:20 27:18 71:7
81:21 82:4
**completed (2)** 4:13
36:18
**complex (2)** 31:6
61:17
**comply (1)** 61:25
**Compound (3)** 14:22
15:21 24:10
**compute (1)** 16:12
**concern (1)** 58:15
**concerns (2)** 58:16
86:21
**concluded (2)** 57:12
88:5
**conclusion (5)** 32:3
41:11 46:11,20
62:19
**conduct (5)** 31:11
36:14 37:6 45:23
71:10
**confer (1)** 36:7
**confirm (1)** 45:4
**conflict (1)** 83:11

**conjunction (1)** 66:9
**consider (2)** 65:20
67:8
**considered (3)** 66:23
71:3 86:21
**considering (2)** 13:8
55:17
**consistent (1)** 72:5
**constituent (1)** 27:23
**Constitution (1)**
57:16
**constitutional (2)**
57:15 60:4
**constitutionality (1)**
58:15
**contact (3)** 14:25
76:12,24
**contains (1)** 65:16
**content (1)** 60:12
**continue (1)** 74:12
**continuing (1)** 23:11
**contract (2)** 7:12
8:19
**contradiction (1)**
66:16
**contraption (1)**
66:23
**control (4)** 39:17,19
40:1 84:12
**controlled (1)** 39:18
**controls (2)** 35:20,23
**conversation (6)** 22:5
23:18 24:23 25:7
36:16 54:14
**conversations (2)**
25:17 36:17
**convince (1)** 15:17
**cooler (2)** 34:9,10
**coordinates (1)** 35:5
**copied (5)** 59:9 60:20
60:22 61:12,19
**copies (1)** 56:1
**copy (5)** 65:13 80:4
80:23,25 88:3
**correct (26)** 8:18
12:10 14:11 22:1
23:4 34:16 41:17
42:21 47:8,20
48:18 50:22,23
51:3 53:8,10 55:20

57:3 59:9 60:9
66:14,24 72:1
76:25 84:13 86:22
**correcting (1)** 5:24
**corrections (1)** 82:9
**corruption (1)** 38:24
**Coughs (1)** 71:12
**council (11)** 22:20,21
22:22,23,25 29:22
50:1 55:17,17 68:3
78:20
**Councilmember (7)**
29:24,24,25 30:3,16
31:9,10
**Councilwoman (1)**
30:8
**counsel (12)** 23:6
24:8 25:7,12 30:5
53:25 59:19 62:21
70:15 79:14 82:12
90:12
**counter (2)** 37:13,14
**County (3)** 87:5 89:4
90:4
**couple (6)** 30:19 31:9
56:13 62:9 74:13
75:9
**course (2)** 22:24
30:24
**court (10)** 1:1 3:19
4:11 24:17 75:13
80:25 89:17 90:6
90:24 92:24
**courtesy (1)** 92:16
**courts (4)** 50:9 57:24
67:6,6
**covered (1)** 77:16
**COVID (3)** 71:15
78:11,16
**cream (9)** 12:24 13:2
34:2,14 38:8 51:9
51:10,11 67:9
**created (2)** 23:12
75:25
**criteria (4)** 23:8
48:17 72:23 84:15
**CROSS-EXAMIN...**
3:5 75:7
**current (1)** 58:9
**currently (1)** 76:2

**custody (1)** 25:15
**cuts (2)** 34:23 43:24

**D**

**daily (4)** 8:24,24,24
9:1
**date (4)** 1:14 17:25
51:6 91:25
**dated (6)** 45:9 56:12
59:7 64:13 67:15
68:5
**Davis (1)** 6:10
**day (6)** 4:5 28:19
44:12 68:6,9 92:19
**day-to-day (2)** 8:24
9:2
**DBPR (2)** 13:10,12
**deal (1)** 75:4
**Dear (1)** 92:14
**December (2)** 7:14
8:19
**decide (4)** 20:17 39:9
39:11,14
**deciding (3)** 16:25
17:6 23:9
**decision (19)** 15:19
22:15 23:1,4,17
32:9 39:7 46:1 48:4
48:5,8 50:8,17,18
50:20,22 70:17,18
71:4
**declaratory (1)** 69:16
**decorative (1)** 31:5
**dedication (1)** 30:18
**deem (1)** 83:10
**Defendant (4)** 1:10
2:11 3:23 70:22
**Defendant's (2)** 81:4
86:16
**defer (2)** 58:19 62:21
**deferred (2)** 60:14
61:5
**definite (1)** 28:21
**deliberations (1)**
83:15
**deliver (1)** 72:13
**delivered (1)** 71:25
**demonstrated (3)**
32:16,20 36:6
**denied (1)** 78:3

**department (31)**
3:21 9:6 18:25,25
19:3,23,25,25 20:6
21:24 22:6 32:14
33:15 37:11 38:25
39:7 40:9,11 41:17
57:12 61:19 64:4,7
71:11,14 72:18
78:10,14,20 86:1
87:9
**departments (1)** 9:4
**DEPONENT (1)**
1:14
**deposition (10)** 4:3,6
5:23 9:19 44:20
60:11 74:13 88:5
91:16 92:16
**depositions (1)** 5:20
**desk (1)** 36:19
**despite (1)** 32:20
**details (2)** 17:25
52:15
**deteriorated (1)** 28:1
**determination (13)**
12:13 15:25 16:10
20:22,23 23:6 32:5
32:6 40:15,16 67:7
72:10 76:13
**determine (2)** 21:9
47:13
**Determines (1)** 77:2
**Development (2)**
61:22 62:6
**diatribe (5)** 51:6,8,15
52:4 53:22
**differences (1)** 13:9
**different (7)** 35:11
58:1 70:6 78:8,18
79:13,19
**differentiate (1)** 70:3
**differentiating (1)**
29:7
**direct (6)** 3:4 5:13
23:7 54:21 66:15
83:12
**directed (5)** 29:1
30:7 39:5 40:2 45:9
**director (7)** 7:4,6,18
7:20,22 10:12,16
**directors (2)** 9:3,5

**disagree (1)** 79:17
**disagreed (2)** 35:4,7
**discriminate (2)**
82:19 84:23
**discriminated (7)**
49:3,23 50:11 55:4
55:6,8,11
**discrimination (24)**
11:10,18,23 39:2
50:1,6 51:14,25
52:21 53:6 54:1,25
70:14,19,24 71:3
81:15,17,20,23
82:11,14,21 83:1
**discriminatory (1)**
83:5
**discussing (1)** 27:22
**discussion (1)** 22:5
**disgusting (1)** 30:7
**dismiss (6)** 9:24
12:16 39:4 50:4
69:13 70:21
**dispensing (3)** 67:10
76:9 84:16
**dispute (3)** 11:20
12:6 52:1
**disputed (1)** 26:7
**disrupt (1)** 36:6
**disrupted (4)** 32:24
33:6,9 34:21
**disrupting (2)** 32:16
32:19
**disruption (5)** 45:17
46:17 47:7,14 73:5
**disruptive (2)** 33:20
37:6
**disruptor (1)** 47:5
**distinctions (1)** 13:8
**district (7)** 1:1,1 14:6
14:9 75:24 76:4,6
**diverse (1)** 86:12
**DIVISION (1)** 1:2
**document (5)** 3:20
52:23,24 65:14
75:22
**documentation (1)**
59:23
**documented (1)** 38:4
**documents (3)** 9:19
10:7 56:1

**dogs (1)** 14:19
**doing (5)** 22:3 26:14
  44:5 57:10 77:14
**Donovan (4)** 2:12
  55:25 59:4 92:6
**donroper@ropera...**
  2:19
**door (4)** 19:5 20:9
  86:6,7
**drafted (2)** 59:25
  75:22
**dring@roperandr...**
  2:20
**drink (1)** 15:2
**DRIVE (2)** 1:16 4:4
**drop (1)** 20:8
**due (7)** 24:14 50:14
  50:15 59:16 61:1
  69:20 82:22
**duly (1)** 89:8
**duration (4)** 39:17
  39:22 40:1 41:4
**Dustyn (1)** 2:13

**E**

**E (4)** 5:5,17 90:1,1
**e-mail (42)** 2:9,18
  3:11,12,14,16,19,24
  24:6 26:6,8 51:5
  52:4,20 53:5,21
  56:11,19 57:9
  58:11 59:2,8,9,13
  59:25 60:1,23,24
  61:7,8,17 64:9
  65:16,17 81:19,20
  82:8,9 83:4 86:15
  86:16,18
**e-mail@roperandr...**
  2:18
**e-mails (1)** 25:20
**earlier (5)** 12:15
  39:24 62:23 75:10
  78:9
**Eastern (1)** 69:9
**Easy (1)** 9:13
**education (2)** 6:18,24
**Edward (2)** 5:18
  67:20
**effect (7)** 15:25 20:9
  20:10 21:23 36:21

  78:11,16
**either (9)** 9:21 10:2
  24:6 28:24 32:9
  40:21 41:3,10
  78:19
**elderly (2)** 30:8
  31:10
**elected (3)** 29:3
  78:20 79:25
**Electronic (2)** 88:1,2
**employed (2)** 57:7
  90:13
**employee (2)** 46:22
  46:22
**employees (5)** 9:8
  29:2 39:17,19
  61:19
**empowered (2)** 45:15
  73:2
**ended (2)** 21:10
  23:24
**enforced (1)** 57:18
**entail (1)** 79:18
**enter (6)** 20:10 26:17
  26:18 30:15 42:24
  43:4
**entered (1)** 91:18
**entire (2)** 61:22
  91:16
**entrance (1)** 78:14
**entry (1)** 8:11
**equipment (2)** 31:7
  76:10
**Errata (2)** 91:1,20
**escalated (1)** 18:24
**escaping (1)** 13:15
**Esquire (4)** 2:4,12,13
  92:6
**essentially (1)** 12:24
**et (3)** 4:6 15:2 88:5
**ethnically (1)** 86:12
**event (27)** 13:25
  14:13,16,19,25 15:3
  15:5,7,10,18 16:3
  24:17,18 25:18
  32:18,19 35:5,21
  76:11,12,24 77:1,4
  84:11,17,19 85:6
**events (18)** 16:8
  32:20,23,25 33:3,6

  33:8,9,11,12 35:5
  35:11 36:6 37:7,8
  50:12 75:12 77:16
**evicted (2)** 12:3,8
**evidence (12)** 14:22
  17:3 28:10,11 32:2
  46:10 50:7,16
  60:10 62:18 63:11
  70:16
**evolved (1)** 8:9
**exact (1)** 9:11
**exactly (1)** 53:4
**EXAMINATION (...**
  3:4,6 5:13 84:2
**example (3)** 46:15
  72:24 76:13
**examples (1)** 9:1
**exception (1)** 63:8
**exchange (1)** 25:20
**Excuse (2)** 13:1
  14:15
**exemplified (1)**
  33:13
**exercised (1)** 80:1
**exhibit (21)** 3:9
  56:15,20 59:6,10
  60:11 61:8,10
  64:19 65:15,23
  66:16 67:15,17
  68:13 80:23 81:1,4
  81:10,11 86:16
**EXHIBITS (1)** 3:8
**expanded (1)** 76:7
**expansion (1)** 71:13
**experience (1)** 76:17
**Expires (1)** 89:19
**explain (4)** 14:12
  32:23 71:9 75:12
**explained (2)** 53:15
  77:16
**explaining (1)** 77:8
**extended (1)** 57:16
**extent (1)** 25:11
**extra (1)** 65:13

