UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


JESSE LEE,

        Petitioner,

-vs-               CASE NO.: 8:23-cv-02996-VMC-AEP

CITY OF GULFPORT,

        Defendant.

_____/




**<u>DEPOSITION OF ROBERT VINCENT</u>**


    Reported by Elaine Richbourg, a Court Reporter

and Notary Public, State of Florida at Large, taken

via Zoom Videoconference, on Wednesday, April 16th,

2025.

**ELAINE RICHBOURG**
**COURT REPORTER**
**Cantonment, Florida 32533**
**(850) 712-0984**
**elainerichbourg@cox.net**

1                          **APPEARANCES**

2     For the Plaintiff:

3                          MARCY I. LAHART, ESQUIRE
                           MARCY I. LAHART, P.A.
4                          249 SE Tuscawilla Road
                           Micanopy, FL  32667
5

6     For the Defendant:

7                          DUSTYN RING, ESQUIRE
                           ROPER & ROPER, P.A.
8                          116 North Park Avenue
                           Apopka, FL  32703
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            <u>INDEX OF TRANSCRIPT</u>

2    WITNESS:

3     ROBERT VINCENT

4            Direct Examination by Ms. LaHart.........04

5            Cross-Examination by Mr. Ring............70

6    Reporter's Deposition Certificate...............77

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    WHEREUPON,

2                         **ROBERT VINCENT**

3    having been duly sworn to tell the truth, the whole truth

4    and nothing but the truth, was examined and testified as

5    follows:

6                     **DIRECT EXAMINATION**

7    BY MS. LAHART:

8        Q    I guess we're ready to begin.  The witness

9    happens been sworn.  Mr. Vincent, my name is Marcy

10   LaHart.  I represent Jesse Lee in a lawsuit against

11   The City of Gulfport.  I'm assuming, as Former Chief

12   of Police, maybe a current Chief of Police that

13   you've given many depositions over the course of

14   your career, and I don't need to explain to you how

15   they work; is that correct?

16       A    I have, yes.

17       Q    You have given many depositions?

18       A    Yes.

19       Q    Okay.  Have you reviewed the lawsuit that

20   was filed on behalf of Jesse Lee against the City of

21   Gulfport?

22       A    Yes, I have.

23       Q    When did you do that?

24       A    Oh, I don't remember the exact date.  I

25   can probably pull up an email from, I think it was

```
 1   forwarded to me from HR in Gulfport.

 2        Q    Were you still --

 3        A    Whenever you served the -- the Notice was

 4   served on the City is when I got notice, as well.

 5        Q    Were you still employed by the City then?

 6        A    Yes.

 7        Q    When did you leave Gulfport?  When did you

 8   stop acting as the Chief of Police?

 9        A    Well, my last day of work was

10   December 6th, but I was still on the payroll until

11   sometime in January of 2025.

12        Q    How long were you the Police Chief in

13   Gulfport?

14        A    About 16 years.

15        Q    Where were you employed before that?

16        A    Well, I was a police officer there since

17   1994.  Before that I had various jobs.  Worked for a

18   sporting goods store, supermarket, et cetera.

19        Q    So, what was your first position with the

20   City of Gulfport?

21        A    I was a patrol officer.

22        Q    And then, at some point, you were

23   promoted?

24        A    Yes.

25        Q    Do you recall when?
```

    1       A     About five years after I started.  So, it

    2    would have been around 1999 I was promoted to

    3    Sergeant.

    4       Q     And then, at some point, you were promoted

    5    to Chief from that?

    6       A     No.  In 2002 I was promoted to Lieutenant

    7    and then in 2016 I was offered the Chief's job.

    8       Q     Can you tell me about what your

    9    responsibilities were as the Chief of Police for the

   10    City of Gulfport?

   11       A     Well, my job was to oversee a police

   12    department consisting of 33 sworn officers, and

   13    about 7 support staff and including the associated

   14    budget for that.  Establish policies, employee

   15    discipline, terminate, if necessary, employees under

   16    my authority.

   17       Q     In that position did you work closely with

   18    the City Manager, James O'Reilly?

   19       A     Yeah.  Fairly closely.

   20       Q     What's your opinion of the City Manager of

   21    Gulfport?

   22       A     On what particular issue?

   23       Q     Honesty.  Do you think he is an honest

   24    person?

   25       A     Sure.

1       Q       Have you ever known him to lie?

2       A       I can't think of an example.

3       Q       What's your opinion of the job he does as

4    the City Manager?

5       A       There's some things I would do

6    differently, but I'm not going to -- he's obviously

7    -- he's obviously done a lot to improve Gulfport.

8    Gulfport is considerably better than what it was

9    before he took office.  So, he's done a pretty good

10   job in that respect.

11      Q       How is it better?

12      A       It's a destination.  People before, you

13   know, 20 years ago, a lot of people never heard of

14   Gulfport.  Now people seek it out, to live there, to

15   recreate there, et cetera.

16      Q       What would you do differently from James

17   O'Reilly?

18      A       Organizational structure.  I think he has

19   too many people reporting directly to him, in my

20   opinion, but if it's the way he wants to do it,

21   that's his prerogative.

22      Q       Okay.  I want to ask you about the

23   trespass policy or policies that were in place when

24   you worked for the City of Gulfport.

25      A       Okay.

```
 1      Q    Was there more than one policy in place
 2  during your tenure?
 3      A    I suppose you could say that.  The only
 4  policy that -- and you said City of Gulfport --
 5      Q    Yes.
 6      A    The police department had a policy that
 7  was implemented in, approximately, 2022.  Prior to
 8  that, I don't -- there was no police department
 9  policy, and I'm not aware of any city policy.  So,
10  prior to that police department policy being
11  implemented, the only thing we had to go by was the
12  State Statute, but in 2022, the City Council was
13  considering an ordinance regarding conduct on City
14  facilities, and part of that ordinance included the
15  police department's role in issuing trespass
16  warnings.  So, those are different time periods, and
17  you know, if you consider the ordinance as a policy,
18  then that will be one of them.
19      Q    When you say consider the ordinance as a
20  policy, which ordinance are you referring to?
21      A    Well, if you'll give me a minute, I'll
22  pull it up.
23      Q    Sure.  Take your time.
24      A    There's some bug flying around in here.  I
25  don't know if you can hear it buzzing.  I may have
```

1    to use this laptop.  I'm not sure if I minimize the

2    zoom, it will make me disappear, I mean, because

3    it's not working on the desktop.

4        Q    Okay.

5        A    Well, it's Section 1-10, it says "Control

6    of and access to City owned, controlled and leased

7    property."  And that was passed 2024, 2024-02 is the

8    ordinance number, but like I say, it was in draft or

9    staff review, et cetera, back as far as 2022, which

10   is when the police department policy was created in

11   preparation for that ordinance.

12       Q    When you said the police department

13   policy, you're referring to, was it Directive 406?

14       A    Let's see, yes.

15       Q    What was the impetus to adopt Directive

16   406?

17            MR. RING:  Objection.  Object to the form.

18       Q    (By Ms. Lahart) You can answer.

19       A    Well, I can just explain, it was because

20   of that ordinance that was being considered.  The

21   ordinance contained an element that said the police

22   department could issue a trespass warning if there

23   was conduct prohibited by the ordinance.  So, prior

24   to that, there was no such requirement.  There was

25   no burden on the police department to establish that

1    there was any conduct.  We just would simply issue

2    the trespass warning at the request of the facility

3    manager.  So, because the ordinance put a burden on

4    the police department to establish that there was

5    conduct prohibited by the ordinance, we created a

6    policy to direct the officers on what their

7    responsibility was, if they responded to a call

8    about somebody, where a manager, facility manager

9    wanted someone trespassed.

10        Q    Okay.  So, prior to the adoption of

11   Directive 406, did the police department make any

12   sort of the reasonable cause determination before

13   they issued a trespass, or did they just issue a

14   trespass any time they were asked to do so by a

15   Facility Director Supervisor?

16        A    Prior to that, we didn't issue trespass

17   warnings.  We just delivered them.

18        Q    Okay.

19        A    In other words, the Facility Manager is

20   the one issuing the trespass warning.  All we did

21   was put it on a piece of paper and give it to the

22   person who was getting the warning.

23        Q    So, the police department was just the

24   messenger?

25        A    Yes.  And, no, we did not do any

1    determinational cause.  We didn't inquire as to what

2    the reason was.

3         Q    So, the police department would go and

4    trespass somebody from City property without asking

5    why they were being trespassed?

6         A    Correct.

7         Q    Who would determine the duration of a

8    trespass warning?

9         A    I have never, in my 30 years at Gulfport,

10   seen a trespass warning, other than indefinite or

11   permanent.  That's what I was taught when I first

12   started, that it was, the trespass warning, once you

13   issued it, was always in effect, unless the person

14   who issued it, asked for it to be rescinded, and

15   that's been the practice forever, as far as I knew.

16        Q    Okay.  Do you know of any trespass that

17   was ever rescinded at the request of a Building

18   Supervisor?

19        A    I'm sure it's happened, but I can't think

20   of any specific examples.