**F**

**F (1)** 90:1
**F-A-R-R-E-L-L (1)**
  10:17
**face (1)** 46:25

**Facebook (2)** 14:18
  71:21
**facilities (2)** 45:14
  73:2
**facility (3)** 12:12,14
  48:1
**fact (4)** 16:9 24:25
  32:1 82:18
**facts (11)** 14:22 17:3
  28:9,10 32:1 46:10
  60:10 62:18 63:10
  79:19,21
**factual (1)** 13:8
**failure (1)** 50:13
**fair (2)** 83:10,13
**familial (1)** 11:21
**far (1)** 18:18
**Farrand (1)** 56:12
**Farrand's (1)** 10:19
**Farrell (1)** 10:16
**feared (1)** 28:24
**February (1)** 92:4
**Fed (1)** 4:7
**fee (1)** 77:2
**feel (1)** 64:15
**feeling (1)** 26:3
**field (1)** 8:12
**figure (1)** 27:9
**file (5)** 21:12 27:18
  38:3 52:11 86:19
**filed (22)** 9:24 10:3
  11:14 12:16,17,19
  12:21 22:7 24:13
  28:4 37:20,21 50:6
  51:24,25 54:22
  65:18 69:13 70:14
  70:24 71:1 77:24
**filing (2)** 71:5 77:21
**fill (1)** 52:18
**film (5)** 44:1,2,3,15
  44:17
**filming (3)** 42:9,18
  42:23
**financially (1)** 90:14
**find (2)** 25:25 58:9
**fine (3)** 49:21 54:15
  81:7
**fingers (1)** 71:18
**finish (3)** 22:25 49:14
  55:19

**fire (2)** 64:3,7
**first (12)** 6:20,21
  16:15 43:9,11 52:1
  60:19 62:9 80:16
  80:21 81:14,14
**five (1)** 40:14
**Five-minute (1)**
  48:24
**FL (1)** 1:23
**Florida (18)** 1:1,16
  2:7,16 4:5,11 6:3
  50:9 57:15,17
  70:17 87:7 89:3,18
  90:3,7 92:2,8
**Florida's (1)** 57:15
**folks (1)** 64:12
**follow (2)** 83:8 85:8
**follow- (1)** 85:24
**follow-up (1)** 83:25
**following (3)** 7:12
  79:18 91:18
**food (28)** 12:25 13:3
  13:6,9,11,14 14:13
  14:17 15:1,12,14,14
  16:6,7 34:11 65:21
  66:13,23 67:10
  76:8,10,10,23,23
  77:4,15 84:16
  85:12
**footage (2)** 79:3,8
**footnote (2)** 50:5
  70:20
**foregoing (2)** 89:7
  90:9
**forever (1)** 40:14
**form (18)** 14:21
  15:20 17:2 24:10
  38:9 40:23 44:19
  46:9 48:20 51:20
  52:17 55:1 60:6
  62:17 66:18,25
  73:22 85:22
**formal (11)** 11:12,13
  51:1,2 52:13,23,24
  53:7,9 54:1 81:23
**format (2)** 59:21
  74:14
**former (1)** 27:21
**forward (4)** 83:9,12
  83:19 87:4

**forwarded (1)** 65:18
**forwarding (3)** 59:13
  60:24 61:18
**found (3)** 12:7 59:14
  60:24
**four (3)** 7:7 18:3
  20:12
**fourth (1)** 56:18
**Frain's (3)** 48:4,5,8
**frame (1)** 23:21
**free (1)** 57:17
**Friday (2)** 56:12
  92:19
**Fridovich (1)** 3:17
**front (3)** 37:13,14
  62:15
**full (1)** 5:3
**function (1)** 76:1
**further (4)** 82:19,20
  83:23 90:12

### G
**gain (1)** 78:14
**Gainesville (4)** 85:10
  85:14 87:18,21
**gay (2)** 12:1 49:5
**gender (1)** 82:20
**general (5)** 57:14,25
  58:4 82:5,6
**gentleman (2)** 28:21
  28:22
**give (16)** 5:8 9:1
  17:25 27:17 43:11
  46:15 49:25 56:17
  68:1 69:4,6 72:24
  77:3,11 80:25
  84:19
**given (11)** 5:19,23
  9:9 17:16 19:9
  38:14 47:25 48:12
  68:11 78:22 92:16
**glance (1)** 56:8
**GMAC (1)** 82:14
**go (18)** 6:25 7:16
  16:14 21:23 22:3
  25:8 34:18 45:7
  49:17 56:14 58:21
  62:14 64:3 69:5
  77:18 80:20,20,24
**goes (3)** 75:24 80:10

83:3
**going (29)** 15:10
  19:15 20:17 21:5,6
  34:7 40:14 43:22
  43:23 48:19,21
  49:22 56:4 59:5
  65:14,14 68:10,12
  69:12 72:19 73:1
  74:12 75:3 76:14
  80:5,9,22 85:19
  87:22
**golf (1)** 30:24
**good (4)** 5:15,16 26:3
  45:7
**goods (1)** 34:24
**grievances (1)** 71:2
**grounds (3)** 39:15
  57:13 68:13
**grow (1)** 6:2
**guess (2)** 11:24 17:19
**guest (3)** 28:6,13,17
**guidance (1)** 72:11
**Gulf (1)** 24:17
**Gulfport (50)** 1:10
  2:11 3:21 6:3,4,25
  9:10 10:22 11:3
  13:11 24:13,17
  26:20,21 28:3
  29:16 30:23,25
  31:12 35:25 40:21
  42:15 43:20 50:2
  54:25 57:3 65:9
  66:22 67:8 70:18
  75:11,12,15,20 76:2
  76:11 78:3,23
  79:24 82:1,12 84:4
  84:8,9,13,23 85:14
  85:16,18 92:11
**Gulfport's (2)** 69:15
  69:17
**guys (1)** 69:6

### H
**Hall (27)** 16:15 18:4
  18:7,19 19:2,7
  21:24 33:14 37:5,6
  38:21 39:6 41:16
  43:25 44:4,5 61:17
  61:24 62:7,14 63:4
  63:5,19,22,25 71:10

71:14
**Hall/Community (1)**
  61:21
**hand (2)** 5:7 65:14
**handed (2)** 56:11
  64:9
**handled (1)** 43:6
**hands (1)** 39:8
**handy (1)** 80:4
**happen (5)** 14:20
  21:17 27:16 30:17
  75:4
**happened (6)** 27:13
  33:16 35:3 46:3
  54:6 72:21
**happens (2)** 58:12
  84:12
**happier (1)** 86:12
**happy (2)** 17:22 69:2
**harass (1)** 37:12
**harassing (1)** 64:22
**harm (3)** 29:13,17
  30:11
**harsh (1)** 30:6
**he'll (1)** 45:6
**head (1)** 53:1
**hear (2)** 69:2 75:13
**heard (3)** 49:10,22
  49:25
**heinous (1)** 38:7
**held (1)** 55:18
**help (1)** 82:22
**Henderson (1)** 3:18
**HH (1)** 89:20
**Hickman (2)** 7:25
  8:4
**High (2)** 6:4,5
**hired (3)** 7:2,4 8:10
**hit (1)** 21:6
**home (1)** 57:20
**homeless (1)** 57:22
**honest (1)** 18:16
**hopefully (1)** 74:15
**hostile (2)** 20:5,7
**hours (1)** 92:19
**houses (1)** 64:7
**HR (2)** 10:12,15
**human (8)** 10:15,15
  10:21 11:2 37:21
  52:10 87:5,7

**hypothetical (2)** 14:23 32:2

**I**

**ice (9)** 12:24 13:2 34:2,14 38:8 51:9 51:10,11 67:9
**idea (2)** 24:22 32:17
**Identification (9)** 56:20 59:10 61:10 64:19 65:23 67:17 81:4 89:10,10
**impetus (1)** 42:22
**implement (1)** 9:3
**implementing (2)** 47:19 62:24
**Improper (2)** 14:22 32:2
**incident (1)** 25:14
**include (1)** 9:6
**including (2)** 57:25 83:11
**incomplete (1)** 68:13
**incorrect (1)** 5:20
**indefinite (5)** 40:3,22 41:4,10,13
**INDEX (1)** 3:1
**indicated (2)** 71:3 91:19
**individual (9)** 45:14 45:16 46:16,24 47:14 57:13 73:2,4 73:7
**individual's (2)** 47:9 57:16
**individuals (8)** 42:24 43:8,9,19,25 44:4,5 58:24
**inform (3)** 16:3 77:18 92:16
**information (4)** 24:14,20 51:17 71:7
**inherited (3)** 73:13 73:14,15
**initial (1)** 82:9
**initiated (1)** 17:24
**inject (1)** 36:17
**input (1)** 46:1
**inquire (1)** 22:5

**inquired (1)** 77:14
**inquiries (3)** 32:22 33:4,7
**inside (2)** 44:15 61:23
**inspection (1)** 77:3
**intended (1)** 24:16
**intention (1)** 32:18
**intentional (1)** 82:13
**intentionally (2)** 63:15 82:17
**interacted (1)** 79:11
**interaction (3)** 19:1 33:17 35:1
**interactions (4)** 33:19 79:4,8,24
**interest (1)** 83:11
**interested (1)** 90:15
**interference (1)** 82:16
**interim (2)** 7:11,15
**interject (2)** 36:15,22
**interpret (1)** 70:6
**interrogatories (1)** 70:7
**interrogatory (1)** 70:23
**intervene (2)** 35:2 36:12
**intervened (2)** 27:20 36:10
**investigate (2)** 50:24 51:18
**invite (1)** 28:14
**invited (1)** 28:17
**involve (2)** 25:7,12
**involved (2)** 27:6 90:14
**involves (1)** 68:3
**involving (1)** 12:11
**inward (1)** 86:7
**iPad (1)** 80:12
**issuance (2)** 59:15 60:25
**issue (17)** 16:25 17:6 22:12 28:20 39:7,9 40:8,9 45:15 46:5 50:15 62:18 65:8 72:1,9,14 73:3
**issued (11)** 16:15

40:2,11,21 41:3,10 61:21 62:4 71:23 71:24 72:17
**issues (1)** 77:5
**iteration (1)** 36:1