21        Q    Okay.  So emails that you sent, when you

22   were the Chief of Police, you indicated that the

23   City had a trespass policy whereby supervisors of

24   individual City facilities are empowered to issue

25   trespass warnings whenever they have a reason to

1    believe an individual has caused, or is likely to

2    cause a disruption of service, or put the safety of

3    staff or the public at risk.  Is that consistent

4    with your understanding what the trespass policy

5    was?

6         A    I'm not sure.  Was that before or after

7    this -- I think I sent that email sometime before

8    this ordinance or this policy; right?

9         Q    Correct.

10         A    Do you have a date on that?

11         Q    No.  Sorry.

12         A    So, yeah, I mean, prior to this ordinance,

13    it was within the authority of each department to

14    make their own decision on when or how they wanted

15    somebody to be trespassed from their property.

16         Q    I'd like to -- well, I'm sorry, let me

17    backtrack.  Going back to the written, Directive

18    406.  Who actually wrote that?

19         A    I'm not sure.  They do keep a -- the data

20    base that they use keeps track of all of the

21    policies from draft to approval.

22         Q    Uh-huh.

23         A    So, whoever was the author of it would be

24    indicated in that data base.  You can ask for that.

25    I'm sure they'll share it with you.

1      Q      Okay.

2      A      I don't have access to it anymore, so

3   otherwise I'd --

4      Q      I understand.  What's the difference

5   between a Police Directive and a City Ordinance?

6      A      Well, City Ordinance is legislation that

7   is approved by the City Council, basically city law,

8   whereas a policy is applicable only to members of

9   the police department, issued at the direction of

10  the Chief of Police.

11     Q      What role, if any, did you play in

12  crafting Directive 406?

13            MR. RING:  Object to the form.

14     A      (By the Witness)  My responsibility was to

15  -- at first I directed staff to find examples in

16  other jurisdictions and then tailor that language to

17  Gulfport.  At that point, once we have a draft, it

18  goes through a staff review where all of the

19  supervisory personnel have input on it.  Then it

20  comes to me with all of their comments, and then I

21  would approve it, as the Chief.

22     Q      (By Ms. Lahart) Okay.  Are you aware of

23  any other municipality that has a policy of

24  permanently banning citizens from public property?

25     A      I'm not sure, no.

1    Q    The Directive 406 says that, essentially,

2    that unless otherwise directed at any -- do you know

3    what, why don't I just pull up the language.  Excuse

4    me just a second.  I'm going to share my screen, and

5    we can look at it together.  I thought I had this

6    pulled up.  Here it is, I think.  Can you see what's

7    -- it says at the bottom, Exhibit 4, Lee vs.

8    Gulfport?

9    A    I can probably pull it up, as well, but I

10    don't see it up there.

11    Q    Well, then I'm not sharing my screen

12    correctly, so just give me a second and I'll figure

13    it out.  How about now?

14    A    No.  I have it up here on my screen

15    though.

16    Q    Well, this is not my first Zoom.  I should

17    have figured out how to do this by now.  How about

18    now?

19    A    Yeah, I see it.

20    Q    All right.  Do you see the portion that

21    I've highlighted?

22    A    Yes.

23    Q    "Trespass warning documented in accordance

24    with this written directive shall be permanent

25    unless a specific expiration date is requested by

1   the issuing authority."

2       A    Yes.  I see that.

3       Q    Why was this part of the policy?  Why not

4   trespass someone for a year or 6 months or 5 years,

5   why -- why permanent, unless otherwise requested?

6       A    Well, two reasons.  Number one, like I

7   already told you, that's the way that it had always

8   been done.  We didn't -- we didn't -- there had

9   never been a case where we had put a trespass, a

10  temporary trespass warning, that I'm aware of.  But

11  number two, putting an expiration date on it, would

12  then create some sort of burden on our staff to

13  track that somehow, and we didn't have the means to

14  do that.  Our data base didn't have any way to, you

15  know, if you go into the data base, and put an

16  address in it, it will list on it the trespass

17  warnings, and to -- to have to task someone with

18  remembering to go in there and deactivate a trespass

19  warning of a specific date, based on what was

20  written on trespass notice, I think that's a little

21  bit too burdensome to try and keep track of, and

22  something I didn't want to add as a responsibility

23  to our already, our working people.

24      Q    Okay.  I'd like to specifically ask you

25  some questions about Jesse Lee's trespasses from --

1   from the public areas, publicly owned property in

2   the City of Gulfport, and I want to make sure I get

3   these dates right.  September 4th, 2020, Mr. Lee was

4   trespassed from City Hall.  Can you tell me what you

5   know about that?

6         A    I believe the Community Development

7   Department staff called, I think they called the

8   Communications Center and then somebody over there

9   called the City Manager, and as police were

10  responding to the call from the Communication

11  Center, the City Manager relayed to the supervisor

12  on duty that he wanted Mr. Lee to be trespassed from

13  -- from the facility.  And the Community Development

14  Office is on the same complex as City Hall.  So,

15  officers responded to that and --

16        Q    Can I interrupt you, and just ask you a

17  quick question?

18        A    Sure.

19        Q    Is City Development the same thing as the

20  Building Department, are they in the same place?

21        A    Yes.

22        Q    Thank you.  Okay.  I interrupted you.  I'm

23  sorry.

24        A    So, when the officers responded, they

25  simply delivered the trespass warning that

1   Mr. O'Reilly had asked them to issue, and that was

2   that.

3        Q    Can you explain why he was trespassed from

4   City Hall based on an incident that happened at the

5   Building Department?

6             MR. RING:  Object to the form.

7        A    (By the Witness)  Well, I'm not sure it

8   was entirely clear, at the time.  I know I sent a

9   letter or email or something to Mr. Lee, later

10  clarifying that the trespass warning he had been

11  issued applied to the entire property, and not just

12  the Community Development Department, and that was

13  made clear to me by the city manager, and personally

14  he said, no, I don't -- he is- his conduct towards

15  employees has been such that I don't want him on

16  this -- anywhere on this campus.  So, the entire

17  property was included in that warning.

18       Q    (By Ms. Lahart) So, going back to the 4th

19  of September of 2020, Mr. Lee received a written

20  piece of paper that said he was trespassed from City

21  Hall; is that correct?

22       A    I don't know.  Do you have the notice

23  handy to see what it says?

24       Q    Sure.

25       A    Okay.

1      Q      Hold on just a second.

2      A      Does it have an address or does it say

3  City Hall?

4      Q      Give me just a second, and I will pull it

5  right up.  I don't have it.  It was just at my

6  fingertips.  There we go.

7      A      Yeah.  That's the one from 2021.

8      Q      I swear I just had it.  I have too many

9  tabs open.  I have like 6 different copies from the

10  one from September 14th and I can't find one of

11  them.

12      A      I believe it had the address of 2401 53rd

13  Street South on there.  I don't know if --

14      Q      There it is.  It says Gulfport City Hall;

15  correct?

16      A      Sure.

17      Q      It doesn't say the Building Department;

18  correct?

19      A      That's correct.

20      Q      And then there was a subsequent trespass

21  issue that did specifically identify the building

22  department?

23      A      That was the one you just showed up a

24  minute ago, yeah.

25      Q      Yeah.  So, again, why trespass from City

1    Hall if the incident occurred at the Building

2    Department?

3        A    Well, I think most people consider them

4    the same place.  I would consider them the same

5    place.  It's all in the same campus.

6        Q    Okay.

7        A    And that's why I sent the letter to him.

8    I sent the letter to him on August 18th of 2022,

9    clarifying to him that the trespass warning that was

10   issued on 9/4 of 2020 included the entire campus,

11   including the Building Department in case he wasn't

12   clear on that.

13       Q    Okay.  So, almost two years later you sent

14   him a -- communicated to him that the trespass was

15   the entire complex?

16       A    Yes.

17       Q    Why did you do that almost two years

18   later?

19       A    I'm -- I think someone had seen him over

20   there by the Building Department and told me, hey,

21   Mr. Lee is still coming over here on this property.

22   So I wanted to make sure that he understood that

23   that property was included in the trespass warning.

24   And then, I guess, he came back later in September,

25   and so officers went out and personally gave him

 1    another trespass warning that made it clear that he

 2    was not to be on that property either.

 3        Q    Well --

 4        A    Probably could have arrested him, but --

 5             COURT REPORTER:  I'm sorry, what did you

 6        say?

 7        A    (By the Witness)  I said they probably

 8    could have arrested him, but they, in my opinion,

 9    they chose to be a little lenient and give him

10    another warning.

11        Q    (By Ms. Lahart) If the trespass issued on

12    September 4th of 2020, included the entire campus

13    why did a second one have to be issued?

14             MR. RING:  Asked and answered.

15        A    (By the Witness)  Yeah.  I don't think it

16    had to be.  It's like I said, I think they were

17    being very nice to him.

18        Q    (By Ms. Lahart) Okay.  At some point there

19    was an investigation into the incident that happened

20    on September 4th; correct?

21        A    Yes.

22        Q    And that didn't happen until March of

23    2021; correct?

24        A    Correct.

25        Q    Why investigate several months after

1    issuing the trespass?