**J**

**James (10)** 1:14 3:14 3:17 4:3 5:5 48:11 67:20 70:18,20 92:6
**January (7)** 1:14 4:6 7:1,5,13 90:17 92:16
**Jason (1)** 56:19
**Jennifer (2)** 27:12,13
**Jesse (13)** 1:6 2:3,22 3:24 12:24 13:2,5 21:23 49:12 61:16 70:19 79:23 92:11
**job (3)** 6:20,21 7:17
**Josh (1)** 59:14
**Joshua (1)** 3:13
**JR (2)** 1:16 4:4
**judged (1)** 83:4
**July (10)** 3:11,12,14 21:18 45:9 56:12 59:7 60:3 62:8,8
**jury (1)** 75:13
**Justice (1)** 87:9
**Justin (2)** 31:20,21

**K**

**Kept (1)** 86:19
**kind (4)** 8:8 36:20 76:16 77:7
**know (57)** 10:11 13:10 14:5 16:18 17:21 18:14,19,20 18:20 19:12,17,19 19:20,25 20:2,24 24:20 26:8 27:5,22 28:2,18 29:15 30:5 30:13 34:7,8,9 35:12 38:18 41:19 41:22,24 42:8 43:23 46:13 47:12 48:12 51:6 52:14 53:18,19,20 54:13 54:19 63:14 64:6

64:14 65:10,22 73:11,14 77:24 78:2 80:4 83:17 86:25

**knowledge (1)** 76:21

**L**

**L (1)** 82:13
**label (2)** 65:15 80:23
**lack (1)** 82:22
**lady (1)** 30:3
**LaHart (81)** 2:4,5 3:4,6 5:14 9:17 13:17,18 15:4 16:2 16:22 17:5 19:13 22:14 24:11 25:16 25:24 26:2,4,5 28:15 32:7 38:13 41:1,7,14 42:7 44:22 46:14 47:3 47:23 48:21,24 49:2,18 51:22 55:2 55:25 56:3,6,10,22 59:12 60:8,15 61:7 61:12,15 62:22 63:13,17 64:21 66:4,17,19,21 67:4 67:14,19 68:16,22 69:2,7,11 74:1,9,11 74:18,25 75:3 80:14,19 83:25 84:3 85:17,23 87:17,22,23,25 88:2
**laid (5)** 11:4,5,7 52:13,15
**Lakes (2)** 1:22 92:1
**landlord (1)** 11:20
**Large (1)** 90:7
**Latino (1)** 49:4
**law (8)** 57:21 58:13 58:22 59:14 60:25 66:2,9,11
**lawsuit (1)** 51:24
**LAWYERS' (4)** 1:15 1:22 4:3 92:1
**lease (2)** 55:18,20
**leave (3)** 34:14 61:24 71:15
**leaves (1)** 82:18
**Lee (63)** 1:6 2:3,22

3:24 10:9 14:2
16:15 17:15 19:7
22:7 25:15 26:12
27:19 28:5,24 29:4
31:11,21 32:9,15,23
36:5 38:6 39:5 42:3
42:8 48:12 49:12
49:23 51:23 53:9
53:15,18,20 54:22
61:16,20 62:11,14
63:18 64:3 66:14
68:6,19 71:6,9,20
73:18 77:9,13
78:10,13 79:11,23
81:23 83:3,7,18
86:2,11,17 87:11
92:11
**Lee's (8)** 12:24 13:2
46:7 65:18 66:23
67:9 70:19 78:22
**left (1)** 42:8
**legal (9)** 25:7,12 32:2
41:11 46:10,19
62:19,21 72:10
**legally (1)** 65:1
**legislate (1)** 44:12
**legitimate (1)** 12:8
**leisure (6)** 7:4,5,18
7:20,21 8:8
**length (4)** 40:17,19
40:20 71:16
**Leo (4)** 6:7,7,11,12
**let's (6)** 6:1 16:14
24:12 43:24 49:16
83:7
**letter (3)** 45:9 48:3
92:16
**level (1)** 8:11
**liberties (1)** 57:17
**Liberty (2)** 43:13,15
**library (2)** 7:24 8:1
**lifer (1)** 6:6
**lifestyle (1)** 11:23
**lifetime (1)** 64:25
**Lilianna (6)** 1:24
4:10 89:16 90:6,23
92:24
**Lily (1)** 54:16
**limited (1)** 82:14
**line (4)** 78:8,18 79:13

91:3
**lines (1)** 8:20
**list (3)** 33:5 81:21
82:4
**listed (1)** 67:16
**litigation (1)** 55:19
**little (3)** 54:11 57:10
77:11
**lobby (1)** 37:10
**local (1)** 66:3
**located (1)** 6:9
**LOCATION (1)** 1:15
**locations (2)** 32:21
33:3
**lockdown (3)** 71:15
78:11,16
**long (9)** 7:5,15 22:8
25:6 40:11 53:15
75:15 76:18 84:7
**look (13)** 7:16 14:14
17:23 18:1,2,13
34:18 51:13 56:7
59:4 69:4 70:3
80:22
**looked (2)** 61:12 62:6
**looking (1)** 13:21
**Lori (1)** 37:24
**lost (1)** 26:1
**lot (1)** 64:23
**lunch (1)** 31:13
**luncheon (4)** 26:10
28:6 32:24 42:3

**M**

**M-O-T-T-E (1)**
56:23
**M.L.K (2)** 1:16 4:4
**ma'am (1)** 26:23
**mail (1)** 74:23
**maintains (1)** 45:13
**major (1)** 82:13
**making (3)** 12:12
15:19 81:23
**male (2)** 49:4,5
**manage (2)** 8:24 9:4
**managed (1)** 54:19
**manager (3)** 7:2,8
7:10 8:14,16,22
10:15 48:9,14 72:3
72:17 73:19 82:13

**managers (2)** 73:16
73:17
**manner (4)** 29:2
70:25 73:25 74:4
**March (5)** 3:16,19
64:13 66:12,22
**Marcy (2)** 2:4,5
**Marcy@floridaani...**
2:9
**marina (7)** 7:23 8:1,2
48:6,7 64:16,17
**mark (2)** 56:14 61:7
**MARKED (7)** 56:20
59:10 61:10 64:19
65:23 67:17 81:4
**market (6)** 33:12,16
34:13,21 35:15,24
**Mary (2)** 10:19 56:12
**matter (4)** 58:5,8,10
91:17
**Max (1)** 58:5
**mayor (1)** 29:24
**me.I (1)** 91:18
**mean (12)** 11:24,24
20:7 30:4,6 31:19
35:18 44:24 46:18
51:24 63:22 85:16
**meaningful (1)** 13:8
**means (2)** 30:5 83:21
**meant (4)** 57:11 61:3
83:18,19
**mediation (1)** 52:15
**meet (3)** 22:4 65:5
72:23
**meeting (4)** 23:24
28:2 50:1 62:2
**meetings (2)** 22:21
22:22
**meets (1)** 39:15
**member (5)** 29:13,16
46:22 47:1 85:10
**members (7)** 29:2,7,8
31:14 44:6 68:4
78:20
**memo (1)** 59:25
**memory (1)** 77:7
**mentioned (2)** 38:20
78:9
**Merchant (1)** 85:11
**merchants (14)**

35:25 75:11,15,20
76:2 77:6,17,23
78:3 82:5 84:5,9,23
85:18
**merely (1)** 71:25
**merged (2)** 75:21
84:10
**message (1)** 71:21
**met (1)** 27:23
**Micanopy (1)** 2:7
**Michael (1)** 3:17
**MIDDLE (1)** 1:1
**mine (1)** 25:25
**minimum (2)** 15:23
76:20
**minutes (1)** 69:4
**mischaracterizatio...**
44:20 60:11 63:11
**mischaracterize (1)**
63:15
**miscommunicatio...**
69:23
**misdemeanor (1)**
67:23
**mistake (1)** 65:12
**mobile (11)** 14:13,17
16:6 65:21 66:13
66:23 67:10 76:8
77:14 84:16 85:12
**moment (2)** 71:19
74:11
**Monday (1)** 92:19
**month (1)** 55:23
**moot (2)** 69:17 74:15
**morning (2)** 5:15,16
**mortar (1)** 16:10
**mortars (1)** 16:13
**motion (12)** 9:24
12:16,23 24:13
28:4 32:15 39:4
50:4 65:18 69:12
69:14 70:20
**Motte (3)** 56:19 57:1
57:2
**move (1)** 33:25
**movement (1)** 57:17
**municipal (1)** 48:6

**N**

**name (3)** 5:3 91:20

91:25
**named (1)** 11:16
**names (3)** 10:13
  37:16 43:11
**necessary (1)** 62:10
**need (5)** 9:11 43:2
  49:14 56:7 74:18
**needed (2)** 33:22
  51:17
**needs (1)** 82:18
**negative (1)** 23:3
**neither (1)** 71:22
**never (15)** 5:23 22:21
  26:3 39:5 40:6,15
  40:16 41:15 42:11
  51:1,2 63:15 70:24
  73:24 74:4
**new (1)** 44:13
**nice (1)** 54:11
**non- (1)** 37:6
**non-public (1)** 37:8
**North (4)** 1:16 2:15
  4:4 92:7
**Notary (4)** 4:10
  89:17 90:6,24
**note (4)** 50:5,5 62:1
  82:10
**notes (1)** 69:4
**notice (1)** 60:4
**notion (1)** 50:10
**number (5)** 9:11,13
  67:20 80:8 89:20
**Numerous (1)** 21:16

**O**

**O'Reilly (27)** 1:14
  3:14,17 4:3 5:3,5
  5:15,19 24:7 25:6
  25:24 39:5 41:15
  42:14 48:11 49:20
  50:5 56:4 62:23
  63:14 67:21 69:12
  70:18 75:10 80:22
  92:6,14
**O'Reilly's (1)** 70:20
**OATH (1)** 89:1
**object (9)** 14:21
  31:25 48:19 51:20
  55:1 66:18 68:10
  68:12 70:23

**objection (27)** 15:20
  16:17 17:2 19:11
  22:10 24:10 28:9
  31:25 38:9 40:23
  41:5,12 42:4 44:19
  46:9,19 60:6 62:17
  63:10 65:24 66:15
  66:25 67:12 68:17
  68:20 73:22 85:22
**objective (1)** 21:9
**obligations (1)** 52:10
**observe (2)** 26:12
  68:18
**observed (1)** 13:5
**obtain (1)** 76:8
**obtained (1)** 6:24
**obviously (4)** 33:15
  33:17 39:24 68:2
**occur (1)** 30:21
**of-way (1)** 35:24
**offensive (1)** 71:10
**offered (1)** 83:16
**office (5)** 25:8 61:22
  74:23 87:5 92:19
**officer (15)** 8:23
  10:21 11:2 17:13
  17:16,20 37:22
  52:11 57:1,2,2
  58:14 72:9,13,15
**officers (7)** 38:21
  58:13 71:24,25
  72:1 78:21,24
**official (2)** 7:9 86:4
**officials (6)** 29:3
  78:21,21,23 79:25
  79:25
**Oh (4)** 5:25 7:15
  16:23 26:3
**okay (149)** 5:25 6:25
  7:9,11 9:21 11:7
  12:15 14:24 15:17
  17:24 18:12,15,17
  18:21,23 19:9
  21:12 22:3 23:5,8
  23:21 24:5 25:10
  25:17,24 27:2,22
  28:4,16,18 29:12,19
  29:21 30:9,21 31:8
  31:19 32:8 34:4,10
  34:13,17,20 35:23