2         A    There was somebody who made a YouTube

3    video and then attached that YouTube video to social

4    media outlets that were managed by the police

5    department, and I felt that video was incredibly

6    misleading.  So, in response to that video I created

7    a statement explaining the accurate facts about what

8    happened leading to that trespass warning.  And when

9    I published that, Mr. Lee reached out to me later

10   and said that he believed that had incorrect

11   information in it.  So, based on that, I directed

12   our detective supervisor to do that investigation.

13        Q    So, if I'm understanding, you issued a

14   police statement in response to the YouTube video.

15   Mr. Lee said, what was in the statement wasn't

16   correct, so then you decided to do an investigation

17   to see if your statement was correct?

18        A    No.  To eval -- to -- his concerns were

19   that the statement that I put out was not what

20   happened at the building department, the Community

21   Development Department.  So, my statement, when I

22   put it out, was based on the information provided to

23   me by the Director of the Community Development

24   Department, who is Fred Metcalf.

25        Q    Uh-huh.

1      A    We had, like I told you before, the police

2    who responded, that were under no obligation to

3    investigate anything, so they did not ask any

4    questions about what happened, or why they were

5    being asked to issue a trespass warning.  So, the

6    only information I had to go on, at that moment, was

7    what was given to me by the Community Development

8    Director.  So, after I put the statement out,

9    Mr. Lee reached out and said, no, that's not what

10   happened.

11     Q    What -- what facts did Mr. Lee dispute, if

12   you recall?

13     A    That he had tried to force his way into

14   the building.  Mr. Metcalf told me that Mr. Lee was

15   trying to force his way into the office, when it was

16   closed due to Covid, and Mr. --

17     Q    What did --

18     A    -- and Mr. Lee says, no, did he not do

19   that.

20     Q    So, what did the investigation reveal?

21     A    That he was holding the -- there's a

22   button outside the door, that if you push the

23   button, it's a handicap access.  If you push the

24   button, it will open the door if the door is

25   unlocked, but if the door is already opened, it will

1   not allow the door to close, and the witness

2   statements were that he was holding that button so

3   that they were unable to close the door.  So, I --

4   in the opinion of the Director, that appeared to him

5   as though he was trying to gain access to the

6   building by forcing the door to stay open.

7        Q    But he didn't go through the door, did he?

8        A    No.  Because there were people standing in

9   it, in the doorway.

10       Q    So, in your opinion, is pushing the button

11  for the handicap access the same thing as trying to

12  force your way into a building?

13       A    I believe that had those employees not

14  been standing in the doorway, he would have walked

15  right in there, even though they told them not to.

16       Q    That's not my question.  My question is:

17  Standing outside of the building and preventing the

18  door from closing, the same thing as forcing your

19  way into a building?

20            MR. RING:  Object to the form.

21       A    (By the Witness)  He was forcing the door

22  to stay open when the building was closed.  I'm

23  telling you, that it was the opinion of the

24  Director, not mine, that he was trying to force his

25  way into the building.

1     Q    (By Ms. Lahart) It's not your opinion that

2 he was trying to force his way into the building?

3     A    Well, I already told you my opinion.

4     Q    What's your opinion?

5     A    But that wasn't what you were asking.

6 Well, now you're asking me.  When I reviewed, that

7 he was trying to get into the building, and had

8 those people not been standing in the doorway, he

9 would have went in.

10     Q    What makes you say that?

11     A    I just have seen Mr. Lee continuously and

12 repetitively disregard directions from people in

13 positions of authority.  He will not do what they

14 tell him to do and it's legitimately -- when there

15 are legitimate requests, and knowing his -- his

16 history, I'm pretty confident that's what he was

17 trying to do.

18     Q    Okay.  You posted that he was trying to

19 force his way into the building in a blog; correct?

20     A    In a blog?

21     Q    On a Facebook post?

22     A    We put a statement out on our website

23 under news.  We did not send that out as a news

24 release or anything.  It wasn't put out on a blog.

25     Q    Okay.  The statement on a website, and did

1   you also post it somewhere?

2       A    Yeah.  We put all of the news releases on

3   a bulletin board in our police department lobby.

4       Q    At any point did you clarify that Mr. Lee

5   had not actually attempted to enter the building,

6   and was merely pressing on the handicap access

7   button to prevent the door from closing?

8       A    What do you mean did I clarify it?

9       Q    Well, I think you have agreed with me that

10  pushing the button outside the door is not the same

11  thing as trying to force your way in; would you

12  agree?

13          MR. RING:  Objection.  Asked and answered.

14      A    (By the Witness)  No, we already went down

15  that road.

16      Q    (By Ms. Lahart) Well, humor me, and tell

17  me again.  Is pushing a button outside a door the

18  same thing as trying to force your way into the

19  building?

20      A    That was what the Community Development

21  Director thought.  That's what he told me, and I

22  believe that had those people not been standing in

23  the doorway, he would have tried to go in.

24      Q    Who were the people standing in the

25  doorway?

          1      A      The building official, his name is Clark,

          2   and one of the permit technicians over there.  I

          3   can't remember her name.  I think her name is Lisa.

          4   Their names are in that report.  You should have

          5   them.

          6      Q      Okay.  Are you telling me that it was

          7   Mr. Metcalf who felt like Mr. Lee was forcing his

          8   way in the building.  Your opinion was, if people

          9   hadn't been there, he would have forced his way into

         10   the building; correct?

         11      A      Yeah.  That's my thought.

         12      Q      But you're the one who published the

         13   statement that he was attempting to force his way

         14   into the building?

         15      A      Do you have that?  Let me see if I can

         16   find that statement.  I think I wrote in there the

         17   Community Development Director said he was trying to

         18   force his way into the building.

         19      Q      Is that statement still in the lobby

         20   today; do you know?

         21      A      I don't know.

         22      Q      Was it there when you left?

         23      A      I don't know.

         24      Q      Did you ever take it down?

         25      A      No.  The statement says that police were

1    called to City Hall to address a complaint that

2    Jesse Lee had just attempted to force his way into

3    the Community Development Office.  That's what it

4    says.

5         Q    Okay.

6         A    We did not say that he forced his way or

7    attempted to force his way into the office.

8         Q    Let's change course here and ask you about

9    Mr. Lee's arrest at the Gulfport casino.

10        A    Okay.

11        Q    Now, prior to the volunteer luncheon, you

12   had sent Mr. Lee an email; correct?

13        A    I did.

14        Q    Was that at the direction of the City

15   Manager?

16        A    Yes.  Well, I'm not sure -- I don't know

17   if he specifically told me to send him an email.  He

18   told me that he wanted me to make sure that Mr. Lee

19   and Mr. Rodriguez were not on that property during

20   the event.  I may have decided, on my own, to send

21   the email.

22        Q    Okay.  What was the impetus for the email

23   or what --

24        A    Somebody told me that he, the two of them,

25   were planning to show up at the event to cause a

1    disturbance, and I don't know where that came from.

2    I'm not sure if you intended me to see it or not,

3    but you had on it when you were sharing your screen,

4    an email from Jim Wright, who was our Volunteer

5    Coordinator.  Apparently, he heard that from

6    Worthington, but I wasn't aware of the original

7    source, where that had come from, when I sent the

8    email to Mr. Lee.

9         Q    You didn't do any investigation to

10   determine whether the allegation was true?

11        A    Whether the allegation --

12        Q    The allegation that Lee was planning to

13   come to the volunteer luncheon?

14        A    No.

15        Q    And at the time that you warned him not to

16   come, you weren't even sure of the source of the

17   rumor that he was going to come to the luncheon; is

18   that accurate?

19        A    That's accurate.  But I will say there

20   wasn't much time.  I mean, it was -- I believe it

21   was the day before.

22        Q    Do you know if Mr. Lee actually saw your

23   email before the --

24        A    I don't know.  I know he says he did not

25   see it, but I don't know if he saw it or not.

1    Q    Who is Lee -- Lou Worthington?

2    A    Lou Worthington is a member of the

3  Community Emergency Response Team that's overseen by

4  Jim Wright, who's the Volunteer Coordinator.

5    Q    Did you have a conversation with

6  Mr. O'Reilly about Mr. Lee and Mr. Rodriguez

7  planning to attend the luncheon?

8    A    Yes.

9    Q    Tell me about that conversation.

10    A    Well, I mentioned to him that I heard they

11  might be planning to show up there to cause a

12  disturbance.  I clarified with him that it was a

13  private event, not open to the public.  And then he

14  made it clear to me that he did not want either of

15  them on the property while that event was taking

16  place.

17    Q    When and how did this conversation occur?

18  Was it via telephone; did you talk to him in person?

19    A    It was in person.

20    Q    His office or yours?

21    A    I don't remember.

22    Q    Do you recall when you sent the email in

23  relation to when the luncheon was going to take

24  place?

25    A    No.  Like I said a minute ago, I think it

1   was the day before, but I'm sure you have all of

2   that available.

3        Q    I'm going to share with you my screen

4   again, assuming I can figure out how to do it.  I'm

5   looking at the email James Wright to Robert Burkhart

6   with a courtesy copy to Josh Stone; do you see that

7   email?

8        A    Yes.

9        Q    Okay.  Who is James Wright?

10       A    He is the Volunteer Coordinator.

11       Q    Oh, right.  It says that right there.  And

12  who's Robert Burkhart?