37:3 38:20 39:23
  40:13 41:19 42:19
  43:5,11 44:11,24
  45:12,22 46:2,15
  47:4,12 49:9,15,15
  49:17,19,21,21
  51:17 52:17 53:5
  53:24 54:11,11,15
  54:18 55:7,10
  56:21 58:14 59:2,7
  59:13 60:3,16,19,23
  61:7 62:3,8,23
  64:20 66:8,10,12
  67:8,18,22 68:5,8
  68:17 70:5,13
  71:12,16 72:8,16
  74:10,17 75:6 76:1
  76:5,8,18,22 77:1,7
  77:18,24 78:2,8,13
  79:3,13,17,23 80:7
  80:15,18,19 81:5,7
  81:9,13,13,22 82:3
  82:7 83:3,24 84:1
  84:11 85:7,24,24
  86:20,23 87:1,3,4
**old-school (1)** 80:14
**older (1)** 30:3
**one- (1)** 59:2
**ones (3)** 38:15 83:10
  84:12
**ongoing (1)** 22:12
**online (1)** 14:18
**open (9)** 32:21,25
  33:3,6 57:13,25
  58:4,8 86:7
**operating (6)** 8:23
  12:13 13:6,11 14:7
  14:12
**operation (3)** 13:14
  35:17,18
**operations (4)** 8:25
  9:2 36:11,13
**Opposing (1)** 79:14
**ORANGE (2)** 89:4
  90:4
**order (1)** 87:24
**ordinance (26)** 10:24
  11:5,8 15:13 23:5
  24:6 38:7 42:15,18
  42:20,22 43:2

44:14 52:13,16,25
  53:3 65:21,22 66:3
  66:14 69:19,22,24
  69:25 73:8
**ordinances (1)** 71:1
**ordinary (1)** 54:14
**organization (2)**
  35:20 75:18
**organizations (2)**
  75:18 87:15
**orientation (1)** 82:20
**origin (1)** 73:11
**original (1)** 91:21
**outline (1)** 84:20
**outlined (2)** 52:25
  58:1
**outside (12)** 15:1
  16:8 43:18,19
  44:17 63:3,19,22
  76:6 83:8,18 86:21
**Outsiders (1)** 43:20
**override (3)** 22:23
  23:1,3
**oversee (1)** 83:14
**overturn (1)** 23:4
**owned (1)** 84:12
**owner (1)** 72:3
**owns (1)** 85:11

**P**

**P (1)** 4:7
**P.A (3)** 2:5,14 92:7
**p.m (3)** 69:9 88:5
  92:19
**pad (3)** 30:22,24 31:2
**page (16)** 3:2,9,21
  56:18 68:1,11
  80:10,12,16,16,21
  81:14,16 82:7,7
  91:3
**pager (1)** 59:3
**pages (2)** 68:2 75:1
**Palm (4)** 1:22,23
  92:1,2
**paper (3)** 17:15 80:3
  80:25
**park (5)** 2:15 57:13
  58:1,6 92:7
**parking (1)** 64:23
**parks (4)** 57:14,22,23

58:1
**part (8)** 13:25 14:13
14:15 31:2,6 52:1
61:24 86:24
**part-time (1)** 8:11
**particular (1)** 8:7
**parties (2)** 52:12
90:13
**partisan (1)** 43:23
**party (3)** 26:18 35:14
65:7
**passing (1)** 83:10
**pathetic (1)** 64:22
**patron (1)** 64:18
**pay (1)** 55:23
**paying (2)** 44:6 55:22
**people (12)** 13:5,6
28:18 37:13,15
44:14 54:24 57:21
57:23 64:16 76:15
83:5
**perceive (4)** 81:19,22
82:3,23
**perceived (1)** 69:24
**permanent (4)** 40:3
40:22 41:3,10
**permanently (2)** 39:6
41:16
**permission (3)** 13:22
13:23 15:1
**permit (2)** 20:8 76:9
**permits (2)** 13:9,12
**person (7)** 12:8 21:9
23:18 50:21 54:20
58:2,5
**personally (1)** 89:7
**pertaining (1)** 57:20
**perused (1)** 12:20
**Pete (3)** 6:22,23 8:10
**Petersburg (4)** 1:16
4:5 57:21 58:23
**petition (1)** 70:24
**Phone (1)** 25:22
**phonetic (1)** 13:16
**phrased (1)** 70:23
**physical (1)** 29:17
**Pick (2)** 13:16,17
**piece (1)** 17:15
**pieces (1)** 76:10
**Pinellas (1)** 87:4

**pizza (3)** 85:11,13,19
**place (6)** 25:14 28:2
32:18 62:11 76:19
82:21
**placed (1)** 82:12
**Plaintiff (12)** 1:6 2:3
2:22 3:10 24:14,16
26:7 32:17 41:16
50:6 69:17 70:24
**Plaintiff's (11)** 50:10
56:14,20 59:10
61:10 64:19 65:15
65:23 67:14,17
71:5
**play (2)** 10:6 15:19
**please (6)** 5:3,6,20
62:1 65:1 81:1
**PM (1)** 1:15
**point (5)** 18:24 55:14
74:16 78:16,22
**police (47)** 3:21 9:6
10:20 17:13,16
19:23,24,25 21:1,12
22:6 24:15,21
25:14,18 26:17
32:6,14 37:11,20
38:21,25 39:8,9
40:7,7,9,10,13
45:11 57:2,12
58:12,14 61:18,19
65:19 67:15 71:24
71:25 72:1,9,18
78:20,24 79:6,25
**policies (1)** 40:8
**policy (15)** 23:7 24:6
39:16 41:9 45:13
45:20 46:7 47:20
62:25 69:15,18,21
71:16 73:1,12
**politely (1)** 49:7
**population (1)** 9:10
**portions (1)** 74:22
**posed (2)** 57:10,11
**position (3)** 8:11,13
34:20
**possible (1)** 60:4
**possibly (4)** 33:9
49:6 51:16 72:22
**post (1)** 14:18
**postgraduate (1)**

6:18
**practice (1)** 58:13
**pre-existed (1)** 75:23
**precluding (1)** 43:3
**prepare (1)** 9:18
**present (2)** 2:22 86:9
**pretty (1)** 69:3
**prevented (2)** 42:2
63:3
**Previous (2)** 73:16
73:17
**print (1)** 74:23
**prior (6)** 12:12 32:24
44:20 60:11 63:11
75:18
**private (11)** 15:15
24:16 26:18 32:18
35:14,16,17,18 44:7
44:8 66:7
**probably (2)** 26:2
56:9
**problems (2)** 32:19
60:5
**procedural (4)** 48:17
50:14,15 69:20
**procedure (5)** 4:8
64:14,25 65:10
76:18
**procedures (1)** 50:14
**proceed (3)** 5:11 83:9
83:19
**proceeding (2)** 90:9
90:10
**PROCEEDINGS (2)**
3:3 5:1
**process (11)** 11:5,7
21:11 50:15,15
52:14 59:16 61:1
69:20 71:4 77:8
**Produced (1)** 89:10
**product (1)** 76:15
**production (2)** 10:8
74:14
**profanity (2)** 30:9
31:8
**promote (2)** 76:3
82:16
**proper (2)** 77:5
83:15
**properly (2)** 66:20

70:24
**property (11)** 15:15
57:25 58:3,7,16
59:16 61:1,22 66:7
72:4 84:12
**protections (1)** 82:21
**protest (3)** 62:15
63:20,24
**protested (2)** 63:5,18
**protesting (1)** 63:3
**provide (1)** 71:6
**provided (9)** 10:7,8
24:15,20 66:11
70:25 71:4 72:11
84:20
**provides (3)** 24:2
44:25 45:1
**public (35)** 4:11 6:13
15:16 27:25 29:3,5
32:21,25 33:3,7,9
33:11 37:7 42:18
44:6,10 45:18
49:25 57:13,13,14
57:22,23,24,25 58:3
58:4,16 62:2 64:23
72:2 73:6 89:17
90:7,24
**Pull (2)** 13:16,17
**pulling (3)** 19:4 20:9
86:6
**purpose (2)** 75:16
76:1
**purposes (1)** 6:24
**pursuant (2)** 4:7
44:13
**pursue (1)** 50:13
**pursued (3)** 50:7,17
70:16
**purview (1)** 9:5
**put (8)** 30:15 38:3
39:8 45:17 52:22
59:5 71:18 73:5

———————
**Q**

**question (32)** 14:21
15:21 16:18 17:3,4
19:14,15 22:11,25
25:9 32:3 38:10
40:24 46:9,11
49:14 54:10,20

57:9 60:7,12,16,19 62:20 63:16 66:19 67:5 70:13 74:5 79:18 81:18 83:17
**questioning (3)** 78:8 78:18 79:13
**questions (8)** 70:8,11 74:20 75:10 81:3 81:16 83:25 85:25
**quite (1)** 11:22
**quote (2)** 29:11 52:25

**R**

**R (2)** 4:7 90:1
**R-O-A-C (1)** 37:25
**R-O-A-C-H (1)** 38:1
**race (2)** 51:12 82:20
**racial (2)** 50:6 70:13
**raise (1)** 5:6
**rambling (1)** 71:1
**Ray (4)** 28:22 29:25 64:14,24
**Raymond (1)** 45:10
**reach (2)** 53:25 54:8
**reached (5)** 7:12 48:11 55:14,14 59:18
**read (15)** 9:21 10:2,5 12:19 26:6 32:16 81:2,19 86:24 87:19,20,22 91:16 91:17 92:20
**reading (2)** 4:12 92:17
**ready (2)** 85:15 92:17
**real (1)** 6:21
**realize (1)** 12:21
**really (2)** 12:25 21:9
**reason (12)** 12:8 45:16 46:16 47:13 51:11 54:5 58:4 73:3,19,20 74:3 91:3
**reasons (2)** 35:9 91:19
**recall (6)** 14:6 62:13 70:7 79:1,15 81:10
**receive (4)** 14:2 35:19 51:4 60:21