13       A    Right now he's a Sergeant in charge of

14  Special Operations.  I don't remember what his title

15  was on the date of that email.

16       Q    Okay.  And this email is dated Friday,

17  April 21st, 2023.  You didn't send the email to

18  Mr. Lee until April 27th?

19       A    Okay.

20       Q    Correct?

21       A    If you have it.  I don't have it.  I

22  don't -- I don't remember.  If you have it, then

23  yes.  There you go, yeah.

24       Q    So, that was 6 days later; correct?

25       A    Yes.

1    Q    Six days you couldn't pick up the phone

2    and call Jesse and ask him if he was planning on

3    attending the volunteer luncheon?

4    A    Well, I sent the email to Jesse and

5    Mr. Rodriguez when I got the information and

6    conferred with the City Manager.  I didn't delay --

7    whoever gave me the information, I mean, if Sergeant

8    Burkhart and Commander Stone got the information on

9    the 121st, it didn't make its way to me until at

10   least the 27th.

11   Q    It stays says here, "If you harass any of

12   the guests or create a public disturbance you may be

13   arrested for such conduct, as well."  Did he harass

14   any of the guests?

15   A    I didn't receive any complaints that he

16   was harassing anybody, but I did see them -- see him

17   approach several of the people as they were walking

18   up to the building.  I don't know what he said to

19   them.  I know that several of the people that he

20   approached did not stop and carry on a conversation.

21   It looked as though he was trying to talk to them,

22   and they weren't interested.

23   Q    Okay.  Did he create a public disturbance?

24   A    Absolutely.

25   Q    How so?

1      A    By refusing to leave when I told him to

2    leave several times.  He was publicly and loudly

3    defying my directions to leave the property.  There

4    were many people staring at the -- the conduct, as

5    it was happening.

6      Q    Did you try and force his way into the

7    casino?

8      A    No.

9      Q    Did he enter the casino at all?

10     A    Not the building.

11     Q    Okay.  How far away from the door was he

12   standing when he was arrested, approximately?

13     A    From the front door, I would say probably

14   about 50 feet.

15     Q    And isn't it true that the place he was

16   standing, when he was arrested, has never been

17   considered part of the casino?

18     A    It depends on who you ask.  I would

19   consider it part of the casino.

20     Q    Did you ask anybody?

21     A    Yeah.  I asked several people.

22     Q    Who?

23     A    I asked the City Manager, who was the

24   Parks and Recreation Director before he was the City

25   Manager.  That's where his office was.  It was also

1    the opinion of the -- of the criminal court judge,

2    in his Motion to Dismiss the judge said that if she

3    had rented the casino, she would consider that --

4    she had control over that property, as part of the

5    rental.

6        Q    When he was arrested, all he was doing is

7    standing there filming you; isn't that true?

8        A    And refusing to leave.

9        Q    Why did he need to leave?

10       A    Because the City Manager said he did not

11   want him on the property during the event.

12       Q    Did he disrupt the event in any way?

13            MR. RING:  Asked and answered.

14       A    (By the Witness)  As he was standing out

15   there arguing with me, the event was supposed to

16   have already started, but they were not starting the

17   event because people were standing outside watching

18   as he was disturbing the event.

19       Q    (By Ms. Lahart) So, because people were

20   standing outside watching him, they couldn't start

21   the luncheon?

22       A    I would say that's correct.  People who

23   are supposed to be recognized for their volunteer

24   efforts were distracted by his scene, rather than

25   being able to be recognized for their volunteer

1  effort.

2      Q    Well, wouldn't it be their choice to go

3  inside, if they wanted to?

4      A    I suppose, but I certainly wouldn't want

5  to be putting an event on, with that going on

6  outside, trying to keep their attention to the

7  program --

8      Q    You wouldn't want to put on --

9      A    -- (cross-talk) the program.

10     Q    -- with a citizen standing outside,

11  50 feet away from the door filming?

12     A    I don't think that would be a problem, but

13  arguing with the police officer who's telling him he

14  has to leave, certainly is a distraction.

15     Q    Couldn't you have just gone inside the

16  casino and attended the luncheon and left him out

17  there?

18          MR. RING:  Object to the form.

19     A    (By the Witness)  Because then I wouldn't

20  be doing as the City Manager instructed and making

21  sure he was off the property during the event.

22     Q    (By Ms. Lahart) So, this was after the

23  adoption of Directive 406; correct?

24     A    Yes.

25     Q    So, what did you do to ensure that there

1    was a legitimate reason for asking him to leave?

2        A    I don't think it applies in this case,

3    because even though the building is owned by, the

4    property is owned by the City --

5        Q    Uh-huh.

6        A    -- when it was being used for a private

7    event, it's completely different.  It's no longer

8    public property.

9        Q    But he was not in the building; correct?

10       A    No, he was not in the building.

11       Q    And he didn't attempt to enter the

12    building; correct?

13       A    He was stopped at the door, as he tried to

14    go inside.

15       Q    Did he continue to try to force his way

16    inside?

17       A    No.

18       Q    Why were the charges against Jesse Lee

19    dropped?

20       A    I don't know.  You'd have to ask the

21    Assistant State Attorney who made that decision.

22       Q    Another document I would like to share

23    with you.  Did the State Attorney's Office ask you

24    for permission to drop the case?

25       A    Permission?

1      Q     Yes.

2            MR. RING:  Object to form.

3      A     (By the Witness)  I don't ever recall them

4   asking for permission.  I know they called me and

5   told me they were planning to do it.

6      Q     (By Ms. Lahart) What did they tell you

7   about why they were planning to do it?

8      A     That they didn't think they were going to

9   be able to convince a jury beyond a doubt.

10     Q     Did they tell you why they thought that?

11     A     Nope.

12     Q     Do you recall who the State Attorney that

13   handled the case was?

14     A     I don't remember her name.

15     Q     Do you recognize this document?

16     A     Can you scroll down a little bit?  Yes.

17     Q     Was that your signature?

18     A     Yes.

19     Q     You stated here, "That without being

20   authorized, licensed or invited, willfully enter

21   upon, or remain on the property of the City of

22   Gulfport, located at 5500 Shore Boulevard, as to

23   which notice against entering or remaining on said

24   property was given by opportunity communication from

25   Police Chief Robert Vincent, via City Manager James

1    O'Reilly, the authorized representative of the

2    owner."  Is that -- do you stand by that statement?

3        A    It might be more accurate to switch the

4    names.  In other words, if it said actual

5    communication from City Manager, James O'Reilly, via

6    Police Chief, Robert Vincent, would probably be the

7    more accurate.

8        Q    But it's your statement that he was asked

9    not to attend the luncheon at the behest of James

10   O'Reilly?

11       A    Correct.  Well, more than that.  He was

12   asked not to be on the property.

13       Q    Right.  Have you ever talked to James

14   O'Reilly about this case?

15       A    Yeah.  I'm sure.

16       Q    By this case, I mean the civil case that I

17   filed?

18       A    Oh, I thought you meant about that

19   trespass case.  Obviously, any time the police

20   department had significant interaction with

21   Mr. Lee -- we had a standing Monday morning meeting,

22   both the Fire Chief and myself with the City

23   Manager, and that meeting included, kind of an

24   overview of anything that happened during the past

25   week, and if anything had happened during the past

1    week that involved a significant interaction with

2    Mr. Lee, then it would come up.  And, of course, any

3    of the interactions with Mr. Lee have made their way

4    into this lawsuit.  So, yes, we had conversations

5    about things that are mentioned in this lawsuit, but

6    to say that we specifically had a conversation about

7    the lawsuit, or because of the lawsuit, no, I don't

8    think that would be accurate.

9         Q    So, you never talked about this lawsuit

10   with James O'Reilly after it was filed?

11        A    Yeah, I mean, maybe -- yes, we were both

12   aware that it was filed, and you know, we discussed,

13   you know, he told me that -- who was going to be

14   representing the City in the case, and you know,

15   both, we had to make sure that we were available for

16   meetings, that kind of thing, but, no, we never

17   discussed -- it's not like we sat down and reviewed

18   the case and pulled it apart, and that kind of

19   thing, no, I mean.

20        Q    Did you ever discuss the merits of the

21   case?

22             MR. RING:  Object to the form.  I think

23        we're getting into arguable work product there.

24             MS. LAHART:  Wrong.  There was no attorney

25        involved.  I'm asking about two City employees

1    talking to each other.

2         MR. RING:  You don't know who was

3    involved, so I don't know if he can say who was

4    involved.

5         Q    (By Ms. Lahart) Was there ever an attorney

6    present when you and the City Manager were

7    discussing the lawsuit?

8         A    Quite often the City Attorney was present

9    when we were discussing matters related to Mr. Lee,

10   yes.

11        Q    Was the City Attorney ever present when

12   you were discussing this lawsuit?

13        A    Yes.  We had a meeting with Mr. Roper,

14   with Human Resources Director, with Mr. O'Reilly and

15   myself, when we discussed this lawsuit.

16        Q    Prior to that, had you discussed the

17   merits of the case with Mr. O'Reilly?

18        A    What do you mean when you say merits of

19   the case?  I'm not sure what you mean by that.