**received (7)** 11:12 14:25 16:20 25:13 51:1,2 71:23
**receiving (1)** 70:7
**recollection (1)** 77:8
**record (14)** 5:2,4 14:4 49:1,19 52:2 68:17 69:6,8,10 74:19 80:24 90:10 91:19
**records (2)** 18:1,2
**recreation (3)** 6:22 7:24 8:6
**Redevelopment (3)** 14:9 75:24 76:4
**REDIRECT (2)** 3:6 84:2
**Refer (1)** 54:7
**referenced (2)** 70:20 71:17
**referencing (1)** 57:19
**referred (6)** 26:8 52:4,14 53:22 55:12 61:6
**referring (3)** 43:8 48:5 65:22
**reflects (1)** 39:17
**refuses (1)** 61:25
**regarding (9)** 42:16 42:18,23 44:14 50:1 65:21 68:18 70:19 71:7
**regards (3)** 69:23 78:21,23
**register (1)** 15:2
**registration (1)** 77:2
**regular (2)** 88:1,2
**related (3)** 33:12 58:22 90:13
**Relations (1)** 87:7
**relevant (1)** 50:14
**relief (1)** 69:16
**reluctant (1)** 8:13
**remember (8)** 9:13 13:14,19 18:22,23 54:10 59:25 86:1
**remove (2)** 33:25 64:25
**removed (1)** 65:11
**removing (1)** 64:14

**renewed (1)** 55:20
**renewing (1)** 55:18
**rental (1)** 11:19
**Rentals (1)** 36:21
**repeated (3)** 38:23 80:16 82:10
**repeatedly (4)** 29:6 37:11,12 38:24
**replaced (3)** 69:16,18 69:21
**reply (1)** 52:8
**report (6)** 3:21 21:12 37:21 67:15 68:12 90:8
**reported (1)** 82:10
**reporter (15)** 1:24 4:11 5:2,6,11 69:9 81:1 87:20,23 88:1 88:3 89:17 90:6,24 92:24
**REPORTING (4)** 1:15,22 4:4 92:1
**reports (1)** 37:20
**representation (4)** 53:14,14,21,24
**representative (4)** 27:6,11,18,21
**represented (1)** 24:8
**representing (1)** 57:19
**request (9)** 10:8 20:13,14,15,16 59:23 72:12 74:14 91:18
**requested (1)** 41:18
**requesting (2)** 83:8 86:20
**required (1)** 73:7
**requirement (2)** 47:24 48:2
**requires (1)** 15:24
**research (2)** 57:10,11
**Reserve (2)** 20:22,23
**resident (4)** 11:15 46:25 64:17 65:9
**residents (2)** 43:15 43:20
**resources (2)** 10:15 37:22
**respect (1)** 16:10

**respond (4)** 54:21 65:3,6 87:11
**respondent (1)** 11:4
**response (11)** 10:7 22:2 28:23 41:23 42:1 47:18 52:3 59:21 70:22 86:15 86:18
**responses (1)** 74:13
**responsibilities (1)** 8:21
**responsible (4)** 7:23 47:19 50:12 62:24
**responsive (1)** 37:19
**restaurant (1)** 85:11
**restricted (3)** 42:25 43:1,4
**restriction (1)** 72:3
**restrictions (1)** 44:14
**result (1)** 12:4
**resulted (2)** 31:11 46:7
**retained (2)** 53:16,18
**review (3)** 9:19 12:17 70:10
**reviewed (1)** 11:10
**reviewing (1)** 58:9
**revised (2)** 66:3,5
**Richard (1)** 64:16
**right (29)** 5:7 8:1 9:13 12:9 13:7,7 15:16 16:7 24:3,8 24:12 26:4 37:5 41:24 44:10,13 47:5 48:10 56:24 62:25 64:9 65:13 66:17 67:14 73:1 75:5 80:7,20 82:8
**right- (1)** 35:23
**right-of-way (1)** 35:21
**rights (7)** 10:21 11:2 52:10 57:16 83:9 83:13 87:5
**righty (1)** 88:3
**Ring (12)** 2:13 3:16 55:7 64:10,11 65:3 65:4,6 80:6,10,15 81:6
**rings (1)** 25:22

**risk (3)** 10:15 45:18
 73:6
**Roach (1)** 37:24
**Road (1)** 2:6
**roadway (1)** 35:21
**Robert (3)** 3:12
 45:11 59:8
**Rodriguez (7)** 28:22
 28:25 45:10 48:6
 55:3 64:24 65:5
**Rodriguez's (2)**
 64:14 65:8
**role (6)** 7:3 10:6,19
 15:19 16:25 17:6
**room (1)** 69:6
**Roper (70)** 2:12,14
 2:14 3:5 9:13 13:16
 14:21 15:20 16:17
 17:2 19:11 22:10
 24:10 25:6,11 26:1
 26:3 28:9 31:25
 38:9 40:23 41:5,11
 42:4 44:19 46:9,19
 47:22 48:19,23,25
 49:16 51:20 55:1
 56:2,8 60:6,10
 62:17 63:10,16
 65:24 66:15,18,25
 67:12 68:10,20
 69:5 73:22 74:21
 75:2,6,8 80:7,11,18
 80:20 81:8 83:23
 84:4 85:22,24
 86:24 87:19 88:3,4
 92:6,7,7
**rule (2)** 4:7 57:24
**rules (1)** 48:17
**ruling (4)** 57:18,19
 58:2,2
**runs (2)** 35:4 75:11

**S**

**S-E- (1)** 82:12
**safety (4)** 45:17 72:2
 73:5 77:5
**Saint (6)** 1:16 4:5 6:7
 6:7,11,12
**sales (1)** 15:1
**Salzman (8)** 3:15,20
 25:8 59:8,18,21

61:9 65:17
**Sam (1)** 3:17
**Samantha (3)** 3:16
 64:10,11
**San (1)** 6:10
**save (1)** 81:6
**saying (4)** 12:24
 54:17,20 59:14
**says (18)** 24:5,7 28:5
 32:15 33:2 45:11
 45:13 48:3,13 50:4
 50:16 59:6 60:24
 67:23 69:14,17
 84:22 87:2
**school (2)** 6:4,5
**Scouts (2)** 12:11,13
**screamed (1)** 29:6
**screaming (2)** 36:23
 36:24
**scroll (1)** 80:11
**Seaside (1)** 11:15
**second (5)** 56:18
 62:10 80:10,16
 81:16
**see (8)** 13:10 14:18
 20:24 58:11 61:23
 68:23,24 74:23
**seeing (1)** 81:10
**seen (3)** 45:23 53:19
 56:9
**selecting (1)** 10:6
**sell (16)** 14:19 15:6,8
 15:12,18 16:7
 34:14,23 51:9,10,11
 76:10,22 77:15
 85:13,19
**selling (2)** 38:7 76:15
**Send (1)** 87:14
**senior (2)** 7:24 8:1
**sent (16)** 9:20 10:4
 52:4 53:5,13,21
 55:18 59:25 60:1
 63:8 64:11 71:20
 80:5,6,7 82:9
**September (11)** 7:11
 8:17 16:14,23
 18:14 30:19 52:1
 71:20 80:3 82:8
 86:16
**sergeant (2)** 57:1,6

**seriously (1)** 72:22
**serve (1)** 10:23
**served (1)** 10:8
**service (3)** 3:19 7:4
 7:18
**SERVICE@LAW...**
 1:23
**services (10)** 7:6,20
 7:21 8:8 45:17
 46:17 47:5,7,14
 73:5
**set (2)** 23:7 71:1
**Setting (1)** 66:6
**settled (1)** 55:21
**settlement (1)** 55:15
**sexual (1)** 82:20
**sexuality (1)** 11:24
**Shannon (1)** 10:16
**shared (2)** 36:8 37:1
**Shea (4)** 31:20,21
 35:4,7
**Sheet (1)** 91:20
**shorter (1)** 40:3
**show (6)** 17:22 24:16
 24:17 28:5,19 80:9
**showed (3)** 26:7
 28:25 34:13
**shows (2)** 36:5 60:20
**sic (1)** 85:11
**sidewalk (5)** 33:22
 33:24 58:1 63:23
 63:24
**sign (3)** 17:10 62:15
 92:20
**signed (8)** 8:19 17:8
 17:9,20,21 45:10
 53:2 91:19
**signifies (1)** 39:16
**signing (2)** 4:12
 92:17
**simply (1)** 71:13
**Sincerely (1)** 92:22
**sir (7)** 32:3 46:12
 60:13 78:12,17
 83:2,22
**sit (7)** 29:15 35:12
 48:16 54:5 56:3,5
 59:24
**situation (3)** 11:19
 12:11 79:19

**situations (1)** 58:23
**six (1)** 77:13
**six-page (1)** 68:12
**solemnly (1)** 5:7
**Some- (1)** 18:9
**somebody (13)** 18:5
 18:8 23:23 24:7
 46:2 47:24 52:11
 52:18,20 53:5 74:2
 76:14 84:16
**somebody's (1)** 23:1
**someone's (1)** 68:3
**sorry (8)** 5:24 18:6
 33:1 47:6 49:8,17
 71:12 75:5
**source (3)** 83:8,18
 86:21
**Southeast (1)** 2:6
**speak (4)** 22:21
 37:11 54:3 78:7
**SPEAKER (1)** 85:16
**special (12)** 13:25
 14:13,16,19 15:3,7
 15:10 16:8 75:11
 84:17,19 85:6
**specific (9)** 19:5 23:8
 51:17 52:17 57:21
 62:5 71:2 72:24
 82:24
**specifically (6)** 17:10
 20:4 26:14 34:25
 36:5 86:20
**specifics (1)** 18:14
**speculate (1)** 19:16
**speculation (10)**
 16:17 19:11 22:10
 28:11 41:6 51:21
 62:19 65:24 68:15
 73:23
**speech (1)** 27:9
**spoke (1)** 77:22
**spoken (1)** 78:19
**sponsor (11)** 14:25
 15:3,5,17 16:3
 75:22 76:12,24
 77:1 84:11,19
**sponsors (4)** 33:18
 35:6,20 77:17
**sponsorship (1)**
 35:19

**St (5)** 6:22,23 8:10
57:20 58:22
**staff (30)** 20:20 22:7
27:1,6,7,8,10,15,15
27:20 28:1 29:19
31:14,18,19 33:18
35:1,3 36:7,8,25
45:18 46:22 47:1
72:11,12 73:5
78:20,23 79:24
**staff's (1)** 46:1
**stage (1)** 31:6
**stand (1)** 22:19
**standards (2)** 15:23
66:6
**standing (1)** 72:10
**start (1)** 6:1
**starts (1)** 47:1
**state (20)** 4:11 5:3
27:6,11,21 44:24
45:1,3 50:9 63:18
66:1,2,9,11 70:17
83:3 89:3,18 90:3,7
**stated (1)** 75:10
**statement (5)** 40:22
63:8 73:18,18
74:19
**statements (1)** 52:12
**states (5)** 1:1 57:9
64:13 66:16 82:8
**status (1)** 11:21
**statute (6)** 30:18
44:24 45:1,3 66:2
73:8
**step (4)** 27:15 30:14
31:10 83:12
**steps (2)** 62:15 63:25
**sticker (1)** 59:5
**sticks (1)** 46:24
**STIPULATION (1)**
4:1
**Stone (3)** 3:13 59:14
61:3
**stop (2)** 20:25 86:6
**stopped (1)** 22:21
**straighten (1)** 5:21
**strapped (2)** 34:9,10
**STREET (2)** 1:16
4:4
**strike (2)** 21:5 30:2