20        Q    Where it's --

21        A    Well, obviously we think -- both of us

22   think it's -- all the allegations are wrong, and

23   yes, we both shared that opinion with each other, if

24   that's what you mean.

25        Q    All the allegations are wrong?

1    A    That they are improper, sure.  We disagree

2  with -- I personally disagree with it.  I personally

3  disagree with it.  I'm sure he's told you he

4  personally disagrees with it.  We both shared our

5  opinions that we disagree with it.

6    Q    So, does that mean that he hasn't been

7  permanently trespassed from City Hall and the

8  Building Department?

9         MR. RING:  Objection.  Argumentative.

10    Q    (By Ms. Lahart) You can answer.

11    A    Well, I mean, is that your -- the

12  lawsuit's implications that any of the conduct on

13  the part of the City Staff, myself or the City

14  Manager were improper, we disagree with.

15    Q    Okay.  Had you ever received emails from

16  employees of the police department expressing

17  concern that permanently banning somebody might be

18  unconstitutional?

19    A    I don't remember receiving any kind of

20  email like that.

21    Q    Was there ever any analysis of whether the

22  City's policy was constitutional, that you're aware

23  of?

24         MR. RING:  Objection.  Work product.

25    Q    (By Ms. Lahart) Prior to this lawsuit

1  being filed?

2      A    When you say the City's policy, are you

3  referring to the ordinance or the police

4  department's written directive?

5      Q    I'm referring to the policy that was in

6  place when Mr. Lee was trespassed.  So, that would

7  have been 2020 and 2021.

8      A    There was no policy.

9      Q    Didn't you send an email stating that

10  there was a policy that said that City Managers of

11  City facilities could trespass somebody any time

12  this posed a threat to public safety, or caused a

13  disturbance, or seemed like they might cause a

14  disturbance?

15      A    Sure.  That is based on the state law, and

16  verbal direction from the City Manager to those

17  department heads.  It's not a written policy.

18      Q    Because it wasn't written policy, does

19  that mean that it doesn't apply?

20      A    Well, your question that prompted this

21  was:  Was the policy analyzed to see if it was

22  constitutional.

23      Q    Yeah.  That's the policy I'm talking

24  about.

25      A    So, if the State -- if the State Statute

1   was constitutional, I'm sure there was some analysis

2   done by the legislature when they passed the law.

3        Q    The State policy or the State Statute

4   applies to private property, doesn't it?

5        A    It doesn't distinguish between private and

6   public property.

7        Q    Do you think there's a difference between

8   trespassing somebody from private property and

9   public property?

10       A    Not as far as the criminal statute goes,

11  and not as far as the role of the police department

12  goes.  Absent this newly created City Ordinance,

13  which puts a burden on the police department, then

14  there would be no difference.  Now, it might be, and

15  I'm speaking on behalf of the police department's

16  role --

17       Q    Uh-huh.

18       A    -- if there is some responsibility for the

19  Department Head to ensure there is a violation, or

20  some conduct before calling the police, that is

21  outside my role as the Police Chief.  That would be

22  up to the City Manager.  So, what I'm telling you

23  is, verbally, the City Manager had conveyed to all

24  of the Department Heads that, before you call the

25  police to have somebody trespassed, they need to be

1    disruptive, in some way, but that's -- that was on

2    them.  It wasn't -- the police officers who

3    responded, didn't have to verify that.  And they

4    didn't always call the police.  I know, for example,

5    the library would issue trespass warnings

6    frequently, without ever calling the police.

7        Q    All right.  Let's talk about ice cream.

8    Am I still sharing my screen?

9        A    No.

10       Q    Thank you.  Can you tell me, prior to

11   2022, what the City of Gulfport's policies were

12   regarding mobile food vending?

13       A    Well, everything in the ordinance.

14       Q    Before it was in the ordinance.

15       A    As far as I know, ever since I've worked

16   there, it's been in the ordinance.  As it was

17   communicated to me by Mr. Metcalf, who was in charge

18   of that department --

19       Q    Uh-huh.

20       A    -- mobile food vending was prohibited, by

21   City Ordinance, in Gulfport.

22       Q    Do you know why that was?

23       A    I have no idea why that was.

24       Q    Okay.  Did you ever direct law enforcement

25   officers to not give citations when they saw

1    somebody selling from a mobile food vehicle?

2        A    Yes.  Specifically, Mr. Lee, because we

3    had conversation with Mr. Metcalf about what we were

4    going to do.  My position was, that needed to be

5    regulated by the Community Development Department,

6    not the police department.  So, at that point, I had

7    instructed officers that if they observed a

8    violation, to simply document it, and we would refer

9    it to the Community Development Department.

10   Obviously, that changed later, but before that time,

11   yeah, that was my direction to them was, no, let the

12   Community Development Department handle it.

13       Q    Does the Community Development Department

14   have the authority to issue citations?

15       A    Yeah.  That Code Enforcement is part of

16   their purview.

17       Q    Do you know if the Community Development

18   Department ever did issue a citation to anyone for

19   violating the prohibition on mobile food vending?

20       A    I don't know if they did or not.  I don't

21   think so.  I'm not sure.

22       Q    Are you aware of there ever being mobile

23   food vendors in the City?

24       A    Only during special events, where they are

25   participating in the special event.

1    Q    You never saw a mobile food vendor outside

2  of the special event?

3    A    Oh, yeah, plenty of times.  Whenever I saw

4  one, if I was not already working on something, I

5  would let them know they're not allowed to do it,

6  and usually the response was, oh, I didn't know

7  that, thank you for letting me know, and then they

8  would stop doing what they were doing.

9    Q    You mentioned that that changed, at some

10  point.  Tell me about that.

11    A    The City passed another ordinance

12  regulating mobile vending.  I don't remember when

13  that ordinance was passed, but around when that was

14  happening, myself, the City Manager, the City

15  Attorney and the Community Development Director met,

16  to discuss how we would enforce this violation on

17  the part of Mr. Lee.  And the conclusion was that

18  the officer who had witnessed the violation would

19  issue him a citation.  And so that was the direction

20  given to me by the City Manager, so that's what we

21  did.

22    Q    So, why was Mr. Lee singling out to get

23  citations from the police department?

24         MR. RING:  Objection to the form.

25    A    (By the Witness)  Well, he wasn't singled

1    out.  In the entire time I worked there, Mr. Lee is

2    the only person that we have ever encountered, who

3    was violating that ordinance, who refused to comply

4    when requested to do so.  And so he was given the

5    citation, because he wouldn't comply.

6         MS. LAHART:  Let me take about a 10 minute

7         break.

8         MR. DONOVAN:  Okay.

9         MS. LAHART:  It is 11:13.  It's, let's say

10        11:30.

11                       (WHEREUPON, a brief recess was

12                       taken, after which the

13                       deposition continued.)

14    Q    (By Ms. Lahart) Mr. Vincent, did you ever

15    communicate to Jesse Lee that, quote, "The City

16    Manager can trespass someone for any reason, or no

17    reason at all?"

18    A    Yes.

19    Q    Is that still your belief?

20    A    Is it still my belief?

21    Q    That the City Manager can trespass

22    somebody from City property, without no reason at

23    all?

24    A    Well, he wouldn't have to tell the police

25    department what his reason is.  I mean, not under

1   that existing ordinance though.  Under that

2   ordinance that was passed in 2022, or excuse my,

3   2024, he would have to have a reason.

4       Q    So, prior to the enactment of that

5   ordinance, the City Manager could trespass somebody

6   for no reason at all?

7       A    Sure.

8       Q    Okay.  What is the difference between a

9   trespass and a trespass warning?

10      A    I would say that a trespass warning is a

11  message communicated to a person that they're not

12  allowed to be on a property, whereas trespass is

13  violating that warning.

14      Q    Okay.  Would the warning be written or

15  verbal or both?

16      A    It could be either.  It doesn't have to be

17  written.  Not under criminal law.

18      Q    Is there a requirement that there be a

19  warning before a trespass is actually issued?

20      A    Do you mean before someone is charged with

21  trespassing?

22      Q    Before somebody is given a written piece

23  of paper that says you're not allowed back on this

24  property?

25      A    So, you're asking before they're given the

1    written warning, do they have to be given a verbal

2    warning, is that what you're asking?

3         Q    I'm asking, in the City of Gulfport, say

4    prior to 2024, you get a phone call from

5    Mr. O'Reilly that says I want you to trespass Jesse

6    Lee from the casino, do you know if Jesse Lee would

7    have had to have been warned about his conduct prior

8    to the police showing up and giving him that piece

9    of paper that says you can't come back to the

10   casino?

11        A    No.

12        Q    He didn't have to be warned first?  So

13   somebody can be trespassed without any warning?

14        A    Well, you asked me what the difference was

15   between a trespass warning and a trespass.  So, when

16   I answered that question, I said a trespass warning

17   was the notice, whereas a trespass was the actual

18   crime being committed by violating the warning, but

19   now I think you're actually asking something other

20   than what I answered.  So, in general conversation,

21   particularly among police department employees, they

22   mean exactly the same thing.  If I say I gave

23   somebody a trespass warning, and I say I trespassed

24   somebody, that means the same thing.