**study (1)** 6:12
**stuffs (1)** 77:15
**subject (1)** 61:16
**submit (2)** 53:7,9
**submitted (2)** 54:2
90:17
**subsequently (5)**
26:19 27:25 75:21
76:7 84:10
**suggesting (1)** 24:15
**Suite (3)** 1:16,22 92:1
**Supervising (1)** 9:3
**supervisor (3)** 6:22
10:15 45:22
**supervisors (2)** 45:14
73:2
**Suppose (2)** 14:17
85:10
**supposed (1)** 41:22
**sure (12)** 17:18 22:17
34:4 46:4,6 48:23
52:22 69:5 72:7,7
77:3,4
**suspense (1)** 55:19
**sustaining (1)** 23:11
**swear (2)** 4:12 5:7
**sworn (1)** 89:8

## T

**T (3)** 61:17 90:1,1
**take (7)** 48:22 52:12
55:16 56:8 59:4
81:2,20
**taken (6)** 4:3,7 25:14
25:15 65:2 91:16
**talk (4)** 24:12 25:3,4
38:21
**talked (2)** 38:5 71:16
**talking (3)** 17:15,18
34:25
**Tampa (2)** 1:2 86:13
**Telephone (2)** 2:8,17
**tell (29)** 9:18 16:15
18:11,12,22 23:21
25:3 26:14,25 27:5
29:18 31:17,18
32:9 36:4 37:5
40:10,25 61:24
62:23 63:2,21 65:1
65:5 68:2 72:18

74:21 78:1 86:11
**telling (2)** 72:16 83:4
**ten-minute (1)** 48:22
**tenant (2)** 11:19 80:1
**tenant- (1)** 11:19
**tenant-landlord (1)**
12:6
**tendency (4)** 32:16
32:20 33:2 36:6
**tender (1)** 40:8
**terminate (2)** 20:17
21:25
**terminated (2)** 22:9
23:13
**testimony (6)** 5:8
44:20 63:12,15
72:6 75:14
**Thank (2)** 5:12 69:7
**Thanos (1)** 29:25
**Theater (3)** 7:25 8:4
8:5
**Theresa (1)** 10:14
**They'd (1)** 40:7
**things (5)** 15:24 30:7
36:21 37:17 77:4
**think (17)** 12:18 13:2
21:8 26:2 28:20
36:4 54:6 57:11
59:13,14 60:24
69:2,23 74:2 75:3
80:4,16
**thinking (1)** 74:21
**Thomas (2)** 3:11
56:11
**thought (2)** 25:22
66:13
**thoughts (2)** 58:5,8
**threat (1)** 72:2
**threaten (3)** 29:23
30:1,11
**threatened (6)** 21:8
21:13 29:4,12,16,21
**threatening (7)** 21:1
21:3,4 29:1,2 31:14
36:10
**threats (3)** 21:4 30:2
30:4
**three (2)** 56:18 76:15
**ticket (3)** 17:19 18:13
40:8

**till (2)** 55:14,19
**time (22)** 1:15 7:15
9:9,16 11:16,16
19:8 23:21 40:3,19
40:20 54:17 57:3
69:9,10 70:22 78:9
78:13,16,22 81:2
84:7
**timeline (2)** 26:6
34:18
**times (3)** 7:7 19:18
27:17
**timing (1)** 22:13
**title (1)** 81:14
**titled (2)** 81:13,16
**titles (1)** 81:14
**today (9)** 9:19 29:15
35:12 36:1 39:25
48:16 54:5 57:10
59:24
**tofu (3)** 14:19 15:6,8
**told (14)** 7:16 20:24
21:5,6 28:1,5 31:11
34:15 35:10,13
46:3 72:22 77:9
86:6
**top (2)** 53:1 82:8
**town (1)** 82:15
**training (1)** 8:7
**transcribed (1)** 92:17
**transcript (7)** 4:13
87:24 89:7 90:9
91:16,21 92:20
**treatment (1)** 82:11
**trespass (58)** 16:15
16:21 17:1,11,12,14
17:24 20:12,18
21:10,22 22:1,9
23:10,13,23 38:19
39:7,10,18 40:1,2
40:20 41:2,9 42:16
42:19 45:15,24
46:5 48:5 59:15
60:5,25 61:20 62:9
62:25 63:2 64:1,2
64:15 65:10 67:24
69:15,18,21,25
71:22 72:1,17 73:3
73:11,19 74:2
78:10 79:14,18

85:25

**trespassed (21)** 18:4
18:7,19 19:2,7,10
20:11 23:18 26:19
26:21 27:2 31:22
48:1 57:22,23,24
58:3,6 61:16 71:10
73:9
**trespassing (6)** 23:2
24:19 57:12 58:15
58:24 62:1
**trial (1)** 83:13
**Troll (2)** 43:14,15
**truck (9)** 12:25 13:3
13:9,11,14 15:14
34:11 76:11,23
**trucks (1)** 13:6
**true (2)** 40:22 90:9
**trust (1)** 63:18
**truth (3)** 5:9,9,9
**try (3)** 58:13 74:22
76:10
**trying (8)** 27:9 28:20
30:6 36:14 43:21
44:23 46:23 78:13
**Tuesday (7)** 4:5
33:12,16 34:13,21
35:15,24
**turnaround (2)** 88:1
88:2
**turned (1)** 25:23
**Tuscawilla (1)** 2:6
**twice (1)** 49:15
**two (6)** 7:1 35:11
56:1,18 75:18
81:14
**type (6)** 14:4 16:1
17:19 75:18 77:14
82:23

**U**

**Uh-huh (9)** 27:24
37:9 40:10 45:2,19
59:20 61:11,14
63:1
**ultimately (2)** 50:9
55:20
**unacceptable (2)**
78:15 86:2
**unaware (1)** 42:6

**unbiased (1)** 83:13
**uncertain (1)** 22:13
**unconstitutional (3)**
57:14 59:17 61:2
**undersigned (1)** 89:6
**understand (20)**
15:22 16:18 17:4
19:14,15 22:11
32:3 34:5,6 44:9,23
45:6 46:11 54:13
60:12,16 61:3,5
62:20 65:25
**understanding (2)**
12:25 42:14
**unfair (1)** 64:15
**Unfortunately (1)**
74:12
**unfounded (1)** 12:5
**unhappy (1)** 22:15
**UNIDENTIFIED (1)**
85:16
**unique (1)** 79:21
**UNITED (1)** 1:1
**University (1)** 6:7
**update (2)** 20:14
82:9
**use (3)** 76:14,16
80:13
**usual (1)** 83:10
**utilizing (1)** 12:12

**V**

**Vague (1)** 15:21
**vagueness (1)** 69:19
**valuing (1)** 82:17
**various (1)** 71:17
**vehicle (6)** 66:24
67:9,10 76:9 84:16
85:12
**vending (4)** 66:3,24
77:15 85:12
**vendor (6)** 14:13,17
15:14 66:14 76:22
76:24
**vendors (5)** 16:1,4,6
65:21 77:4
**verbal (6)** 22:2 28:23
41:23 42:1 47:18
47:25
**verbally (1)** 29:9

**video (5)** 64:17 69:24
70:4 79:3,8
**videotaped (1)** 79:12
**vile (3)** 30:2,4,5
**Villas (1)** 11:15
**Vincent (11)** 3:12
24:23 32:13 42:9
45:11 59:8 60:23
63:9 66:13 71:20
73:17
**violated (1)** 73:8
**violating (5)** 38:6
57:15 64:1,2 83:9
**violation (2)** 69:19
83:12
**void (1)** 69:19
**volunteer (6)** 24:16
26:10 28:6 31:12
32:24 42:3
**volunteers (1)** 28:7
**vs (2)** 1:8 92:11

**W**

**wait (1)** 83:15
**waived (1)** 4:13
**Walter (1)** 64:16
**want (15)** 7:17 14:19
20:24,25 24:4
30:19 34:4 47:12
56:3 59:4 63:14
67:9 71:15 85:12
87:24
**wanted (11)** 15:8
21:23 34:14 38:21
56:16 62:14 63:24
64:4 77:15 82:10
87:2
**wanting (1)** 37:10
**wants (2)** 76:22
84:16
**warned (7)** 19:18,20
19:24 24:14 28:19
78:15 86:2
**warning (13)** 20:2
23:10 39:7,18 41:2
45:24 47:25 59:17
61:2,21 67:24
79:18 86:3
**warnings (11)** 19:9
39:10 41:9 42:16

45:15 59:15 60:25
71:23 72:2 73:3
79:14
**wasn't (2)** 59:23 74:5
**watched (2)** 79:3,6
**water (2)** 15:9 44:7
**Waterfront (3)** 14:8
75:24 76:3
**way (5)** 15:16 16:7
32:20 40:9 54:13
**we'll (6)** 43:9 56:14
69:6 81:1,9 87:19
**we're (7)** 23:11 54:11
72:19 81:9 85:18
87:17,18
**we've (5)** 48:21 71:16
79:11 80:5 81:9
**Webb (3)** 27:12,13
27:18
**weenies (2)** 15:6,8
**went (4)** 6:8 13:21
42:11 83:7
**West (2)** 1:23 92:2
**whichever (3)** 6:10
15:2 47:2
**white (2)** 13:7,7
**widgets (1)** 76:22
**wish (2)** 48:4,8
**withdraw (1)** 66:19
**witness (47)** 4:12,13
5:5,10,12 9:15
14:24 15:23 16:20
21:15 22:12 25:10
25:13,22 28:13
32:5 38:11 40:25
41:13 42:6 46:13
46:21 49:17 56:5
60:14 61:11,14
62:21 66:1 67:2,16
67:18,20,23,25
68:21 73:24 74:10
74:17,20 81:5,7
83:24 84:1 87:18
87:21 89:6
**witnessed (1)** 68:9
**Woodman (6)** 3:11
56:12,25 57:1,5,7
**word (1)** 30:5
**words (1)** 63:7
**work (1)** 6:25

**worked (2)** 6:21 8:11
**working (1)** 6:23
**works (1)** 54:14
**would've (2)** 60:1
 84:18
**wrapping (1)** 69:3
**WRD (2)** 14:10 15:9
**write (2)** 54:16,19
**writing (5)** 24:2,5
 41:20 48:13 84:22
**written (8)** 24:6
 47:25 48:16,17
 65:19 70:8 73:18
 84:15
**wrong (2)** 16:23
 38:22
**wrote (2)** 17:12
 73:12