25        Q    Thank you.

1    A    You're welcome.

2    Q    While we took that break, I put all of the

3    documents I want to ask you about in one folder that

4    will hopefully make this go a little more smoothly.

5    I apologize for my prior fumbling.  Now, I'm going

6    to share my screen again, and there are several

7    documents I would like to ask you about.

8         Can you see this document that I'm

9    sharing?

10   A    Yes.

11   Q    Can you identify this document?

12   A    It looks like an email I sent to the City

13   Attorney asking for his opinion about how we should

14   proceed with the case against Mr. Lee on the

15   ordinance violation.

16   Q    You asked if you should amend the charge

17   to the more recent ordinance regarding mobile food

18   vendors.  Why did you ask that question?

19   A    Because the ordinance was passed

20   specifically related to food vendors, and I wanted

21   his opinion as to whether or not it was more

22   relevant.

23   Q    Why was that?

24   A    Because he's more experienced with the law

25   and how it might apply to a case.

1    Q    And I'm asking why you asked about

2   amending to the more specific ordinance, as opposed

3   to apparently the ordinance that you had already

4   cited?

5    A    I just wanted his opinion.  I mean, he

6   knew what we had charged him with, and I wanted his

7   thought on whether or not the new ordinance was more

8   applicable.

9    Q    Okay.  How did you decide what to charge

10   him with?

11    A    Like I said earlier, it was a meeting

12   between myself, the City Manager, Community

13   Development Director, and I'm sure pretty sure the

14   City Attorney was there, and we had a discussion and

15   that's what we decided.

16    Q    Okay.

17    A    Or ultimately what the City Manager

18   decided.

19    Q    I'm going to show you another document

20   that states, at the top, GP20-24848 Ordinance

21   Violation.  It was authored by an Officer McIntyre,

22   dated October 27th, 2020.  Are you familiar with

23   this document?

24    A    Like his police report.

25    Q    Do you know Officer McEntry (sic) --

1      A    McIntyre, yes.

2      Q    McIntyre?

3      A    Yes.

4      Q    According to Officer McIntyre, on October 27th, 2020, Lee was operating his ice cream stand and was not acting belligerent or drawing attention to himself.  It goes on to say that, no citation or trespass warnings were issued, and Lee packed up and left the area without further issues.  And is this report accurate?

11     A    I don't know.  I assume so.  I wasn't there.

13     Q    Can you tell me why Mr. Lee received a citation for his conduct on October 27th of 2020?

15     A    Well, like I said, we had a meeting and that was the decision, at the end of the meeting. One of the things we discussed in the meeting was the fact that Mr. Lee himself had insisted on being issued a citation, because he wanted to take it to court.

21     Q    It says that "Chief Vincent advised me that the City Attorney and the City Manager had researched the issue and determined that Section 22-6.12(b) of the City Ordinances respecting the requirement for special permits to sell products in

1    WRD—CL1 and CL2 zones of the City was applicable to

2    the issue at hand."  So, did you, after

3    October 27th, try to find a reason or a basis to

4    give Mr. Lee a citation?

5         A    Well, yeah.  That's why we had the meeting

6    with the Community Development Director, the City

7    Manager and the City Attorney because this was

8    something that he had repeatedly been doing.

9         Q    So, you're aware of other dates, or other

10   incidents involving Mr. Lee attempting to sell ice

11   cream from his ice cream cart?

12        A    Yes.

13        Q    Do you recall when or where those were?

14        A    There is a report authored by Officer

15   McIntyre, I think, that would have that information

16   in it.  I don't have access to it, but if you have

17   it, I think it's call the Problem Oriented Policing

18   Report.

19        Q    Did Officer McIntyre ever ask you, or tell

20   you, that he wanted to retract the citation that had

21   been given to Mr. Lee?

22        A    I don't know if he used those words.  I

23   don't know if he said he wanted to retract it.  I

24   think he must have said, when he told to issue the

25   citation, that he did not agree with it.

1    Q    He's the one who had to sign the citation;

2    correct?

3    A    Yes.

4    Q    So, if he wanted to retract the citation,

5    why couldn't he?

6    A    I don't know that once -- once a citation

7    has been issued for an ordinance violation, the

8    issuing officer has any authority to retract it.  At

9    that point, it's in the hands of the prosecutor.

10    Q    What did Officer McIntyre say regarding

11    why he disagreed with the issuance of the citation?

12    A    I don't remember.  I think he was -- he

13    thought that he could handle it without any official

14    enforcement action.  I'm not sure.  I do believe

15    that was part of the conversation.

16    Q    If Officer McIntyre didn't agree with the

17    decision to cite Mr. Lee, why did you issue the

18    citation?

19    A    That's what he was told to do.

20    Q    Told to do by whom?

21    A    By me.

22    Q    And why did you tell him to do that?

23    A    Because that's what the City Manager asked

24    us to do.

25    Q    Earlier I asked you whether anyone had

1    ever indicated to you that the City's policy

2    regarding trespasses might be unconstitutional.

3         A    I remember you asking that, yes.

4         Q    I'm showing you the July 11th, 2019, email

5    from Josh Stone to yourself, and Mary Ferrand

6    stating, "I think I found case law that would make

7    the issuance of trespass warnings on our City owned

8    property, without due process to challenge the

9    warning, unconstitutional."  Did you receive that

10   email?

11        A    Your screen is not sharing right now, but

12   I --

13        Q    Oh, sorry.

14        A    -- think I remember what you're talking

15   about.

16        Q    Yes.  Do you recall receiving this?

17        A    Yes.

18        Q    What did you do?

19        A    I met with him and discussed that -- let's

20   see, the date on this, in 2019 -- for some reason I

21   remember this as being part of the staff review for

22   the written Directive 406, but I don't remember it

23   being 2019.  I know I had a conversation with him

24   about it, and I said to him that I don't think we

25   were having any problem because, even though we

1   don't specifically tell people what their -- what

2   their recourse is for due process, that doesn't mean

3   they don't have due process.  You still have the

4   right to due process, even though we don't

5   specifically tell them what it is.

6        Q    So, it was your opinion, in July of 2019,

7   that citizens had a right to appeal trespasses, but

8   they were entitled to written notice that they were?

9        A    They weren't entit -- oh, you mean that we

10  didn't have any obligation to tell them what their

11  appeal process was?

12       Q    Right.

13       A    Yeah, that's -- yeah, I didn't believe we

14  had -- we would be violating anyone's rights by not

15  telling them what their appeal process was.

16       Q    What was the appeal process in 2019?

17       A    They would ask the person who issued the

18  trespass warning to reconsider and rescind it.

19       Q    How would somebody who had been given a

20  trespass know that they had the ability to do that?

21       A    I suppose they could ask a lawyer.  It

22  seemed like common sense to me.

23       Q    Well, is that in any ordinance in the City

24  of Gulfport's code?

25       A    It's in the State law.

1     Q     In the State law it says that somebody can

2 appeal a trespass to the person that issued it?

3     A     No.  The State law says that if you enter

4 a property after having been warned not to enter

5 that property, then you are committing trespassing.

6 Well, then logically, if that warning is rescinded

7 by the person who issued it, then you are no longer

8 warned, and you are not trespassing.  So, the

9 natural remedy is to ask the person who issued the

10 warning to rescind it, or in the case of government

11 property, that person's boss, ultimately, the City

12 Council.  I don't -- I don't see the need to

13 specifically tell somebody what the process is or

14 was.

15     Q     Okay.  When you adopted written Director

16 406, it does say in writing that there is an appeal

17 process; correct?

18     A     Yes, it does.

19     Q     And, at some point, the City started --

20 actually, it was the police department that started

21 putting on the citations, or trespasses rather, you

22 could appeal this to the City -- City Manager;

23 correct?

24     A     Yes.

25     Q     Why did you do that?

1     A    Well, because like I answered earlier,

2  when we created the policy, we obtained drafts or

3  examples of what other cities were doing, and that

4  seemed to be something that was common, and other

5  examples of policies.

6     Q    But you didn't think it was required?

7     A    I still don't think it's required.

8     Q    Okay.  I'm going to show you another

9  document.  It's an email from Jesse Lee to you,

10  Monday, October 5th, 2020.  Underneath that, it

11  states, on Monday, October 5th, 2020, Vincent,

12  Robert Vincent wrote, with the exception of the

13  attached emails, any correspondence involving

14  Mr. Lee has already been sent to Mr. Lee.

15     A    Okay.

16     Q    Do you know what the attached emails were?

17     A    It might reference it in an earlier -- I'm

18  sure it's part of a response that I had sent to

19  somebody else in response to a question or a

20  request.

21     Q    This is --

22     A    There's more to it down there, if you

23  could scroll down there, is there not?

24     Q    There's not, Mr. Vincent, and this is how

25  it was produced to me, and so my question is:  Were

1 the attached emails ever provided to Mr. Lee?

2      A    I don't know what they are.

3      Q    Do you know if Mr. Lee was informed that

4  emails were being retained by the police department

5  based on an exemption?

6      A    If he was informed that emails were being

7  retained based on an exemption?

8      Q    Okay.  It says, with the exception of the

9  attached emails, any correspondence involving Mr.