---

**X**

---

**Y**

**Yacht (2)** 55:9,13
**Yeah (12)** 14:17 44:8
 44:8,16 49:16 56:8
 80:11,14,15 84:14
 86:25 88:4
**year (5)** 7:12 21:18
 21:19 40:14 62:10
**years (8)** 7:7 18:3
 20:12 30:19 31:9
 40:14 62:9 77:13
**yelling (3)** 36:23,24
 37:16
**Yep (1)** 67:22
**you-all (1)** 55:14

---

**Z**

**zoning (1)** 14:6
**Zoom (1)** 92:16

---

**0**

**08/16/2027 (1)** 89:19

---

**1**

**1 (12)** 3:11,24 56:15
 56:20 68:2 80:8,23
 81:1,4,10 82:8
 86:16
**10:03 (2)** 1:15 4:6
**11 (2)** 3:12 59:7

**116 (2)** 2:15 92:7
**12 (4)** 3:11 45:9
 56:12 60:3
**12,222 (1)** 9:12
**12:02 (1)** 69:9
**12:30 (2)** 1:15 88:5
**14th (1)** 69:20
**160 (1)** 1:16 4:4
**1655 (2)** 1:22 92:1
**166 (1)** 9:9
**17 (2)** 3:19 66:12
**1993 (1)** 75:25
**1995 (1)** 6:17
**1st (1)** 86:16

---

**2**

**2 (10)** 3:12,16,21
 59:6,10 64:13
 67:20 68:1 82:7,7
**2,000 (1)** 55:23
**20 (1)** 18:16
**2004 (6)** 7:1,5 16:14
 16:21 75:19 76:20
**2007 (1)** 75:21
**2008 (2)** 7:11 8:17
**2009 (3)** 7:13,14 8:19
**2019 (7)** 3:11,12 13:6
 45:9 56:12 59:7
 60:3
**2020 (7)** 3:16 16:23
 16:24 52:1 64:13
 78:10 82:8
**2021 (4)** 3:19 66:12
 66:22 71:20
**2022 (3)** 3:14 62:8,9
**2023 (3)** 67:16 68:6
 68:18
**2024 (1)** 18:14
**2025 (5)** 1:14 4:6
 90:17 92:4,16
**21 (2)** 1:14 92:16
**21st (1)** 4:5
**23rd (1)** 31:23
**242-0023 (2)** 1:23
 92:2
**249 (1)** 2:6
**25 (2)** 85:3,9
**25,000 (1)** 43:13
**26 (3)** 3:14 62:8,8
**27 (3)** 67:16 68:18

 71:20
**27th (4)** 31:23 32:10
 32:10 68:5

---

**3**

**3 (4)** 3:14 61:8,10
 92:4
**30 (1)** 4:7
**31 (1)** 90:17
**32667 (1)** 2:7
**32703 (2)** 2:16 92:8
**33401 (2)** 1:23 92:2
**33702 (2)** 1:16 4:5
**352 (1)** 2:8

---

**4**

**4 (3)** 3:16 16:24
 64:19
**4:00 (1)** 92:19
**405 (1)** 92:1
**407 (1)** 2:17
**434226 (1)** 89:20
**450 (1)** 1:22
**4th (1)** 21:18

---

**5**

**5 (5)** 3:3,4,19 65:15
 65:23
**5,000 (1)** 74:25
**545-7001 (1)** 2:8
**56 (1)** 3:11
**561 (2)** 1:23 92:2
**59 (1)** 3:13

---

**6**

**6 (9)** 3:21,21 50:5
 67:15,17 68:1,2
 70:13,20
**61 (1)** 3:15
**64 (1)** 3:18
**65 (1)** 3:20
**67 (1)** 3:21

---

**7**

**727 (1)** 48:12
**75 (1)** 3:5

---

**8**

**8:23-CV-02996-V...**
 1:2
**82 (1)** 3:24

**84 (1)** 3:6
**884-9944 (1)** 2:17
**893-1009 (1)** 48:12
**8950 (2)** 1:16 4:4

---

**9**

**9:00 (1)** 92:19
**96 (1)** 6:17


**From:** Woodman, Thomas
**To:** Farrand, Mary
**Subject:** FW: RAYMOND RODRIGUEZ TRESPASSED
**Date:** Friday, July 12, 2019 8:08:39 AM
**Attachments:** image001.png
image003.png

I sent you an email regarding that case law with trespassing people from public areas. Det. Pham spoke to me about the below this morning. Apparently, Rodriguez spoke to Det. Pham and the left the building. I'm not sure if Sgt Marotta spoke to Rodriguez prior to but Det. Pham believes that Rodriguez left the building under the impression that I'm going to research his complaint and obtain a list of requested items such as letters previously sent to the chief and phone calls to dispatch.

Has Sgt Marotta spoken to you about this? Who is going to handle the complaint? Det. Pham believes that Rodriguez is making a complaint about harassment in general and not necessarily specific to the trespass. His interaction was recorded. I placed a recording under your door on a disk for reference. I'm out of the office nearly all day today, Tuesday, and Wednesday. Then I'm here for Thursday and Friday next week and then gone for 10 days. Please advise on how you wish to proceed with this or if you need my help in anyway.

*Sgt. Thomas Woodman*
*Criminal Investigative Section*
*Gulfport Police Department*
*2401 53rd St S*
*Gulfport, Fl 33707*
*Office: (727) 893-1051*
*Fax (727) 893-1038*

**From:** Marotta, Mike
**Sent:** Thursday, July 11, 2019 8:20 PM
**To:** Pope, Edward <epope@mygulfport.us>
**Cc:** Vandenberg, Mike <mvandenberg@mygulfport.us>; Woodman, Thomas <twoodman@mygulfport.us>; Farrand, Mary <mfarrand@mygulfport.us>
**Subject:** FW: RAYMOND RODRIGUEZ TRESPASSED

Ofc. Pope,

As you are aware, Mr. Rodriguez came to the police department to speak with a supervisor this afternoon. You told him to speak with a Detective Sergeant, I am not sure why, so he insisted on speaking with Sgt. Woodman. Sgt. Woodman was not available, so he asked for any detective. I had Det. Pham speak with him hoping that it would calm him down and he get the information he was seeking and leave. He told Det. Pham he wants Sgt. Woodman to research his cases because he thinks the police department as a whole is harassing him.

Since you were the Acting Sergeant and it was someone on your squad that issued him the trespass warning, I am asking that you see what it is he would like us to do for him. If he has a formal complaint against a particular officer I'll assist you any way I can with the steps necessary regarding that procedure. I don't think it's Sgt. Woodman's responsibility to do any

research regarding Mr. Rodriguez, unless he specifically has some issue with one of the officers/detectives that work for him.

If you have any questions about this come see me please.

Thanks,

Sgt. Michael Marotta
Gulfport Police Dept.
2401 53rd St S.
Gulfport, Fl. 33707
Dispatch: (727) 582-6177
Office:    (727) 893-1052

*Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public-records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing.*





**From:** Dillard, Brandon <bdillard@mygulfport.us>
**Sent:** Thursday, July 11, 2019 12:11 PM
**To:** Patrol Officers <PatrolOfficers@mygulfport.us>; Police Operations Sworn <PoliceOperationsSworn@mygulfport.us>
**Cc:** Farrand, Mary <mfarrand@mygulfport.us>; Vincent, Robert <rvincent@mygulfport.us>
**Subject:** RAYMOND RODRIGUEZ TRESPASSED

Hello all,

On 07/11/2019 I responded to the Gulfport Marina to issue a trespass warning to Raymond Rodriguez (07/19/69). Denis Fran wanted to have him trespassed after he verbally attacked multiple customers just prior to my arrival. Rodriguez was issued his copy of the trespass and advised that he could not return to the property or he'd be arrested. He stated that he understood and would not return.

During my encounter with Rodriguez, he made multiple statements to Officer Pope and myself that he "does not feel safe with the Gulfport Police Department" and has on multiple occasions, contacted the Pinellas County Sheriff's Office to "file a complaint for harassment against the Gulfport Police Department".

Rodriguez has called in to dispatch and once I responded to his residence, he ran out of his front door and entered his neighbors house, and began recording me stating that I was harassing him because I followed him to his neighbors house.

He feels that because he has clients and boats that he works on within the Yacht Club and Marina the trespass shouldn't apply to him.

This email is for information purposes only and to advise you all that Rodriguez is trespassed from both the Boca Ciega Yacht Club and now the Gulfport Marina.

If contact is made with Rodriguez and he is in violation of the trespass warnings, please take appropriate action, and as always be safe!

From:        Woodman, Thomas
To:          Farrand, Mary
Subject:     FW: Trespass after warning question.
Date:        Friday, July 12, 2019 7:59:54 AM
Attachments: Catron_v._City_of_St._Petersburg.pdf

Regarding Rodriguez and the conversation we briefly had, coupled with the email from Sgt Marotta, I'm sending this to you for reference. I'll be back this afternoon.

*Sgt. Thomas Woodman*
*Criminal Investigative Section*
*Gulfport Police Department*

*2401 53rd St S*
*Gulfport, Fl 33707*
*Office: (727) 893-1051*
*Fax (727) 893-1038*

**From:** Motte, Jason
**Sent:** Friday, May 17, 2019 10:20 AM
**To:** Woodman, Thomas <twoodman@mygulfport.us>
**Subject:** Trespass after warning question.

I had a question posed to be today so I was doing a little research. After my research, I've concluded this, the police department trespassing an individual from a public park or public grounds open to the general public, such as parks, is unconstitutional, violating Florida Constitution rights extended to an individuals civil liberties for free movement. I've attached the Florida Applet Ruling, which is still in force, that I am referencing. This ruling Is close close to home too, pertaining to the City of St. Petersburg.

This case law is specific to people being trespassed from public parks, in this case, homeless people were being trespassed from public parks. The courts ruled that no one can be trespassed from public property that is open to the general public, including parks. A park is no different than a side walk outlined in the ruling. It appears in the ruling, a person can only be trespassed from public property if it isn't open to the general public.

The reason I'm asking your thoughts on this matter is a person asked me about Max being trespassed from the Beach Front and Park. They asked how the city could do this since the property is open to everyone.

What are your thoughts on this matter after reviewing the most current case law I could find on this matter.

Thanks.

Officer J. Motte
Gulfport Police Department
2401 53rd Street S.
Gulfport, Fl 33707
727-582-6177
jmotte@mygulfport.us



Exhibit _____ 2
366071
Date 01/28/25

| | |
|---|---|
| **From:** | Vincent, Robert |
| **To:** | Andrew Salzman |
| **Cc:** | City Manager, City of Gulfport, FL |
| **Subject:** | Fwd: RAYMOND RODRIGUEZ TRESPASSED |
| **Date:** | Thursday, July 11, 2019 5:25:51 PM |

Andy we are going to need some counsel on this. See the string below and please advise where we stand on issuing trespass warnings on city properties.