10 Lee has already been sent to Mr. Lee?

11     A    There is no way I can answer this question

12 without seeing the -- what that is in response to.

13 I'm, obviously, answering somebody else.

14     Q    I understand, Mr. Vincent.  This is how it

15 was produced to me, so.

16     A    Well, I don't know what it's in reference

17 to.

18     Q    Okay.  Let's move on.  We already touched

19 on this earlier.  This is an email from you, copied

20 to the City Manager, sent to all police department

21 employees, dated July 26th, 2022, indicating that

22 you had clarified to Mr. Lee that the trespass

23 warning issued to him for City Hall Community

24 Development Office applies to the entire property.

25 Do you recall what was the -- what conduct by

1    Mr. Lee was the impetus for this email to be sent?

2        A    I sent -- I answered earlier where I had

3    sent him a letter or an email.  Let me see if I can

4    find that.  No, I don't remember specifically, but

5    like I said earlier, he was -- Mr. Lee was regularly

6    the topic of conversation at our weekly staff

7    meeting, because he would routinely harass members

8    of the City Staff, and I -- I'm certain several

9    members of the staff, who work in City Hall, wanted

10   to make sure that he was not allowed, not only in

11   the building, but on the property, like while they

12   were walking to their cars, to go to lunch, or

13   coming in, in the morning, or going home at the end

14   of the day, they didn't want to be harassed by him

15   in the parking lot.  That's probably --

16       Q    Do you recall any specific employees that

17   had indicated that?

18       A    Well, the City Manager's Administrative

19   Assistant is one.

20       Q    Okay.  I'm going to show you some excerpts

21   from the deposition of Mr. O'Reilly.  This was taken

22   on January 21st, 2025.  Have you spoken Mr.

23   O'Reilly since then?

24       A    No.

25       Q    So, that's a no?

1    A    No.  That's correct.  I have not.

2    Q    Okay.  So, you never discussed his

3  deposition with him?

4    A    No.

5    Q    Here I'm asking him about Mr. Lee being

6  trespassed from the casino.  Let's talk about the

7  arrest at the casino.  According to the motion that

8  was filed, police was warned, due to information

9  provided to the Police Chief suggesting Plaintiff

10  show up at a private volunteer event at the Gulfport

11  Casino not to show up to that event, and if he did

12  he would be arrested for trespassing.  Do you know

13  who provided that idea or no?  Did you have the

14  conversation with Chief Vincent about this after the

15  fact?

16            Ever, yes.

17            Tell me about that.

18            As I received a call from the Chief of

19  Police that the incident had taken place, he advised

20  me that Lee had taken -- had been taken into

21  custody.

22            Did you have any conversations with the

23  Chief of Police before the event?

24            No.

25            Did you exchange any emails with him?

1          No.

2          So, you did not have anything to do with

3   the decision to either tell Mr. Lee he could not

4   come to the casino on the 27th, or to arrest him on

5   the 27th?

6          No.

7          Would you say that that was all Chief

8   Vincent?

9          It was all the police department.

10         Can you explain to me why he testified

11   that -- to that?

12     A    I don't know.  Obviously, his memory about

13   it might be different than mine, or maybe he didn't

14   understand the question the way you worded it.  I'm

15   not sure.

16     Q    Well, you've testified that you told

17   Mr. Lee not to come to the casino based on being

18   asked to do so by the City Manager, and the City

19   Manager has said that that is not true.  Can you

20   explain the discrepancy?

21     A    I thought I just did.  Either his memory

22   is different than mine, or he did not understand the

23   question, as you worded it.

24     Q    So, on the arrest affidavit you had

25   written that Mr. O'Reilly had -- was a witness and

1  seen Mr. Lee.  Mr. O'Reilly testified that he did

2  not see Mr. Lee on that day.  Why did you put that

3  in your report?

4       A    When did I say he was a witness?  On the

5  arrest affidavit, I said that he conveyed the

6  message via me.

7       Q    You specifically listed him as a witness

8  to Mr. Lee's conduct?

9       A    You mean in the report I said he was a

10  witness?

11       Q    In the affidavit that was submitted in

12  support of Mr. Lee's arrest?

13       A    Those affidavits don't list witnesses.

14       Q    All right.  Well, I will find the document

15  for you --

16       A    Okay.

17       Q    -- later, but there are a few other things

18  I wanted to ask about.  I asked Mr. O'Reilly, are

19  you telling me, as a City Manager, you could ask

20  that a trespass be issued to a citizen and the

21  police department could tell you, no, we're not

22  going to do that?  He answered yes.  Do you agree

23  with that statement?

24       A    Yes.  That would be correct now.

25       Q    Was that the case in 2020 and '21 when

1    Mr. Lee was cited?

2         A    No.  Back then -- well, I suppose if an

3    officer responded and said, I'm not going to do

4    that, I mean, I can't imagine an officer doing that,

5    but if an officer did say that, he would have had

6    the authority to overrule the officer's decision,

7    but now that's not the case.

8         Q    At the top here, I'm referencing a message

9    via Facebook from you, that said, to Mr. Lee, I

10   would like to clarify for you again, that neither of

11   the trespass warnings you received for the City

12   building were issued by police officers.  They were

13   merely -- they were issued by administration and

14   merely delivered to you by police officers.  You are

15   correct that police officers may not issue trespass

16   warnings absent a threat to public safety but the

17   restriction does not apply to the owner or manager

18   of a property.  Is that still your position?

19        A    Well, not since that City Ordinance has

20   been passed.

21        Q    Okay.  All right.  That is all I have from

22   the transcript.  Mr. Vincent, do you know what

23   interrogatories are?

24        A    Yes.

25        Q    I'm going to show you Gulfport's response

1   to interrogatories that I served on behalf of

2   Mr. Lee.  They're signed by Mr. O'Reilly on the 17th

3   of January.  I asked why Jesse Lee was arrested on

4   April 27th.  The answer is, Plaintiff was arrested

5   for trespass because you showed up and repeatedly

6   attempt to enter a private, nonpublic event after

7   being repeatedly, asked repeatedly by law

8   enforcement to leave.  Did he repeatedly attempt to

9   enter the event?

10      A    Well, yes, as I said before, he walked up

11  to the door, and was told at the door, that he had

12  to leave.  I think Christine Brown was there, and

13  told him that he had to leave.

14      Q    Okay.  Did he repeatedly attempt to enter?

15      A    I'm not sure.  You'd have to ask her.

16      Q    Question number 14, James O'Reilly's

17  Motion to Dismiss states James O'Reilly did not

18  write out the trespass warnings or indicate its

19  duration.  The City itself, through Mr. O'Reilly,

20  never permanently barred Plaintiff from City Hall or

21  the Building Department.  Is that correct?

22      A    I think your highlighting your question,

23  not the response.

24      Q    Well, I'm asking you about a statement

25  that was made in a pleading filed by the City.  The

1   City itself, through Mr. O'Reilly, never permanently

2   barred Plaintiff from City Hall or the Building

3   Department; is that statement true or not?

4       A    He did not write up the trespass warning.

5   He did not specify the duration.  That, like I told

6   you before, is the duration of every trespass

7   warning, unless specifically requested otherwise.

8       Q    Okay.  I asked, in the next question, who

9   controls the duration of trespass warning?  Each

10  trespass case is different and requires a different

11  City official to address each trespass at an

12  individual or one-on-one basis.  But, again you,

13  told me that you weren't aware of any trespass that

14  had ever been issued that wasn't either a permanent

15  or indefinite; correct?

16      A    None that involved the police department,

17  but like I said, they didn't always call the police

18  department.  Nothing says you have to call the

19  police to give somebody a trespass warning.

20      Q    Well, if the City, or Mr. O'Reilly said

21  that it was the police department that determines

22  the duration of a trespass, would that be accurate?

23      A    Unless somebody specifically requested

24  otherwise, our practice was to make it indefinite or

25  permanent, which to me, means the same thing.

```
 1        Q    Do you ever recall ever being asked to

 2   issue one for another duration; correct?

 3        A    I don't remember that, no.  I'm sure it

 4   may have occurred, at some point, but I don't

 5   remember any.

 6        Q    Okay.  Officer Vincent, do you still have

 7   access to the emails that you sent when you were

 8   employed by the City of Gulfport?

 9        A    No.

10        Q    After Mr. Lee was arrested, did you have

11   any conversations with Justin Shea (phonetic) or

12   Shea about the boundaries of the casino?

13        A    Yes.

14        Q    Tell me about that.

15        A    Well, we agreed that when it was not being

16   used for a private event, the casino exterior was

17   open to the public.  When it was being used for a

18   private event, it depended on the specifics of the

19   private events.  Some events did not need any access

20   to the exterior.  Some events used the pad outside

21   as part the event.  So, there was no hard and fast

22   definition for what constituted the casinos.  It was

23   specific to the event that was being held there.

24        Q    Was the pad outside being used for the

25   volunteer luncheon?
```

1    A    People were congregating there as they

2    came into the event.  They were being greeted by

3    elected officials outside there.  I would say so.

4    Q    You said that you and Mr. O'Shea (sic)

5    agreed that when there's not a private event, the

6    exterior is open to the public; correct?