Thank you

Get Outlook for iOS

**From:** Stone, Josh
**Sent:** Thursday, July 11, 2019 12:51:16 PM
**To:** Vincent, Robert; Farrand, Mary
**Subject:** Re: RAYMOND RODRIGUEZ TRESPASSED

I think I found case law that would make the issuance of trespass warnings on our city owned property, without due process to challenge the warning, unconstitutional.

https://www.wsh-law.com/blog/1477/

Cmdr. Joshua D. Stone
Professional Standards Section
Gulfport Police Department
2401 53rd Street South
Gulfport, Fl. 33707

Office Phone: 727-893-1111

*Under Florida law, e-mail addresses are public records. If you do not want your e-mail address released in response to a public-records request, do not send electronic mail to this entity. Instead, contact this office by phone or in writing.*

**From:** Vincent, Robert
**Sent:** Thursday, July 11, 2019 12:27 PM
**To:** Farrand, Mary; Stone, Josh
**Subject:** Fwd: RAYMOND RODRIGUEZ TRESPASSED



Exhibit _____ 3
36607
Date 2/21/25

**From:** joreilly@mygulfport.us
**To:** ASalzman@unicesalzman.com
**Bcc:** City Manager, City of Gulfport, FL
**Subject:** Fwd: Jesse Lee trespass at City Hall complext
**Date:** Tuesday, July 26, 2022 5:52:40 PM

FYI

Please let me know if you have any questions.

Thank you

Jim

Sent from my iPhone

Jim O'Reilly

Begin forwarded message:

> **From:** "Vincent, Robert" <RVincent@mygulfport.us>
> **Date:** July 26, 2022 at 4:52:20 PM EDT
> **To:** POLICE DEPARTMENT ALL EMPLOYEES
> <Police_All_Employees@mygulfport.us>
> **Cc:** "City Manager, City of Gulfport, FL" <joreilly@mygulfport.us>
> **Subject: Jesse Lee trespass at City Hall complext**
>
> I have communicated to Mr. Lee clarification that the trespass warning issued to
> him for city hall/community development office applies to the entire property,
> not just the inside of the buildings. If you see him on any part of the city hall
> campus, you may tell him to leave. If he refuses to comply, he may be arrested for
> trespassing.
>
> Please note that this does not apply if he is attending a public meeting.
>
> Thank you.



I would like to know the procedure for Removing Ray Rodriguez's trespass.
I, along with others feel it is unfair that the marina allows some people (like
Richard Walters) to be on camera (I have video) calling a resident and marina
patron "fckng pathetic" over and over and harassing me while I am in my car in
the public parking lot and nothing is done and yet Ray Rodriguez has, what
appears to be a lifetime ban.

There is a procedure to remove his ban. There has to be (legally). Please tell me
what it is so we can get this taken care of.


Samantha Ring

Samantha

Begin forwarded message:

> **From:** Samantha Ring <SamanthaRing@outlook.com>
> **Date:** February 28, 2020 at 9:03:28 AM EST
> **To:** "Frain, Denis" <dfrain@mygulfport.us>
> **Subject: Re: Dinghy**

> I would like to know the procedure for Removing Ray Rodriguez's trespass.
> I, along with others feel it is unfair that the marina allows some people (like
> Richard Walters) to be on camera (I have video) calling a resident and marina
> patron "fucking pathetic" over and over and harassing me while I am in my car in
> the public parking lot and nothing is done and yet Ray Rodriguez has, what
> appears to be a lifetime ban.

> There is a procedure to remove his ban. There has to be (legally). Please tell me
> what it is so we can get this taken care of.

Let me think about it. Let's talk about it after the hearing tomorrow

Sent from my iPhone

On Mar 17, 2021, at 3:47 PM, Vincent, Robert <rvincent@mygulfport.us> wrote:

Should we consider amending the charge to the more recent ordinance regarding mobile food vendors?

**From:** Andrew Salzman <asalzman@unicesalzman.com>
**Sent:** Wednesday, March 17, 2021 2:39 PM
**To:** City Manager, City of Gulfport, FL <joreilly@mygulfport.us>; Vincent, Robert <rvincent@mygulfport.us>
**Subject:** FW: SERVICE OF COURT DOCUMENT CASE NUMBER 522020MO014077000APC STATE OF FLORIDA VS LEE, JESSE

Same motion for second case

Exhibit 5
3 6607 1
Date 01/21/25

**From:** Juan Fernandez-Barquin <juan@jafblaw.com>
**Sent:** Wednesday, March 17, 2021 2:25 PM
**To:** Service Process <service@unicesalzman.com>; Andrew Salzman <asalzman@unicesalzman.com>; Christina Poss <cposs@unicesalzman.com>
**Subject:** Fwd: SERVICE OF COURT DOCUMENT CASE NUMBER 522020MO014077000APC STATE OF FLORIDA VS LEE, JESSE

Notice of Service of Court Documents

Filing Information

Filing #:      123266101
Filing Time:   03/17/2021 02:23:59 PM ET
Filer:         Juan A Fernandez-Barquin 305-446-4555
Court:         Sixth Judicial Circuit in and for Pinellas County, Florida
Case #:        522020MO014077000APC
Court Case #: 20-14077-MO
Case Style:    STATE OF FLORIDA VS LEE, JESSE



Exhibit _____ 6
3666 Ti
Date 01/11/25

---

**Subject #1 - WITNESS #1 - BROWN, CHRISTINE A - Continued**

*Primary Information - Continued*

Residence Type: CITY

*Relationship Information*

| | |
|---|---|
| Related Offense: | WITNESS of COMMITTED MISDEMEANOR TRESPASS AFTER WARNING (810.09) (90J) |
| Homicide Victim: | NO |
| Hate Crime Victim: | NO |
| Domestic Violence: | NO |
| Extent Of Injury: | NONE |
| Use Of Force: | NO |

*Personal Information*

Ethnicity: Not of Hispanic Origin

Photo: NO

*Employment Information*

Occupation: BOCA CIEGA HIGH SCHOOL, TEACHE

*Addresses*

| Relationship | Address |
|---|---|
| HOME ADDRESS | 2802 53RD ST S, ST PETERSBURG, Florida 33707 UNITED STATES |
| HOME ADDRESS | 2802 53RD ST S, GULFPORT, Florida 33707 UNITED STATES |

*Telephones / E-Addresses*

| Relationship | Number/E-Address |
|---|---|
| CELLULAR PHONE | (727) 501-5857 (CELLULAR) |
| HOME | (727) 323-3392 |

---

**Subject #2 - WITNESS #2 - OREILLY, JAMES EDWARD**

*Primary Information*

| | |
|---|---|
| Subject Name: | OREILLY, JAMES EDWARD |
| Record Type: | PERSON |
| Bio: | 63 yr. old, WHITE, MALE |
| Birth Date: | 05/22/1959 |
| Juvenile: | NO |
| Residence Status: | PERMANENT |

*Relationship Information*

| | |
|---|---|
| Related Offense: | WITNESS of COMMITTED MISDEMEANOR TRESPASS AFTER WARNING (810.09) (90J) |
| Homicide Victim: | NO |
| Hate Crime Victim: | NO |
| Domestic Violence: | NO |
| Extent Of Injury: | NONE |
| Use Of Force: | NO |

*This report is property of GULFPORT POLICE DEPARTMENT. Neither it nor its contents may be disseminated to unauthorized personnel.*

### Subject #1 - WITNESS #1 - BROWN, CHRISTINE A - Continued

**Primary Information - Continued**

Residence Type:   CITY

**Relationship Information**

Related Offense:   WITNESS of COMMITTED MISDEMEANOR TRESPASS AFTER WARNING (810.09) (90J)

Homicide Victim:   NO

Hate Crime Victim:   NO

Domestic Violence:   NO

Extent Of Injury:   NONE

Use Of Force:   NO

**Personal Information**

Ethnicity:   Not of Hispanic Origin

Photo:   NO

**Employment Information**

Occupation:   BOCA CIEGA HIGH SCHOOL, TEACHE

**Addresses**

| Relationship | Address |
| --- | --- |
| HOME ADDRESS | 2802 53RD ST S, ST PETERSBURG, Florida 33707 UNITED STATES |
| HOME ADDRESS | 2802 53RD ST S, GULFPORT, Florida 33707 UNITED STATES |

**Telephones / E-Addresses**

| Relationship | Number/E-Address |
| --- | --- |
| CELLULAR PHONE | (727) 501-5857 (CELLULAR) |
| HOME | (727) 323-3392 |

### Subject #2 - WITNESS #2 - OREILLY, JAMES EDWARD

**Primary Information**

Subject Name:   OREILLY, JAMES EDWARD

Record Type:   PERSON

Bio:   63 yr. old, WHITE, MALE

Birth Date:   05/22/1959

Juvenile:   NO

Residence Status:   PERMANENT

**Relationship Information**

Related Offense:   WITNESS of COMMITTED MISDEMEANOR TRESPASS AFTER WARNING (810.09) (90J)

Homicide Victim:   NO

Hate Crime Victim:   NO

Domestic Violence:   NO

Extent Of Injury:   NONE

Use Of Force:   NO

This report is property of GULFPORT POLICE DEPARTMENT. Neither it nor its contents may be disseminated to unauthorized personnel.

## Subject #1 - WITNESS #1 - BROWN, CHRISTINE A - Continued

**Primary Information - Continued**

Residence Type:    CITY

**Relationship Information**

Related Offense:    WITNESS of COMMITTED MISDEMEANOR TRESPASS AFTER WARNING (810.09) (90J)

Homicide Victim:    NO

Hate Crime Victim:    NO

Domestic Violence:    NO

Extent Of Injury:    NONE

Use Of Force:    NO

**Personal Information**

Ethnicity:    Not of Hispanic Origin

Photo:    NO

**Employment Information**

Occupation:    BOCA CIEGA HIGH SCHOOL, TEACHE

**Addresses**

| Relationship | Address |
| --- | --- |
| HOME ADDRESS | 2802 53RD ST S, ST PETERSBURG, Florida 33707 UNITED STATES |
| HOME ADDRESS | 2802 53RD ST S, GULFPORT, Florida 33707 UNITED STATES |

**Telephones / E-Addresses**

| Relationship | Number/E-Address |
| --- | --- |
| CELLULAR PHONE | (727) 501-5857 (CELLULAR) |
| HOME | (727) 323-3392 |

## Subject #2 - WITNESS #2 - OREILLY, JAMES EDWARD

**Primary Information**

Subject Name:    OREILLY, JAMES EDWARD

Record Type:    PERSON

Bio:    63 yr. old, WHITE, MALE

Birth Date:    05/22/1959

Juvenile:    NO

Residence Status:    PERMANENT

**Relationship Information**

Related Offense:    WITNESS of COMMITTED MISDEMEANOR TRESPASS AFTER WARNING (810.09) (90J)

Homicide Victim:    NO

Hate Crime Victim:    NO

Domestic Violence:    NO

Extent Of Injury:    NONE

Use Of Force:    NO

This report is property of GULFPORT POLICE DEPARTMENT. Neither it nor its contents may be disseminated to unauthorized personnel.