7    A    Yes.

8    Q    But when there is a private event, it

9    might or might not be?

10   A    It depends on what the use of the private

11   event is, yes.

12   Q    Because the two of you agreed on that, is

13   that in any ordinance?

14   A    No.

15   Q    Is that in any written policy?

16   A    No.  There are examples of event plans

17   that depict events using that pad.  He showed me

18   some of those.

19   Q    Did the event plan depict, or the luncheon

20   depict using the pad?

21   A    I'm not sure there was a written-up event

22   plan for the luncheon.

23   Q    Officer Vincent, do you know anything

24   about Mr. Lee having been designated as anti-LEO?

25   A    I think you're referring to the report

1   writing data base.  I think somebody put a tag on

2   his name in that data base to indicate that.

3       Q    Do you know who put that tag there or why?

4       A    I do not know why, but I would agree with

5   it.  I knew about it, and I did not object to it, if

6   that's what you mean.  Something you need to know

7   about that data base is that we don't own it.  We

8   are a very small user of it.  It's owned by Pinellas

9   County Sheriff's Office.

10      Q    Thank you.  How did you become aware that

11  Mr. Lee was designated anti-LEO?

12      A    I probably saw it when I pulled his name

13  up in the data base, at some point.

14      Q    All right.

15           MS. LAHART:  I am close to wrapping up.  I

16           need a few minutes to confer with my client, so

17           can we reconvene at 3:30?

18           MR. RING:  We're taking pretty extensive

19           breaks here, but, yeah, I guess so.

20           MS. LAHART:  Do you have someplace else

21           you need to be?

22           MR. RING:  I don't know.  I'm not going to

23           say why, you know, what I've got going on, but

24           that's fine, I guess.

25           MS. LAHART:  Thank you for permission to

1      take a break.

2                        (WHEREUPON, a brief recess was

3                        taken, after which the

4                        deposition continued.)

5      MS. LAHART:  Officer Vincent, you'll be

6      happy to know that I have only a few more

7      questions.

8           THE WITNESS:  Okay.

9      Q    (By Ms. Lahart) Was Jesse Lee ordered to

10     leave a City Council meeting for having used the

11     word shit?

12     A    Oh, my gosh.  I don't -- I know he was

13     asked to leave, but I don't remember exactly what he

14     said.  I'm sure there was a video of it.

15     Q    Okay.  Are you aware of other citizens

16     having used profanities in front of the City

17     Council?

18          MR. RING:  Object to form.

19     A    (By the Witness)  That has happened, and

20     I'm aware of people being asked -- having been asked

21     to leave as a result, yes.

22     Q    (By Ms. Lahart) Are you aware of it

23     happening and people not being asked to leave, even

24     though they used a profanity?

25     A    It may have happened.  Usually the Mayor

1   would give them a warning first.

2      Q     Uh-huh.

3      A     And then, if they did it again.

4      Q     Do you know if citizens have a

5   Constitutional Right to speak to their City Council?

6      A     I'm not sure if it's specifically

7   mentioned that they have a right to speak to their

8   City Council at the council meeting. I know in

9   Gulfport they have a public session period where

10   people are allowed to speak, and using that public

11   session period to speak, is protected by the

12   Constitution, yes.

13        MS. LAHART: Mr. Vincent, I'm sure you

14        will be happy to hear I don't have any more

15        questions, all though Mr. Ring might want to

16        ask you some questions?

17        THE WITNESS: Okay.

18        MR. RING: I have a few follow-up

19        questions for you.

20               **CROSS-EXAMINATION**

21   BY MR. RING:

22      Q     Isn't it true that Mr. Lee was demanding

23   in-person service on September 4th, 2020, at the

24   Building Department, even though they were closed

25   for in-person due to Covid?

1    A    That's what I was told by Mr. Metcalf and

2  that's what the investigation revealed, yes.

3    Q    Hadn't Mr. Lee been arrested for battery

4  on a law enforcement officer, which battery occurred

5  at City Hall, before he was ever trespassed from the

6  complex the second time, on September 14th, 2021?

7    A    Yes.  That's correct.

8    Q    Would it be accurate to say that members

9  of your department and/or City Hall received death

10  threats in response to some of the false and/or

11  misleading publicity Mr. Lee has sought to

12  effectuate in response to the City's actions?

13    A    Yes.  That is correct.

14    Q    As for the scene of arrest at that

15  volunteer luncheon, regardless of the source of the

16  tip, he showed up as predicted, a fair statement?

17    A    Yes.  That's correct.

18    Q    Wasn't he given another verbal trespass

19  warning before he was ever arrested that day?

20    A    Yes.  I gave him several.

21    Q    Would it be a fair statement to say that

22  Mr. Lee has harassed you on numerous occasions?

23    A    That would be accurate.

24    Q    Has he called you names and cursed at you?

25    A    Many times.

1      Q      Would it be a fair statement to say that
2    at the February 15th, 2022 City Council meeting Mr.
3    Lee attended, he was harassing you by standing
4    almost on your person or potentially on top of you
5    and filming what you were doing on your tablet,
6    which was presumably a City owned device?
7      A      Yes.  That's correct.
8      Q      Have you had other people do that to you?
9    Is that a common thing?
10     A      No.  I've never had anybody stand that
11   close to me and film me, as he did.  I've had people
12   call me names and curse at me, but not to the extent
13   that he has.
14     Q      I mean, wouldn't it be common sense and
15   just public decency and decorum to not basically
16   stand right on top of you?
17     A      You would think.  I would think.
18     Q      Are you aware of Mr. Lee having harassed
19   and berated a number of your officers?
20     A      Many.  Most of them.
21     Q      Do you recall Mr. Lee seemingly,
22   intentionally clogging up police phone lines, for
23   extend periods, at some point, in 2021 and 2022?
24     A      He did that many times.
25     Q      Do you think Mr. Lee engaged you in a

1    dignified and respectful manner throughout your

2    dealings with him when you were the Police Chief for

3    the City of Gulfport?

4         A    No, he did not.

5         Q    Isn't it a fair statement that Mr. Lee

6    harassed some members of the staff of the Gulfport

7    City Hall so strongly, and in such a confrontational

8    manner that you had to take over the processing of

9    certain public records requests so as to avoid

10   causing those people to be made to feel threatened

11   by him so frequently?

12        A    That's true.

13        Q    Isn't it true that mobile vendors can

14   operate on private property with permission of the

15   owner?

16        A    As long as they're in a commercial zone,

17   yes.

18        Q    When you say the City Manager can trespass

19   someone for no reason, or was able to, prior to

20   enactment of the ordinance, do you mean that the

21   City Manager need not tell the person delivering the

22   message why he's trespassing them?

23        A    Yes.  That's correct.

24        Q    In other words, the City Manager may have

25   a reason, but he doesn't need to give that to

1   whoever is delivering it?

2       A    Correct.  I would assume he would have a

3   reason, but the police officer who would respond to

4   the call to issue the warning would have no reason

5   to confirm what that reason is.

6       Q    But he's one who's in charge of City Hall,

7   to it's his purview to trespass people who he deems

8   a nuisance to the operations there; right?

9       A    Correct.

10          MR. RING:  I don't have any further

11      questions for you, sir.

12          THE WITNESS:  Okay.

13          MR. RING:  Thank you.

14          MR. DONOVAN:  Are we done, or do I need to

15      wait for any follow-up from Ms. LaHart?

16          MS. LAHART:  I have no follow-up.  We're

17      done.  Thank you.

18          THE WITNESS:  All right.  Thank you all.

19       (WHEREUPON:  The deposition was concluded).

20

21

22

23

24

25

# **E R R A T A   S H E E T**

WITNESS:

ROBERT VINCENT

          I hereby certify that I have read the attached

pages, numbered 1 through 77 inclusive; and the testimony

contained therein is TRUE and CORRECT except for the changes

shown below, if any:

<u>PAGE NO.</u>    <u>LINE NO.</u>     <u>CORRECTIONS/COMMENTS</u>

_____
ROBERT VINCENT


SWORN AND SUBSCRIBED before me this the _____ day of April,
2025

_____
NOTARY PUBLIC, STATE OF FLORIDA
MY COMMISSION EXPIRES:

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ESCAMBIA

I, the undersigned authority, certify that ROBERT
VINCENT personally before me via Zoom
videoconference and was duly sworn.

WITNESS my hand and official seal this 21st day of
April, 2025.

*/s/Elaine Richbourg*

_____

ELAINE RICHBOURG

1

2                    **REPORTER'S DEPOSITION CERTIFICATE**

3

4    I, ELAINE RICHBOURG, Court Reporter, certify that I
          was authorized to and did stenographically
5         report the foregoing deposition of ROBERT
          VINCENT; and that a review of the transcript
6         was not requested; and that the transcript is a
          true and complete record of my stenographic
7         notes.

8    I further certify that I am not a relative,
          employee, attorney, or counsel of any of the
9         parties, attorney or counsel connected with the
          action, nor am I financially interested in the
10        action.

11

12        Dated this 21st day of April, 2025.

13                   */s/Elaine Richbourg*

14        _____

15             ELAINE RICHBOURG, COURT REPORTER

16

17

18

19

20

21

22

23

24

25